**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# A



1156 Van Buren Funding Agreement

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

Docusign Envelope ID: 4A3CD07C-BD2B-460F-8B39-61DFFE6DAA2E

# FUNDING AGREEMENT
## (Real Estate)

**THIS FUNDING AGREEMENT** ("Agreement") is effective as of the latest date this Agreement is executed by the Parties as set forth below (the "Effective Date").

**1. BASIC TERMS**. This <u>Section 1</u> defines the Basic Terms of this Agreement.

1.1 Property:  **1156 Van Buren St, Gary, IN 46407**

1.2 Parties:  **PARTY A:**
**Name:** CeeKou LLC
**Address:** 5720B Brown Ave. Unit B, Fort Knox, KY 40121
**Email:** management@gostarpoint.com
**Phone:** (321) 378-5722

**PARTY B:**
**Name:** Simaya Innovations LLC
**Address:**  1170 Gaylord St., Denver, CO 80210
**Email:** crystaltkac@gmail.com
**Phone:** (303) 621-5738

1.3 Title to the Property shall be held in the name of: CeeKou LLC

1.4 Closing Date of Transaction: August 8, 2025

**Title Company:** True Title Service LLC
**Phone:** (812) 402-6555
**Escrow Agent:** Jamie Smith (Jamie@TrueTitleIN.com)

1.5 Allocation of Expenses: The payment of Expenses will be allocated as follows:

☒ Party A funding: all amounts exceeding the **$45,000.00** capital investment of Party B

☒ Party B funding: will not exceed **$45,000.00** for all expenses related to the property acquisition, closing costs, TC fees and property renovation costs.

1

Parties' Initials:

Docusign Envelope ID: 4A3CD07C-BD2B-460F-8B39-61DFFE6DAA2E

1.6 Compensation Prior to Allocation of Profit:

⊠ One or more of the Parties shall be compensated on their investment prior to the allocation of Profit as follows:

⊠ Party B is entitled to receive the return of their funding contribution in the amount of **$45,000.00**, a compensation of **$8,550.00**.

1.7 Profit shall be allocated as follows:

⊠ Party A shall receive the remaining distributable profits after satisfying Party B's, returns as outlined in Section 1.6, along with closing costs, liens, taxes, and judgments.

1.8 Additional Terms and Conditions:

- **This Funding Agreement** is entered into between Party A, as the Project Operator, and Party B referred to as the Capital Partners, each solely acting in the capacity of a secured lender for the Property described in Section 1.1.
- The Parties acknowledge that Party B is acting exclusively as a secured lender providing capital. Nothing in this Agreement shall be construed to create a general partnership, joint venture, or fiduciary relationship between the Capital Partner and the Project Operator with respect to the ownership, operation, management, or disposition of the Property. Party A agrees to indemnify and hold harmless Party B from any and all liabilities, claims, liens, costs, or losses related to the Project or the Property.

**Financial Contribution from Party B:**
- **Initial Contribution:**
  - Party B shall contribute their funding amount, as outlined in Section 1.5, no later than one (1) business day prior to the scheduled close of escrow for the property described in Section 1.1.
  - All funds shall be wired directly to the Title Company designated in Section 1.4, and to no other party.
  - In the event escrow fails to close Party B shall be entitled to the full return of their initial funding contribution, as outlined in Section 1.5, within forty-eight (48) hours of notification of cancellation.
  - From the total capital contribution described in Section 1.5, a sum of **$45,000.00** shall be immediately designated and made available for use. This amount shall be allocated to cover expenses including, but not limited to, property acquisition, closing costs, holding costs, insurance, Transaction Coordinator (TC) fees, and construction or renovation costs.

2

Parties' Initials:

Docusign Envelope ID: 4A3CD07C-BD2B-460F-8B39-61DFFE6DAA2E

- **Payment Timelines:**
  - Maturity date is November 7, 2025.
  - Grace period of 10 calendar days
  - All sums outlined in Section 1.6 for Party B shall be disbursed in full on or before the maturity date, subsequent to the initial closing of the property purchase.
  - All payments of funding contribution, compensation, extension fees and late fees hereunder shall be made when due without set-off, counterclaim or any other deduction whatsoever in immediately available funds to Party B by **electronic means (wire transfer or ACH) only.**

- **Compensation:**
  - Upon the sale or refinancing of the property, Party B shall first receive their initial contribution and compensation as outlined in Section 1.6, along with any late/extension fees, before any compensation or profits are allocated to Party A.

- **Late/Extension Fees**:
  - There will be no late fees or extension fees given to Party B

**Responsibility of Party A:**

1. **Transaction Coordinator**
   - Party A is accountable for settling the outstanding balance for the fees associated with the TC.
2. **Insurance:**
   - Party A shall at its sole cost and expense, keep the Premises insured against all hazards as is customary and reasonable for properties of similar type and nature located in the county where the Premises is located.
   - Party A shall procure and maintain the requisite insurance coverage necessary for a property under construction, ensuring compliance with all applicable legal requirements.
   - Party A is obligated to include Party B as a lien holder on the insurance policy. Party A must provide Party B with a copy of the insurance policy's declaration page upon the policy activation or renewal.

3. **Budget and Timeline Management:**
   - Party A shall be solely responsible for any cost overruns beyond the original agreed-upon funding amount. Party B shall not be required to contribute additional funds unless expressly agreed to in writing by both parties.
   - Party A agrees to complete the refinancing, sale, or replacement of Party B as the Capital Partner within the three (3) month timeframe specified in this agreement.

4. **Project Management:** Party A is hereby tasked with the onsite management and supervision of the property's renovations, assuming full responsibility for all project

3

Parties' Initials:

Docusign Envelope ID: 4A3CD07C-BD2B-460F-8B39-61DFFE6DAA2E

related activities from the close of escrow for the property purchase to the close of escrow for its refinance. This includes but is not limited to, the following obligations:

- Providing weekly updates and progress photos through text message.
- Timely remittance of payment to all contractors and subcontractors, contingent upon the receipt of lien waivers in exchange. Party A to collect lien waivers from contractors and subs prior to disbursing final rehab payments or listing/refinance.
- Party A to obtain all required permits, inspections, and code approvals from the city/fire department as needed, and to cover any associated costs or penalties.
- Party A is responsible for obtaining fire clearance or certificate of occupancy after construction.

**Collateral and Security:**

1. **Title Commitment:** A Title Commitment will be executed and provided to Party B with the closing loan packet.
2. **Recorded Lien / Security Instrument:** A First Position Lien Deed of Trust / Mortgage will be filed and recorded by the Title company against the property as delineated in line 1.1 of this agreement for Party B.
3. **Promissory Note and Personal Guarantees:** A Promissory Note and Personal Guarantee(s) will be executed by Party A for Party B.
4. **Lenders Title Policy:** A Lender's Title policy will be provided by the title company.
5. **Builder's Insurance Policy:** Party A shall add Party B to their builder's insurance policy as a loss payee for the total amount funded.
6. **No Loan Modification or Additional Liens:** Party A agrees that no loan modifications or additional liens maybe taken out against the property until Party B has been paid.
7. **Closing Documents:** An electronic set of the signed closing loan document will be sent to Party B by the TC. A set of the executed wet signature closing loan documents shall be sent by the title company to Party B at the address delineated in Section 1.2. Party B assumes responsibility for the safekeeping of said documents if legal action becomes necessary.

**Acknowledgment of Lien and Release Conditions:**

1. **Acknowledgment of Lien:**
   - Party A acknowledges that Party B has imposed a First position lien on the property delineated in Section 1.1.

2. **Conditions for Lien Release:**
   - After the full payment has been received by Party B as specified in this Funding agreement and the accompanying Mortgage and Promissory Note action will be taken to effectuate the release of the lien.
3. **Completing the Satisfaction of Mortgage (Lien Release):**
   - Upon receipt of full repayment of the Loan, including all principal, interest, fees, and any other amounts due, Party B shall prepare and execute a Satisfaction of Mortgage if one is not provided by title.

4

Parties' Initials:

Docusign Envelope ID: 4A3CD07C-BD2B-460F-8B39-61DFFE6DAA2E

- The notarized Satisfaction of Mortgage shall be delivered to Party A or the designated title company for recording within five (5) business days of full repayment.
- Party B shall bear all costs associated with the notarization fees and mailing (if a label is not provided by Title) of the wet signature copy of the Satisfaction of Mortgage.

4. **Expense of Recording:**
   - The cost associated with recording the Satisfaction of Mortgage will be borne by Party A.

**Default and Remedies Clause:**

It is expressly agreed by Party A that time is of the essence hereof. In the event the repayment extends thirty (30) days beyond the maturity date, Party B shall undertake the following actions:

- **Notice of Default:** It is expressly agreed by Party A that time is of the essence hereof. In the event of: any default in the payment of any principal, interest or other sums when due hereunder that is not cured within five (5) days of receiving notice (email is considered notice), cure or grace period provided therein, if any, the entire amount of principal, fees and interest then remaining unpaid hereunder or thereunder, at the option of Lender and without notice, shall become immediately due and payable. Any other default by Borrower must be cured within ten (10) days after receipt of notice (email is considered notice). Failure to exercise any such option shall not constitute a waiver of the right to exercise the same at a later time or in the event of any subsequent default.
- **Remedies on Continued Default:** If any Default is not cured within the allotted time, and legal procedures are instituted, Party A will be charged a minimum of **Ten Percent (10%)** of the principal amount of the loan for legal fees and penalties. If the amount exceeds **$4,500.00,** Party A will be charged actual fees.
- **Foreclosure Process:** Party B hereby reserve the unequivocal right to initiate the foreclosure process immediately upon the occurrence of a default, in accordance with applicable state laws and the terms of the Mortgage and Promissory Note.
  - o To circumvent court proceedings, Party A and Party B mutually agree to work collaboratively in transferring the deed of the property directly to Party B.

This agreement stands in effect until all parties have been compensated as indicate herein.

**2. PURPOSE OF FUNDING AGREEMENT.** The purpose of this Agreement is to document the terms under which the Capital Partners provide secured funding for the Property. This Agreement is not intended to create a joint venture, partnership, or fiduciary relationship between the Parties

5

Parties' Initials:

Docusign Envelope ID: 4A3CD07C-BD2B-460F-8B39-61DFFE6DAA2E

**3. PROJECT EXPENSES**. The term "Expenses" shall mean all amounts incurred in connection with the Project, including but not limited to costs related to acquisition, rehabilitation, holding, and disposition of the Property (e.g., insurance, property taxes, utilities, advertising, commissions, and closing costs).

Unless otherwise agreed in writing, Expenses shall be the sole responsibility of Party A. If the Capital Partners agree in writing to fund certain Expenses, such funding shall be treated as part of the secured loan balance owed by Party A and shall accrue interest accordingly

**4. REPAYMENT OF CAPITAL AND RETURN** The term "Repayment" shall refer to the total amount due to the Capital Partners, which includes the original principal amount funded plus any agreed-upon return, fees, or interest as defined in Section 1.6. The Capital Partners are entitled only to the agreed return on their capital and are not entitled to any share of profits or ongoing cash flow beyond what is expressly stated in this Agreement.

**5. ESCROW INSTRUCTIONS UPON THE SALE OR REFINANCE**. Upon sale or refinance of the Property, Party A agrees to deliver irrevocable escrow instructions to the designated closing agent. These instructions shall direct repayment to the Capital Partners of their principal and agreed return, along with any other outstanding amounts due under this Agreement, prior to any distribution of remaining funds to Party A.

**6. TERMINATION OF THIS AGREEMENT**. This Agreement shall terminate upon full repayment to the Capital Partners of all amounts due under this Agreement, or upon written mutual agreement of the Parties.

**7. RESOLUTION OF DISPUTES**. The Parties' commit to each other to resolve any issues in a commercially reasonable manner as promptly as possible. This commitment underlines the intention to handle disputes amicably and efficiently.

**8. COSTS AND ATTORNEYS' FEES**. In the event of litigation arising out of this Agreement instituted by any one of the Parties to it, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party in that litigation and the costs and attorneys' fees related to collection of any amounts awarded.

**9. NO ORAL CHANGES OR REPRESENTATIONS.** This Agreement supersedes any and all prior understandings and agreements. This Agreement may be amended or modified only in writing signed by the Parties.

**10. NOTICES**. Any and all notices, demands or requests required or permitted hereunder shall be in writing and shall be effective upon personal delivery or when sent by electronic mail addressed as follows:

To Party A: See <u>Section 1.2.</u>        To Party B: See <u>Section 1.2.</u>

Any Party may change its email address for notice by giving notice of change of email address in the manner provided above. The inability to deliver a notice because of a changed email address of which no notice was given shall not affect the effective date or effectiveness of the notice.

6

Parties' Initials:

Docusign Envelope ID: 4A3CD07C-BD2B-460F-8B39-61DFFE6DAA2E

## 11. MISCELLANEOUS.

11.1 *Assignment*. No Party may assign this Agreement without the written consent of all other Parties hereto.

11.2 *Additional Terms and Conditions*. The Parties agree to be bound by and to perform the additional terms and conditions specified in <u>Section 1.8</u>.

11.3 *Successors and Assigns*. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

11.4 *Waiver*. The waiver by any party hereto of any right granted to it hereunder shall not be deemed to be a waiver of any other right granted hereunder, nor shall the same be deemed to be a waiver of a subsequent right obtained by reason of the continuation of any matter previously waived.

11.5 *Severability*. If any provision of this Agreement or any portion of any provision of this Agreement shall be deemed to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability shall not alter the remaining portion of such provision, or any other provision hereof, as each provision of this Agreement shall be deemed severable from all other provisions hereof.

11.6 *Time is of the Essence.* Time is of the essence with respect to the performance of all terms, conditions, and provisions of this Agreement.

11.7 *Choice of Law.* This Agreement shall be governed and enforced under the laws of the state where the Property is located without regard to any conflict of law provisions.

11.8 *Counterparts*. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one instrument. The parties may execute this Agreement by electronic means and may deliver their signatures by facsimile transmission or .pdf e-mail delivery, and such transmission shall have the same effect as delivery of original signatures.

## 12. HOLD HARMLESS

12.1 *No Agency*. No services provided by Hidden Gems TC Services LLC ("Hidden Gems") shall constitute acting as a legal representative or agent of any other party, nor shall Hidden Gems have the right or authority to assume, create, or incur any liability or obligation of any kind, express or implied, in the name of or on behalf of any other party. Additionally, Hidden Gems shall not be liable for any failure or delay in performance by the parties to the agreement.

12.2 *No Legal Advice.* Any information provided by Hidden Gems does not and is not intended to constitute legal advice. All information, content, and materials provided are for general informational purposes only. Such information may include links to other third-party websites, which are solely for the convenience of the reader, user, or browser. Hidden Gems does not recommend or endorse the content of third-party sites.

12.3 *Usuary Laws.* The Parties acknowledges that each state imposes specific legal limits on maximum interest rates and allowable late fees. It is the responsibility of the Capital Partner to be

7

Parties' Initials:

Docusign Envelope ID: 4A3CD07C-BD2B-460F-8B39-61DFFE6DAA2E

aware of the usury laws of the state in which they are lending. Should the imposed fees or interest rates exceed these legal limits, the Capital Partner assumes full responsibility for any resulting legal consequences. In the event of legal action to enforce a lien, the court may refuse to allow the recovery of excessive late fees, interest, and potentially even the principal balance. Hidden Gems TC shall not be held responsible or liable for any fees or interest rates imposed that exceed the legal limits or for any legal consequences arising from such actions.

12.4 *No Financial Responsibility or Partnership.* The Parties acknowledge that certain individuals or entities involved in the transaction are acting solely in the capacity of secured lenders. Nothing in this agreement shall be construed to create a partnership, joint venture, or fiduciary duty between the Parties. Furthermore, Hidden Gems shall not be held responsible or liable for any financial losses, claims, liabilities, or damages incurred by any party, whether arising from the ownership, operation, management, or disposition of the Property or otherwise. Each Party agrees to indemnify and hold harmless Hidden Gems from any and all liabilities, claims, liens, costs, or losses associated with the transaction or the Property.

12.5 *Limitation of Liability.* Hidden Gems shall not be liable for any indirect, incidental, consequential, special, or exemplary damages arising out of or in connection with the services provided, including but not limited to, loss of profits, loss of data, or loss of business opportunities, even if such damages are foreseeable and whether or not Hidden Gems has been advised of the possibility thereof.

12.6 *Indemnification.* The parties to this agreement agree to indemnify, defend, and hold harmless Hidden Gems, its officers, directors, employees, agents, and affiliates from and against any and all claims, liabilities, damages, losses, costs, and expenses (including reasonable attorneys' fees) arising out of or in any way connected with the parties' use of the services provided by Hidden Gems, any breach by the client of this agreement, or any violation by the client of any applicable law or regulation.

12.7 *Disclaimer of Warranties.* The services provided by Hidden Gems are offered on an "as is" and "as available" basis. Hidden Gems expressly disclaims all warranties of any kind, whether express or implied. Hidden Gems makes no warranty that the services will meet the client's requirements, or that they will be uninterrupted, timely, secure, or error-free.

# SIGNATURE PAGE TO FOLLOW

8

Parties' Initials:

**By affixing your signature hereto, all parties confirm they have thoroughly reviewed the document and possess a comprehensive understanding of its terms and implications. Furthermore, all parties hereby acknowledge that they have been duly advised to seek legal counsel before entering into this agreement.**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the dates written below.

PARTY A:

CeeKou LLC, a Wyoming limited liability company

Signature: _____    Date: 8/8/2025

Name of Signer: Siyuan Zheng

Its: Partner

Signature: _____    Date: 8/8/2025

Name of Signer: Van Barker

Its: Managing Partner

PARTY B:

Simaya Innovations LLC, a Colorado limited liability company

Signature: _____    Date: 8/7/2025

Name of Signer: Crystal Cervantez-Tkac

Its: Manager

9

Parties' Initials: _____

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# B

1156 Van Buren Funding Agreement Addendum

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

Docusign Envelope ID: 6DB9AD9E-A3BC-4D59-936C-6837313C8CB7

# ADDENDUM / AMENDMENT TO THE JOINT VENTURE AGREEMENT

**THIS JOINT VENTURE AGREEMENT ADDENDUM / AMENDMENT** ("Addendum") is effective as of the latest date this Addenendum is executed by the Parties as set forth below (the "Effective Date").

1. **BASIC TERMS**. This <u>Section 1</u> defines the Basic Terms of this Addendum / Amendment

    1.1 Property:         **1156 Van Buren St, Gary, IN 46407**

    1.2 Parties:         PARTY A:

                Name: <u>CeeKou LLC</u>

                PARTY B:

                Name: <u>Simaya Innovations LLC</u>

IT IS HERBY AGREED BY AND BETWEEN ALL PARTIES AS FOLLOWS:

    1.5 Allocation of Expenses: The payment of Expenses will be allocated as follows:

        ☒ Party A funding: all amounts exceeding the **$95,000.00** capital investment of Party B

        ☒ Party B funding: will not exceed **$95,000.00** for all expenses related to the property acquisition, closing costs, TC fees and property renovation costs.

    1.6 Compensation Prior to Allocation of Profit:

        ☒ One or more of the Parties shall be compensated on their investment prior to the allocation of Profit as follows:

                ☒ Party B is entitled to receive the return of their funding contribution in the amount of **$95,000.00**, a compensation of **$18,050.00**.

All other terms and conditions of the original Joint Venture Agreement signed on DATE, 2025 shall remain unchanged.

## [SIGNATURE PAGE TO FOLLOW]

Parties' Initials:    <u>SE</u>   <u>VB</u>   <u>U</u>

Docusign Envelope ID: 6DB9AD9E-A3BC-4D59-936C-6837313C8CB7

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the dates written below.


PARTY A:

CeeKou LLC, a Wyoming limited liability company

Signature: _Siyuan Zheng_          Date: _8/21/2025_

Name of Signer: _Siyuan Zheng_

Its: _Partner_


Signature: _Van Barker_          Date: _8/22/2025_

Name of Signer: _Van Barker_

Its: _Managing Partner_


PARTY B:

Simaya Innovations LLC, a Colorado limited liability company

Signature: _____          Date: _8/21/2025_

Name of Signer: _Crystal Cervantez-Tkac_

Its: _Manager_


Parties' Initials: _SZ_ _VB_ _CC_

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# C

1156 Van Buren Promissory Note

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

PROMISSORY NOTE

**$45,000.00**                                                                 Date: August 8, 2025

**FOR VALUE RECEIVED**, the receipt and sufficiency of which is hereby acknowledged, **CEEKOU LLC**, a Wyoming limited liability company (the "Borrower"), promises to pay to the order of **SIMAYA INNOVATIONS LLC**, a Colorado limited liability company (the "Lender"), the principal sum of **FORTY-FIVE THOUSAND DOLLARS AND 00/100 ($45,000.00)** (the "Loan"), together with interest on the outstanding principal balance from the date of this Note until the Note is paid in full.

**IMPORTANT DISCLOSURE: THIS LOAN INCLUDES A BALLOON PAYMENT THAT WILL BE DUE AND PAYABLE ON November 7, 2025. FAILURE TO PAY THE BALLOON AMOUNT BY THE MATURITY DATE MAY RESULT IN FORECLOSURE PROCEEDINGS.**
This Promissory Note is executed for the purpose of financing the renovation of the property located at **1156 Van Buren St, Gary, IN 46407.**

1.       **Payment of Interest and Principal**.

The Borrower promises to pay the principal and interest due under this Note according to the following terms and conditions:

**(a)       Maturity Date**. The Borrower acknowledges and agrees that the full payment of the principal amount of this Note, along with all lending fees, accrued interest, and any other sums due under the terms of this Note, the Mortgage (the "Mortgage"), and any other security agreements securing this Note, shall be due and payable on **November 7, 2025** (the "Maturity Date"), unless otherwise paid earlier through:
(i) the refinancing of the loan secured by this Note, or
(ii) the sale of the Mortgaged Property to a third party, whichever occurs first.

This Note expressly contemplates a **balloon payment** on the Maturity Date, requiring the Borrower to pay all outstanding principal, lending fees, accrued interest, and any additional amounts owed in a single lump-sum payment. The Borrower acknowledges and agrees that failure to make such payment by the Maturity Date shall constitute an immediate **event of default** under this Note, entitling the Lender to exercise any and all rights and remedies available under this Note, the Mortgage, and applicable law, including foreclosure of the Mortgaged Property.

To the extent permitted by Indiana law, the Borrower expressly waives any rights to demand further notice of the balloon payment obligation or the Maturity Date, as such rights are hereby deemed waived upon execution of this Note. The Lender's acceptance of partial payments after the Maturity Date shall not constitute a waiver of its rights to enforce the balloon payment obligation in full.

**(b)       Rate and Payment**. The Loan includes a lending fee of **EIGHT THOUSAND, FIVE HUNDRED AND FIFTY DOLLARS AND 00/100 ($8,550.00)**. The commencement date of this Promissory Note shall be the date set forth above. The lending fee, combined with the principal loan amount, is due and payable no later than the Maturity Date. The Lenders shall not accept partial payments (whether for principal or interest) or any unscheduled payments from the Borrower without prior written consent from all Lenders.

1

(c)    **Prepayments**.

1. **Partial Prepayments**: No partial prepayments shall be accepted under this Note unless explicitly agreed to in writing by the Lender. Acceptance of any partial prepayment shall not constitute a waiver of the Lender's right to refuse future partial prepayments.

2. **Application of Partial Payments**: In the event the Lender agrees to accept a partial prepayment, such payment shall be applied in the following order of priority:

    a. First, to any amounts due under the Mortgage and other security documents securing this Note, including any fees or advances made by the Lender on behalf of the Borrower;

    b. Second, to any unpaid late charges;

    c. Third, to accrued and unpaid interest due as of the date of the prepayment; and

    d. Finally, to the outstanding principal balance.

3. **Full Prepayment**: The Borrower may pay off the Loan in full prior to the Maturity Date, provided that:

    a. The Borrower delivers written notice to the Lender at least ten (10) days before the intended payoff date;

    b. The payoff amount includes the full principal amount, all accrued and unpaid interest, any additional charges due as of the payoff date, and any applicable prepayment penalties or fees, as outlined below.

4. **Payoff Certification**: The Lender shall provide the Borrower with a written payoff statement within five (5) business days of receiving the Borrower's notice of intent to prepay. The Borrower shall rely on this payoff statement to determine the total amount required for full payment

5. **Indiana Law Compliance**: This provision complies with Indiana state law and shall be interpreted in accordance with the Uniform Commercial Code (UCC) as adopted in Indiana.

6. **No Waiver of Future Rights**: Acceptance of any prepayment, whether partial or full, shall not waive the Lender's rights under this Note or any related agreements, including the right to enforce the remaining terms and obligations in the event of a subsequent default.

(d)    **Method and Place of Payment**. All payments of principal, lending fees, interest, and any other amounts due under this Note shall be made in immediately available funds via wire transfer only, to the account(s) designated in writing by the Lender. Payments must be accompanied by any reference details or instructions specified by the Lender to ensure proper crediting.

1. **Exclusive Method of Payment**: No other methods of payment, including but not limited to cash, check, or ACH transfer, shall be accepted unless expressly agreed to in writing by the Lender.

2. **Responsibility for Payment Processing**: The Borrower shall bear any and all costs, fees, or charges associated with the processing or transmission of payments, including wire transfer fees.

3. **Timeliness**: Payments must be received by the Lender in the designated account no later than 3:00 PM Eastern Time on the due date. Payments received after this time shall be deemed received on the next business day and may incur additional interest or late fees as provided in this Note.

4. **Default for Improper Payment**: Any failure by the Borrower to comply with the payment method described herein, including any delays caused by the use of

2

unauthorized payment methods, shall constitute an event of default under this Note.

5. **Indiana UCC Compliance**: This method of payment is established in compliance with the Uniform Commercial Code (UCC) as adopted in Indiana and shall be interpreted in accordance with its provisions.

(e) <u>Acceleration Clause and Balloon Payment</u>. This loan includes a balloon payment provision. The entire outstanding principal balance, along with all accrued interest, fees, and other sums, shall be due and payable on the Maturity Date, as defined herein. Borrower acknowledges and agrees that:

1. **Enforceability of Balloon Payment**: The balloon payment is enforceable, and the Borrower is responsible for ensuring full repayment on the Maturity Date. Borrower further acknowledges that the Loan does not automatically renew and that Lender is under no obligation to refinance or extend the Loan.

2. **Acceleration Rights**: The Lender reserves the right to accelerate the loan and demand immediate payment in full of the outstanding principal, accrued interest, fees, and other sums upon the occurrence of any Event of Default, as defined in this Note.

3. **Compliance with Indiana Law**: This provision complies with Indiana Code § 24-4.5-3-304 or any applicable state statutes, and all necessary disclosures regarding the balloon payment and acceleration clause have been provided to the Borrower.

4. **Acknowledgment of Disclosure**: Borrower expressly confirms receipt of disclosures in compliance with applicable Indiana law regarding the balloon payment and acceleration clause. Borrower further acknowledges that Lender has recommended the Borrower seek independent legal counsel to review the terms of this Note.

5. **Notice Requirement**: The Lender shall provide written notice of default and an opportunity to cure as required by Indiana law, except where such notice is waived or not applicable due to the nature of the default.

6. **Surviving Obligations**: The obligations of the Borrower under this clause, including the payment of the balloon amount and any amounts due upon acceleration, shall survive any bankruptcy, insolvency, or other proceedings involving the Borrower and shall remain enforceable to the fullest extent permitted by Indiana law.

(f) <u>Late Fees/Extensions</u>. No extensions of the Maturity Date shall be granted under any circumstances. The Borrower is required to repay the full amount of the Loan, including all principal, interest, fees, and equity, on or before the Maturity Date. There are no late fees associated with this Loan; however, failure to repay the Loan in full by the Maturity Date shall constitute an immediate event of default, entitling the Lenders to exercise all rights and remedies available under this Note and applicable law.

2. <u>**Defaults and Remedies.**</u>

(a) <u>Incorporation of Documents</u>. The terms, conditions, and provisions of the Mortgage and the Personal Guarantee executed in connection with this Note are hereby expressly incorporated by reference and made an integral part of this Promissory Note as though fully set forth herein. This incorporation ensures that all obligations, covenants, warranties, representations, and remedies outlined in the Mortgage and Personal Guarantee are binding on the Borrower and any Guarantors, and are enforceable by the Lenders under the terms of this Note.

The Borrower acknowledges that any breach of the terms of the Mortgage or the Personal Guarantee shall constitute a breach of this Promissory Note, entitling the Lenders to exercise all rights and remedies available under this Note, the Mortgage, the Personal Guarantee, or applicable law. This clause is intended to provide the Lenders with additional security and enforcement mechanisms, ensuring that all remedies are cumulative and non-exclusive.

The Borrower and Guarantors further agree to execute any additional documents or amendments necessary to clarify or confirm the incorporation of these provisions, as requested by the Lenders.

**(b)    Defaults and Remedies**. The Borrower expressly acknowledges and agrees that time is of the essence with respect to this agreement. In the event of any default in the payment of principal, interest, or other sums due under this Note that is not cured within five (5) days of receiving notice (with email constituting sufficient notice), or after the expiration of any applicable cure or grace period provided herein, the entire remaining balance of principal, interest, fees, and any other amounts owed under this Note, at the sole option of the Lender and without further notice, shall become immediately due and payable. Any other non-payment default by the Borrower must be cured within ten (10) days after receipt of notice (with email constituting sufficient notice).

Failure by the Lender to exercise any such option shall not constitute a waiver of the right to exercise the same in the event of any future or continued default. If a default is not cured within the prescribed timeframe and legal action is initiated, the Borrower shall be liable for a minimum fee equal to **Ten Percent (10%)** of the principal loan amount as compensation for legal fees and penalties. Should this amount exceed **Four Thousand, Five Hundred Dollars and 00/100 ($4,500.00)**, the Borrower shall instead be responsible for the actual legal costs incurred by the Lender.

The Lender reserves the unequivocal right to initiate foreclosure proceedings immediately upon any uncured default, in compliance with applicable Indiana state laws and the terms of this Mortgage and Promissory Note. To mitigate the need for formal court foreclosure proceedings, the Borrower and Lender mutually agree to act in good faith to facilitate the direct transfer of the property deed to the Lender in the event of a default, subject to all terms and conditions stipulated herein.

**(c)    Partial Principal Repayment:** In the event that the Borrower is unable to fully repay the principal loan amount by the Maturity Date, any partial repayment of the principal shall be allocated as follows:

- **SIMAYA INNOVATIONS LLC:** 100% of the amount repaid.

This allocation shall apply to all partial principal repayments and shall remain binding until the total principal loan amount is fully satisfied. The Borrower's obligation to repay the full principal, together with any accrued interest, fees, and other amounts owed as specified under this Note, remains unaffected by this provision. This clause, including the specified allocation terms, is enforceable under the terms of this Promissory Note and the associated Mortgage Agreement

**(d)    Cumulative Remedies**. Each and every right, remedy, option, power, and benefit provided herein to the Lender shall be cumulative and shall not be exclusive of any other rights, remedies, options, powers, or benefits provided by law. Neither the failure nor delay by the Lender in exercising any right, remedy, option, power, or benefit under this agreement shall operate as a waiver of the Lender's ability to exercise the same at any future time. Furthermore, no single or partial exercise of any such right, remedy, option, power, or benefit by the Lender shall preclude or limit the Lender's ability to exercise any additional rights or remedies available

4

under this Note or applicable law.

**Notice Requirements:** All notices required under this Note, including but not limited to foreclosure notices, shall comply with applicable provisions of the Indiana Code, including Indiana Code § 32-30-10, governing foreclosure proceedings. Notices shall be provided in writing and delivered via certified mail, return receipt requested, or by any other method permitted under Indiana law. Any required publication of foreclosure notices shall conform to Indiana Code § 32-30-10-7 and related statutes, including requirements for timely and accurate publication in a newspaper of general circulation within the county where the Mortgaged Property is located.

The Borrower acknowledges and agrees that failure to respond to any notice within the specified timeframe shall result in the acceleration of all obligations under this Note, as described herein, and the initiation of legal remedies, including foreclosure.

**To CeeKou LLC:** Notices shall be sent via Certified Mail, Return Receipt Requested, to an address to be provided to the Lender, and by Email. The date the email is sent shall constitute the Notice Delivery Date.

**To Simaya Innovations LLC:** Notices shall be sent via Certified Mail, Return Receipt Requested, to an address to be provided to the Borrower, and by Email. The date the email is sent shall constitute the Notice Delivery Date.

All communications must be conducted exclusively through Email or U.S. Mail. Text messages, instant messages, or any other informal means of communication shall not be deemed proper notice under this agreement and shall not elicit a response

2. **Foreclosure.**

The Lender may initiate foreclosure proceedings in accordance with applicable Indiana law (Indiana Code § 32-30-10 et seq.) upon the occurrence of an uncured default under this Note or the Mortgage securing it. Foreclosure shall proceed judicially, as non-judicial foreclosure is not permitted in Indiana. The Borrower shall be provided with all required notices in compliance with Indiana foreclosure statutes. Such notices shall be deemed effective upon mailing to the Borrower's last known address, as provided in the Mortgage, and proof of delivery shall be retained by the Lender for evidentiary purposes.

**Judicial Foreclosure and Redemption Rights**

Foreclosure proceedings shall be conducted through the judicial system in compliance with Indiana Code § 32-30-10-3. Following the foreclosure sale, the Borrower retains statutory rights of redemption as outlined in Indiana Code § 32-30-10-14. During the redemption period, the Borrower may redeem the Mortgaged Property by paying the total amount due, including the outstanding principal balance, accrued interest, late fees, attorneys' fees, foreclosure-related expenses, and any other costs allowed under this Note, the Mortgage, or Indiana law. Failure to redeem the Mortgaged Property within the statutory redemption period shall extinguish all of the Borrower's rights, title, and interest in the Mortgaged Property.

If the proceeds of the foreclosure sale are insufficient to fully satisfy the outstanding debt, including all accrued interest, costs, and fees, the Borrower shall remain personally liable for the resulting deficiency unless expressly waived by the Lender in writing.

5

**Deed in Lieu of Foreclosure**

As an alternative to foreclosure proceedings, the Borrower and Lender may agree to execute a deed in lieu of foreclosure, provided such agreement is documented in a separate instrument signed by both parties. The deed in lieu of foreclosure shall comply with all applicable Indiana laws and the terms of this Note and the Mortgage. The Borrower acknowledges and agrees that execution of a deed in lieu of foreclosure does not automatically discharge or satisfy the Borrower's remaining debt obligations unless explicitly stated in writing by the Lender. Any remaining deficiency shall continue to be owed unless waived in writing by the Lender.

**Costs and Remedies**

All reasonable costs incurred by the Lender in connection with foreclosure proceedings—or in executing a deed in lieu of foreclosure—shall be added to the Borrower's total indebtedness secured by the Mortgage. Such costs shall bear interest at the rate specified in this Note until fully reimbursed. These costs may include, but are not limited to, attorneys' fees, court costs, publication fees, and any other expenses related to enforcing the Lender's rights under this Note or the Mortgage.

**Waiver of Claims and Defenses**

The Borrower expressly waives any and all claims, defenses, and counterclaims related to the foreclosure proceedings or the Lender's exercise of its remedies under this Note or the Mortgage, except for claims directly arising from the Lender's failure to comply with statutory notice or procedural requirements under Indiana law. Such waiver is intended to ensure the timely and efficient resolution of foreclosure actions and minimize unnecessary delays.

3.    **General Agreements**.

Borrower agrees to pay all costs and expenses, including attorneys' fees and expenses, incurred by Lender in connection with any collection, enforcement, or litigation arising out of this Note or the Mortgage. Borrower and all endorsers, guarantors, and all persons liable or to become liable under this Note hereby waive, to the fullest extent permitted by law, presentment, demand, notice of non-payment, diligence of collection, protest, notice of protest, protest of dishonor, notice of dishonor, and any other notices in connection with this Note. Borrower further waives any notice of foreclosure sale and releases any right of redemption.

This Note shall be construed and interpreted under, and governed by, the internal laws of the State of Indiana, without regard to its choice of law principles. No modification, waiver, amendment, discharge, or change of this Note shall be valid unless in writing and signed by the party against whom the enforcement of such modification, waiver, amendment, discharge, or change is sought.

Borrower and Lender affirm that each provision in this Note complies with all applicable local, state, and federal laws and judicial decisions. If any provision, or portion thereof, is found by a court of competent jurisdiction to be illegal, invalid, void, or unenforceable, it is the intent of the parties that the remaining provisions of this Note shall continue in full force and effect. Any unenforceable provision shall be reformed to the maximum extent permitted by law to reflect the original intent of the parties.

Borrower agrees that this Loan: (i) constitutes a business loan that complies with Indiana law governing commercial lending, and (ii) is an exempt transaction under the Truth in Lending Act, 15 U.S.C. Sec. 1601 et seq.

6

No agreement, term, or provision herein shall obligate Borrower to pay, nor shall Lender be entitled to receive, interest or other charges exceeding the maximum amount permitted by Indiana usury laws. In the event any interest or charges exceed such lawful limits, the excess shall automatically be applied toward the unpaid principal balance of the Loan, and any remaining amount shall be refunded to Borrower.

BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS NOTE. THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS NOTE.

Borrower irrevocably submits to the non-exclusive jurisdiction of any Indiana state or federal court for any action or proceeding arising out of this Note. Borrower waives, to the fullest extent permitted by law, any objection to venue or the removal of such action or proceeding to another jurisdiction on the basis of forum non conveniens or other grounds.

## SIGNATURE PAGE TO FOLLOW

IN WITNESS WHEREOF, Borrower has caused this Note to be executed as of the date first above written.

**BORROWER:**

CEEKOU LLC

By: _____
    Lighthouse Estates LLC, a Kentucky Limited
    Liability company by Van Barker

By: _____
    Siyuan Zheng, Duly Authorized Member

State of ___Kentucky___

County of ___Hardin___

The foregoing instrument was acknowledged before me this ___8___ day of August 2025, by ___Van Barker and Siyuan Zheng___, as a Member of CeeKou LLC, who are personally known to me or who have produced valid identification as indicated below and who affirmed that they are authorized to act on behalf of the company.

**Type of Identification Presented:** ___Drivers license___

Notary Public State of: ___Kentucky___

_____
Signature

Printed Name: ___Sarita S. Perez-Spidell___

My Commission Expires: ___June 8. 2029___

Notary ID Number: ___KYNP30876___

8

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# D

1156 Van Buren Personal Guarantee

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

# UNLIMITED PERSONAL GUARANTEE
THIS GUARANTEE dated this 8th day of August 2025

From: SIYUAN ZHENG & VAN BARKER and CEEKOU LLC (jointly and severally known as the "Guarantor" and the "Borrower")
To: SIMAYA INNOVATIONS LLC (the "Lender")

In consideration of the Lender extending a loan of **FORTY-FIVE THOUSAND DOLLARS AND 00/100 ($45,000.00)** to the Borrower, the receipt and sufficiency of which is hereby acknowledged, the Guarantor personally guarantees the prompt, full, and complete performance of any and all present and future duties, obligations, and indebtedness (the "Debt") owed to the Lender by the Borrower, including any interest, fees advanced, legal fees, and other costs incurred by the Lender, under the terms of the August 8, 2025 Promissory Note signed by the Borrower (the "Note"), and under the following terms and conditions:

1. **Guarantee of Payment:** The Guarantor unconditionally guarantees the full and prompt payment of the principal, interest, and any other sums owed under the Debt as and when they become due, in accordance with the terms and conditions provided in the Note.
2. **Waiver of Defenses:** To the fullest extent permitted by Indiana law, the Guarantor waives all defenses, counterclaims, or offsets that may be legally available to the Guarantor with respect to the payment of the Debt by the Borrower.
3. **Unlimited Guarantee:** This Personal Guarantee is an unlimited guarantee and is not limited to the amount of the loan or any specific sum.
4. **Non-Dischargeability:** The Guarantor expressly acknowledges and agrees that this Personal Guarantee constitutes a non-dischargeable obligation under any chapter of the United States Bankruptcy Code, to the fullest extent permitted by federal and Indiana law.
5. **Governing Law and Jurisdiction:** This Personal Guarantee shall be construed and governed exclusively by the laws of the State of Indiana. Any disputes arising under this Personal Guarantee shall be brought exclusively in the state or federal courts of Indiana, and the Guarantor hereby submits to the jurisdiction of such courts and waives any objection based on forum non conveniens or venue.
6. **Entire Agreement:** This Personal Guarantee embodies the entire agreement and understanding between the parties with respect to the subject matter herein. It supersedes all prior agreements and understandings, whether written or oral.

This Personal Guarantee shall be construed exclusively in accordance with, and governed by, the laws of the State of Indiana Any dispute arising hereunder may only be brought within the State Courts of the State of Indiana. This Personal Guarantee embodies the entire promise of Guarantor to personally guarantee Borrower's Debt and supersedes all prior agreements and understandings relating to the subject matter here, whether oral or in writing.

## SIGNATURE PAGE TO FOLLOW

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
Lighthouse Estates LLC, a Kentucky Limited
Liability company by Van Barker

By: _____
Siyuan Zheng, an individual

State of _Kentucky_

County of _Hardin_

THE FOREGOING INSTRUMENT was acknowledged before me this _8_ day of August 2025 by __ Van Barker and Siyuan Zheng an individual personally known to me or have produced his/her _Driver license_ as identification and represents that he/she is authorized to act on behalf of the company.

_____
Notary Public, State of: Ky

My Commission Expires: ___June 8, 2029___

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# E

210 N 26th St Louisville JV Agreement

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

# JOINT VENTURE AGREEMENT
## (Real Estate)

**THIS JOINT VENTURE AGREEMENT** ("Agreement") is effective as of the latest date this Agreement is executed by the Parties as set forth below (the "Effective Date").

**1. BASIC TERMS**. This <u>Section 1</u> defines the Basic Terms of this Agreement.

1.1 Property:                         <u>210 N 26th St, Louisville, KY 40212</u>

1.2 Parties:                          PARTY A:

Name: <u>Lighthouse Estates LLC</u>

Address: <u>5720B Brown Ave. Unit B, Fort Knox, KY 40121</u>

Email: <u>management@gostarpoint.com</u>

Phone: <u>321-378-5722</u>

PARTY B:

Name: <u>Simaya Innovations LLC</u>

Address: <u>1942 Broadway St, Suite 314C, Boulder, CO 80302</u>

Email: <u>CrystalTkac@gmail.com</u>

Phone: <u>303-621-5738</u>

PARTY C:

Name: <u>Hidden Gems Ventures LLC</u>

Address: <u>463688 State Road 200 Ste 1-350, Yulee, FL 32097</u>

Email: <u>Funding@hiddengemsventures.com</u>

Phone: <u>904-775-7884</u>

Parties' Initials:

1

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

1.3 Title to the Property shall be held in the name of:  Lighthouse Estates LLC

1.4 Closing Date of Transaction:  03-12-2025

      Title Company: Perpetual Title

      Phone: 502-749-7409

      Escrow Agent: Morris Cummins (Morris@perpetualtitle.com)

1.5 Allocation of Expenses: The payment of Expenses will be allocated as follows:

    Party A funding: all amounts exceeding the $78,000.00 capital investment of Party B.

    Party B funding:  will not exceed $65,000.00 for all expenses related to the property acquisition, closing costs, TC fees and property renovation costs.

    Party B funding:  will not exceed $13,000.00 for all expenses related to the property acquisition, closing costs, TC fees and property renovation costs.

1.6 Compensation Prior to Allocation of Profit:

  ☐ None of the Parties will be compensated on their investment prior to the allocation of Profit; or

  ☒ One or more of the Parties shall be compensated on their investment prior to the allocation of Profit as follows:

    ☒ Party B is entitled to receive the return of their funding contribution in the amount of $65,000.00 as well as a compensation of $9,750.00, in addition to extension fees.

    ☒ Party C is entitled to receive the return of their funding contribution in the amount of $13,000.00 as well as a compensation of $1,950.00, in addition to extension fees.

1.7 Profit shall be allocated as follows:

  ☒ Party A shall receive the remaining distributable profits after satisfying Party B and Party C's, returns as outlined in Section 1.6, along with closing costs, liens, taxes, and judgments.

Parties' Initials: | Initial aM | Initial Jk | Initial VB | Initial CC | DS mgd

2

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

1.8 Additional Terms and Conditions:

- This Joint Venture Agreement, executed between Party A, Party B, establishes a partnership with Party A as the Owner Partner, Party B and Party C as the Capital Partners.

**Financial Contribution from the Capital Partner:**
- **Initial Contribution:**
  - Capital Partner shall contribute their funding contribution outlined in Section 1.5 prior to close of escrow only for the property as outlined in Section 1.1.
  - The funds will be wired to the Title Company outlined in Section 1.4.
  - In the event of the failure of escrow to close Capital Partner shall be entitled to the return of their initial funding contribution as delineated in Section 1.5.
  - From the total funding contribution outlined in Section 1.5, an immediate sum of $78,000.00 shall be designated and made promptly available. This allocation covers expenses such as property acquisition, closing costs, holding costs, insurance, transaction coordinator (TC) fees, and construction/renovations, as detailed in Section 1.1

- **Payment Timelines:**
  - Maturity date is Sept 11, 2025.
  - Grace period of 10 calendar days
  - All sums outlined in Section 1.6 for Capital Partner shall be disbursed in full on or before the maturity date, subsequent to the initial closing of the property purchase.
  - All payments of funding contribution, compensation, extension fees and wire fees hereunder shall be made when due without set-off, counterclaim or any other deduction whatsoever in immediately available funds to Capital Partner by **electronic means (wire transfer or ACH) only.**

- **Compensation:**
  - Upon the refinancing (or sale) of the property, Capital Partner shall receive their initial contribution and compensation as outlined in Section 1.6, along with any extension and wire fees, before any compensation or profits are allocated to Party A.

- **Extension Fees**:
  - If Party A is unable to repay the loan with all principals, interest and fees by the Maturity Date, Party A must request an extension from the Capital Partner minimum of thirty (30) days prior to the Maturity Date. Capital Partner will guarantee only one extension of 30 days for a **fee $1.950.00**.
    - Divided as follows:
      - Party B = $1,625.00
      - Party C = $325.00

Parties' Initials: ___ Initial _aM_ Initial _Jk_ Initial _VB_ Initial _CC_ DS _mgd_

3

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

- Any extension granted will be for a period of thirty (30) days. All extension fees must be paid prior to the granting of any extension period. If Party A does not (a) request an extension (b) does not pay off loan by maturity date or (c) fails to be responsive to any communication from Capital Partner; Capital Partner(s) may automatically continue to extend the loan for thirty (30) days at a time and extensions fees will continue to accrue and will be added to the payoff amount or Capital Partner(s) may choose any and all legal remedies available to Capital Partner(s) including foreclosure.

**Responsibility of Party A:**

1. **Transaction Coordinator**
   - Party A is accountable for settling the outstanding balance for the fees associated with the TC.
2. **Insurance:**
   - Party A shall at its sole cost and expense, keep the Premises insured against all hazards as is customary and reasonable for properties of similar type and nature located in the county where the Premises is located.
   - Party A shall procure and maintain the requisite insurance coverage necessary for a property under construction, ensuring compliance with all applicable legal requirements.
   - Party A is obligated to include the Capital Partner(s) as an additional insured on the insurance policy. Party A must provide the Capital Partner(s) with a copy of the insurance policy's declaration page upon the policy activation or renewal.
3. **Budget and Timeline Management:**
   - Party A hereby undertakes to bear all additional expenses if they failure to adhere to the agreed-upon timelines or if the budgeted funds as explicitly outlined in Section 1.5 provided by Capital Partner(s) is exceeded.
   - In the event Party A is unable to furnish any additional funds to ensure project completion, all parties hereby agree to engage in renegotiate the terms outlined in this Joint Venture Agreement taking into consideration the updated funding requirements.
   - Party A hereby undertakes to effectuate the refinancing or sale of the property within the 6-month timeframe delineated by this agreement.
4. **Project Management:** Party A is hereby tasked with the onsite management and supervision of the property's renovations, assuming full responsibility for all project related activities from the close of escrow for the property purchase to the close of escrow for its sale. This includes but is not limited to, the following obligations:
   - Providing weekly updates and progress photos through text message.
   - Ensuring the timely completion of all necessary repairs and sale of the property within the 6-month timeframe stipulated by this agreement.
   - Timely remittance of payment to all contractors and subcontractors, contingent upon the receipt of lien waivers in exchange.

Parties' Initials: _aM_ _Jk_ _VB_ _CC_ _mgd_

Initial  Initial  Initial  Initial  DS

4

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

**Collateral and Security:**

1. **Title Commitment:** A Title Commitment will be executed and provided to the Capital Partner(s) with the closing packet.
2. **Promissory Note and Personal Guarantees:** A Promissory Note and Personal Guarantee(s) will be executed by Party A for the Capital Partner(s).
3. **Lenders Title Policy:** A Lender's Title policy will be provided by the title company.
4. **Recorded Lien / Security Instrument:** A First Position Lien Deed of Trust / Mortgage will be filed and recorded by the Title company against the property as delineated in line 1.1 of this agreement for the Capital Partner.
5. **Builder's Insurance Policy:** Party A shall add the Capital Partner(s) to their builder's insurance policy as a loss payee for the total amount funded.
6. **No Loan Modification or Additional Liens:** Party A agrees that no loan modifications or additional liens maybe taken out against the property until the Capital Partner has been paid.
7. **Closing Documents:** An electronic set of the signed closing loan document will be sent to Capital Partner by the TC. A set of the executed wet signature closing loan documents shall be overnighted by the title company to Capital Partner at the address delineated in Section 1.2. Party B assumes responsibility for the safekeeping of said documents if legal action becomes necessary.

**Acknowledgment of Lien and Release Conditions:**

1. **Acknowledgment of Lien:**
   - Party A acknowledges that the Capital Partner(s) collectively have imposed a First position lien on the property as delineated in Section 1.1.
2. **Conditions for Lien Release:**
   - After the full payment has been received by the Capital Partner as specified in this Joint Venture agreement and the accompanying Mortgage and Promissory Note action will be taken to effectuate the release of the lien.
3. **Recording Satisfaction of Mortgage:**
   - After the full payment has been received by the Capital Partner(s) a Satisfaction of Mortgage will be sent to Party A or title to be recorded.
4. **Expense of Recording:**
   - The cost associated with recording the Satisfaction of Mortgage will be borne by Party A.

**Default and Remedies Clause:**

It is expressly agreed by Party A that time is of the essence hereof. In the event the repayment extends thirty (30) days beyond the maturity date, Capital Partner shall undertake the following actions:

- **Notice of Default:** It is expressly agreed by Party A that time is of the essence hereof. In the event of: any default in the payment of any principal, interest or other sums when due hereunder that is not cured within five (5) days of receiving notice (email is considered notice), cure or grace period provided therein, if any, the entire amount of principal, fees and interest then remaining unpaid hereunder or thereunder, at the

Parties' Initials: _Initial_ aM  _Initial_ Jk  _Initial_ VB  _Initial_ CC  _DS_ mgd

5

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

option of Lender and without notice, shall become immediately due and payable. Any other default by Borrower must be cured within ten (10) days after receipt of notice (email is considered notice). Failure to exercise any such option shall not constitute a waiver of the right to exercise the same at a later time or in the event of any subsequent default.

- **Remedies on Continued Default:** If any Default is not cured within the allotted time, and legal procedures are instituted, Party A will be charged a minimum of Ten Percent (10%) of the Principal amount of the loan for legal fees and penalties. If the amount exceeds Seven Thousand Eight Hundred Dollars and 00/100 ($7,800.00), Party A will be charged actual fees.
- **Partial Principal Repayment:** If Party A can only repay a portion of the principal at the maturity date, the repayment shall be divided as follows
    1. Party B = 83.33%
    2. Party C = 16.67%
- **Foreclosure Process:** The Capital Partner(s) hereby reserve the unequivocal right to initiate the foreclosure process immediately upon the occurrence of a default, in accordance with applicable state laws and the terms of the Mortgage and Promissory Note.
    o To circumvent court proceedings, Party A and the Capital Partner mutually agree to work collaboratively in transferring the deed of the property directly to Capital Partner.

This agreement stands in effect until all parties have been compensated as indicate herein.

**2. PURPOSE OF JOINT VENTURE.** The purpose of this Agreement and the joint venture described herein shall be for the Parties to acquire, sell and/or hold the Property for Profit (the "Purpose of the Joint Venture").

**3. EXPENSES**. The term "Expenses" shall mean all amounts paid or incurred by the Parties for the Purpose of the Joint Venture, which Expenses include, but are not limited to, all amounts paid for the acquisition of the Property, interest on any loans obtained or consented to by the Parties related to the Property (excluding interest on any loans obtained by a Party for the purpose of paying their share of the Expenses), all costs related to the remodeling and/or rehabilitation of the Property, insurance, property taxes, utilities for the Property, advertising costs, staging costs, commissions, and closing costs for the acquisition and sale of the Property.

The Expenses shall be allocated to and paid by the Parties as set forth in Section 1.5. In the event a Party fails or refuses to pay their portion of the Expenses as required herein, the other Party(ies') may, after five (5) days written notice to the non-paying Party, pay the non-paying Party's share of the expenses in which event the Party(ies') paying the non-paying Party's expenses shall receive compensation of 15% of the amount paid on the non-paying Party's behalf prior to allocation of any Profit.

**4. PROFIT.** The term "Profit" shall mean: (A) the amount remaining from the Parties' sale of the Property after the repayment of any liens secured by the Property, payment of all Expenses related

Parties' Initials:

6

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

to the sale of the Property, repayment to the Parties for all Expenses previously paid, and the payment of compensation to any of the Parties as set forth in Sections 1.6 and 3; and/or (B) the cash flow from the Property after the repayment to the Parties for all Expenses, and the payment of compensation to any of the Parties as set forth in Sections 1.6 and 3. The Profit shall be allocated to the Parties as set forth in Section 1.6.

**5. ESCROW INSTRUCTIONS UPON THE SALE OF THE PROPERTY**. Except to the extent the Parties agree otherwise in writing, the Parties, upon the sale of the Property, shall prepare irrevocable escrow instructions setting forth the distribution of Expenses, compensation, and Profit to be paid to each Party from closing of the sale of the Property and deliver said escrow instructions to the appropriate closing agent.

**6. TERMINATION OF THIS AGREEMENT**. This Agreement shall terminate upon the sale of the Property and full payment to each Party of the amounts each Party is entitled to receive under this Agreement or upon the written agreement of the Parties.

**7. RESOLUTION OF DISPUTES**.

      7.1 *Commitment to Resolution:* The Parties' commit to each other to resolve any issues in a commercially reasonable manner as promptly as possible. This commitment underlines the intention to handle disputes amicably and efficiently.

**8. COSTS AND ATTORNEYS' FEES**. In the event of litigation arising out of this Agreement instituted by any one of the Parties to it, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party in that litigation and the costs and attorneys' fees related to collection of any amounts awarded.

**9. NO ORAL CHANGES OR REPRESENTATIONS.** This Agreement supersedes any and all prior understandings and agreements. This Agreement may be amended or modified only in writing signed by the Parties.

**10. NOTICES**. Any and all notices, demands or requests required or permitted hereunder shall be in writing and shall be effective upon personal delivery or when sent by electronic mail addressed as follows:

      To Party A: See Section 1.2.      To Party C: See Section 1.2.

      To Party B: See Section 1.2.

Any Party may change its email address for notice by giving notice of change of email address in the manner provided above. The inability to deliver a notice because of a changed email address of which no notice was given shall not affect the effective date or effectiveness of the notice.

**11. MISCELLANEOUS.**

      11.1 *Assignment*. No Party may assign this Agreement without the written consent of all other Parties hereto.

Parties' Initials:



7

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

11.2 *Additional Terms and Conditions*. The Parties agree to be bound by and to perform the additional terms and conditions specified in <u>Section 1.8</u>.

11.3 *Successors and Assigns*. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

11.4 *Waiver*. The waiver by any party hereto of any right granted to it hereunder shall not be deemed to be a waiver of any other right granted hereunder, nor shall the same be deemed to be a waiver of a subsequent right obtained by reason of the continuation of any matter previously waived.

11.5 *Severability*. If any provision of this Agreement or any portion of any provision of this Agreement shall be deemed to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability shall not alter the remaining portion of such provision, or any other provision hereof, as each provision of this Agreement shall be deemed severable from all other provisions hereof.

11.6 *Time is of the Essence.* Time is of the essence with respect to the performance of all terms, conditions, and provisions of this Agreement.

11.7 *Choice of Law.* This Agreement shall be governed and enforced under the laws of the state where the Property is located without regard to any conflict of law provisions.

11.8 *Counterparts*. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one instrument. The parties may execute this Agreement by electronic means and may deliver their signatures by facsimile transmission or .pdf e-mail delivery, and such transmission shall have the same effect as delivery of original signatures.

## 12. **HOLD HARMLESS**

12.1 *No Agency*. No services provided by Hidden Gems TC Services LLC ("Hidden Gems") shall constitute acting as a legal representative or agent of any other party, nor shall Hidden Gems have the right or authority to assume, create, or incur any liability or obligation of any kind, express or implied, in the name of or on behalf of any other party. Additionally, Hidden Gems shall not be liable for any failure or delay in performance by the parties to the agreement.

12.2 *No Legal Advice.* Any information provided by Hidden Gems does not and is not intended to constitute legal advice. All information, content, and materials provided are for general informational purposes only. Such information may include links to other third-party websites, which are solely for the convenience of the reader, user, or browser. Hidden Gems does not recommend or endorse the content of third-party sites.

12.3 *Usury Laws.* The Parties acknowledges that each state imposes specific legal limits on maximum interest rates and allowable late fees. It is the responsibility of the Capital Partner to be aware of the usury laws of the state in which they are lending. Should the imposed fees or interest rates exceed these legal limits, the Capital Partner assumes full responsibility for any resulting legal consequences. In the event of legal action to enforce a lien, the court may refuse to allow the recovery of excessive late fees, interest, and potentially even the principal balance. Hidden Gems

Parties' Initials:

8

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

TC shall not be held responsible or liable for any fees or interest rates imposed that exceed the legal limits or for any legal consequences arising from such actions.

12.4 *Limitation of Liability.* Hidden Gems shall not be liable for any indirect, incidental, consequential, special, or exemplary damages arising out of or in connection with the services provided, including but not limited to, loss of profits, loss of data, or loss of business opportunities, even if such damages are foreseeable and whether or not Hidden Gems has been advised of the possibility thereof.

12.5 *Indemnification.* The parties to this agreement agree to indemnify, defend, and hold harmless Hidden Gems, its officers, directors, employees, agents, and affiliates from and against any and all claims, liabilities, damages, losses, costs, and expenses (including reasonable attorneys' fees) arising out of or in any way connected with the parties' use of the services provided by Hidden Gems, any breach by the client of this agreement, or any violation by the client of any applicable law or regulation.

12.6 *Disclaimer of Warranties.* The services provided by Hidden Gems are offered on an "as is" and "as available" basis. Hidden Gems expressly disclaims all warranties of any kind, whether express or implied. Hidden Gems makes no warranty that the services will meet the client's requirements, or that they will be uninterrupted, timely, secure, or error-free.

## *[SIGNATURE PAGES TO FOLLOW]*

Parties' Initials:

9

**By affixing your signature hereto, all parties confirm they have thoroughly reviewed the document and possess a comprehensive understanding of its terms and implications. Furthermore, all parties hereby acknowledge that they have been duly advised to seek legal counsel before entering into this agreement.**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the dates written below.

PARTY A:

Lighthouse Estates LLC, a Kentucky limited liability company

Signature: _Ariel Mermelshtayn_    Date: 3/11/2025

Name of Signer: Ariel Mermelshtayn

Its: Partner

Signature: _Josh Kennedy_    Date: 3/11/2025

Name of Signer: Josh Kennedy

Its: Partner

Signature: _Van Barker_    Date: 3/11/2025

Name of Signer: Van Barker

Its: Managing Partner

PARTY B:

Simaya Innovations LLC, a Colorado limited liability company

Signature: _[signature]_    Date: 3/11/2025

Name of Signer: Crystal Cervantez-Tkac

Its: Manager

Parties' Initials: AM  JK  VB  CC  mgd

10

Docusign Envelope ID: B8845B79-E4F3-4374-928F-9AAD3D0426F5

PARTY B:

Hidden Gems Ventures LLC, a Florida limited liability company

Signature: *Marcia Donaldson*
DocuSigned by:
0AE3110359E146F...

Date: 3/11/2025

Name of Signer: Marcia Donaldson

Its: Managing Member

Parties' Initials: [Initial] aM [Initial] Jk [Initial] VB [Initial] CC [DS] mgd

11

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# F



210 N 26th St Louisville Promissory Note

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

PROMISSORY NOTE

**$78,000.00**                                                       Date: March 12, 2025

**FOR VALUE RECEIVED**, the receipt and sufficiency of which is hereby acknowledged, **LIGHTHOUSE ESTATES LLC,** a Kentucky limited liability company (the "Borrower"), promises to pay to the order of **SIMAYA INNOVATIONS LLC** ("SIMAYA"), a Colorado limited liability company and HIDDEN GEMS VENTURES LLC ("GEMS"), a Florida limited liability company (collectively, the "Lender"), the principal sum of **SEVENTY-EIGHT THOUSAND DOLLARS AND 00/100 ($78,000.00)** (the "Loan"), allocated as follows:

- **SIMAYA:**    Sixty-Five Thousand Dollars and 00/100 ($65,000.00)
- **GEMS:**      Thirteen Thousand Dollars and 00/100 ($13,000.00)

together with interest on the outstanding principal balance from the date of this Note until the Note is paid in full.
**IMPORTANT DISCLOSURE: THIS LOAN INCLUDES A BALLOON PAYMENT THAT WILL BE DUE AND PAYABLE ON SEPTEMBER 11, 2025. FAILURE TO PAY THE BALLOON AMOUNT BY THE MATURITY DATE MAY RESULT IN FORECLOSURE PROCEEDINGS.**
This Promissory Note is executed for the purpose of financing the purchase and renovation of the property located at **210 N 26th Street, Louisville, KY 40212.**

1.      **Payment of Interest and Principal**.

The Borrower promises to pay the principal and interest due under this Note according to the following terms and conditions:

(a)      **Maturity Date**. The Borrower acknowledges and agrees that the full payment of the principal amount of this Note, along with all lending fees, accrued interest, and any other sums due under the terms of this Note, the Mortgage (the "Mortgage"), and any other security agreements securing this Note, shall be due and payable on **September 11, 2025** (the "Maturity Date"), unless otherwise paid earlier through:
(i) the refinancing of the loan secured by this Note, or
(ii) the sale of the Mortgaged Property to a third party, whichever occurs first.

This Note expressly contemplates a **balloon payment** on the Maturity Date, requiring the Borrower to pay all outstanding principal, lending fees, accrued interest, and any additional amounts owed in a single lump-sum payment. The Borrower acknowledges and agrees that failure to make such payment by the Maturity Date shall constitute an immediate **event of default** under this Note, entitling the Lender to exercise any and all rights and remedies available under this Note, the Mortgage, and applicable law, including foreclosure of the Mortgaged Property.

To the extent permitted by Kentucky law, the Borrower expressly waives any rights to demand further notice of the balloon payment obligation or the Maturity Date, as such rights are hereby deemed waived upon execution of this Note. The Lender's acceptance of partial payments after the Maturity Date shall not constitute a waiver of its rights to enforce the balloon payment obligation in full.

(b)      **Rate and Payment**. The Loan includes a lending fee of **ELEVEN THOUSAND SEVEN HUNDRED DOLLARS AND 00/100 ($11,700.00)**, allocated as follows:

1

- **SIMAYA:**     Nine Thousand Seven Hundred Fifty Dollars and 00/100 ($9,750.00)
- **GEMS:**     One Thousand Nine Hundred Fifty Dollars and 00/100 ($1,950.00)

The commencement date of this Promissory Note shall be the date set forth above. The lending fee, combined with the principal loan amount, is due and payable no later than the Maturity Date. The Lenders shall not accept partial payments (whether for principal or interest) or any unscheduled payments from the Borrower without prior written consent from all Lenders.

(c)     **Prepayments**.

1. **Partial Prepayments**: No partial prepayments shall be accepted under this Note unless explicitly agreed to in writing by the Lender. Acceptance of any partial prepayment shall not constitute a waiver of the Lender's right to refuse future partial prepayments.

2. **Application of Partial Payments**: In the event the Lender agrees to accept a partial prepayment, such payment shall be applied in the following order of priority:

   a. First, to any amounts due under the Mortgage and other security documents securing this Note, including any fees or advances made by the Lender on behalf of the Borrower;

   b. Second, to any unpaid late charges;

   c. Third, to accrued and unpaid interest due as of the date of the prepayment; and

   d. Finally, to the outstanding principal balance.

3. **Full Prepayment**: The Borrower may pay off the Loan in full prior to the Maturity Date, provided that:

   a. The Borrower delivers written notice to the Lender at least ten (10) days before the intended payoff date;

   b. The payoff amount includes the full principal amount, all accrued and unpaid interest, any additional charges due as of the payoff date, and any applicable prepayment penalties or fees, as outlined below.

4. **Payoff Certification**: The Lender shall provide the Borrower with a written payoff statement within five (5) business days of receiving the Borrower's notice of intent to prepay. The Borrower shall rely on this payoff statement to determine the total amount required for full payment

5. **Kentucky Law Compliance**: This provision complies with **Kentucky state law** and shall be interpreted in accordance with the **Kentucky Uniform Commercial Code (UCC)** and applicable provisions of **KRS Chapter 286** governing mortgage lending and secured transactions

6. **No Waiver of Future Rights**: Acceptance of any prepayment, whether partial or full, shall not waive the Lender's rights under this Note or any related agreements, including the right to enforce the remaining terms and obligations in the event of a subsequent default.

(d)     **Method and Place of Payment**. All payments of principal, lending fees, interest, and any other amounts due under this Note shall be made in immediately available funds via wire transfer only, to the account(s) designated in writing by the Lender. Payments must be accompanied by any reference details or instructions specified by the Lender to ensure proper crediting.

1. **Exclusive Method of Payment**: No other methods of payment, including but not limited to cash, check, or ACH transfer, shall be accepted unless expressly agreed to in writing by the Lender.

2

2. **Responsibility for Payment Processing**: The Borrower shall bear any and all costs, fees, or charges associated with the processing or transmission of payments, including wire transfer fees.

3. **Timeliness**: Payments must be received by the Lender in the designated account no later than 3:00 PM Eastern Time on the due date. Payments received after this time shall be deemed received on the next business day and may incur additional interest or late fees as provided in this Note.

4. **Default for Improper Payment**: Any failure by the Borrower to comply with the payment method described herein, including any delays caused by the use of unauthorized payment methods, shall constitute an event of default under this Note.

5. **Kentucky UCC Compliance**: This method of payment is established in compliance with the **Uniform Commercial Code (UCC) as adopted in Kentucky** and shall be interpreted in accordance with its provisions, along with applicable regulations under **KRS Chapter 286** governing secured transactions and lending practices.

(e)    **Acceleration Clause and Balloon Payment**. This loan includes a balloon payment provision. The entire outstanding principal balance, along with all accrued interest, fees, and other sums, shall be due and payable on the Maturity Date, as defined herein. Borrower acknowledges and agrees that:

1. **Enforceability of Balloon Payment**: The balloon payment is enforceable, and the Borrower is responsible for ensuring full repayment on the Maturity Date. Borrower further acknowledges that the Loan does not automatically renew and that Lender is under no obligation to refinance or extend the Loan.

2. **Acceleration Rights**: The Lender reserves the right to accelerate the loan and demand immediate payment in full of the outstanding principal, accrued interest, fees, and other sums upon the occurrence of any Event of Default, as defined in this Note.

3. **Compliance with Kentucky Law**: This provision complies with **Kentucky state law**, including **KRS Chapter 286** governing secured transactions and lending practices, and all necessary disclosures regarding the **balloon payment and acceleration clause** have been provided to the Borrower.

4. **Acknowledgment of Disclosure**: Borrower expressly confirms receipt of disclosures in compliance with applicable Kentucky law regarding the balloon payment and acceleration clause. Borrower further acknowledges that Lender has recommended the Borrower seek independent legal counsel to review the terms of this Note.

5. **Notice Requirement**: The Lender shall provide written notice of default and an opportunity to cure as required by Kentucky law, except where such notice is waived or not applicable due to the nature of the default.

6. **Surviving Obligations**: The obligations of the Borrower under this clause, including the payment of the balloon amount and any amounts due upon acceleration, shall survive any bankruptcy, insolvency, or other proceedings involving the Borrower and shall remain enforceable to the fullest extent permitted by Kentucky law.

(f)    **Extensions**. If the Borrower anticipates being unable to repay the Loan, including all principal, interest, fees, and equity, by the Maturity Date, the Borrower must provide written notice to the Lenders no less than thirty (30) days prior to the Maturity Date. Upon receipt of such notice, the Lenders may, at their sole discretion, consider granting an extension of the

3

Maturity Date. The granting of an extension is not guaranteed and is subject to the following terms and conditions:

1.  **Extension Period:**
    Each approved extension shall be for a period of one (1) month. Any request for an additional extension beyond the initial period must be submitted separately and is subject to the Lenders' approval under the same terms and conditions.

2.  **Extension Fees:**
    Each extension shall incur a non-refundable extension fee of **One Thousand Nine Hundred Fifty Dollars and 00/100 ($1950.00)**, allocated among the Lenders as follows:
    - **SIMAYA**: One Thousand Six Hundred Twenty-Five Dollars and 00/100 ($1,625.00)
    - **GEMS**: Three Hundred Twenty-Five Dollars and 00/100 ($325.00)
    
    The extension fee must be paid in full, in immediately available funds, and received by the Lenders prior to the commencement of any approved extension period.

3.  **Written Confirmation:**
    No extension shall be valid or enforceable unless confirmed in writing by the Lenders. Any verbal agreement or understanding regarding an extension shall be null and void.

4.  **Non-Refundable Fees:**
    All extension fees are non-refundable and shall not reduce the principal balance, interest, or any other amounts owed under this Note.

5.  **Failure to Comply:**
    If the Borrower fails to adhere to these extension requirements, including timely notice and payment of the extension fee, the Loan shall remain due and payable on the original Maturity Date, with all applicable penalties and remedies available to the Lenders in the event of default.

6.  **Lender's Sole Discretion:**
    The Lenders retain the exclusive right to approve or deny any extension request, and any denial shall not be construed as a waiver of the Borrower's obligations under this Note, the Mortgage, or any related documents.

2.  **Defaults and Remedies.**

(a)    **Incorporation of Documents.** The terms, conditions, and provisions of the Mortgage and the Personal Guarantee executed in connection with this Note are hereby expressly incorporated by reference and made an integral part of this Promissory Note as though fully set forth herein. This incorporation ensures that all obligations, covenants, warranties, representations, and remedies outlined in the Mortgage and Personal Guarantee are binding on the Borrower and any Guarantors, and are enforceable by the Lenders under the terms of this Note.

The Borrower acknowledges that any breach of the terms of the Mortgage or the Personal Guarantee shall constitute a breach of this Promissory Note, entitling the Lenders to exercise all rights and remedies available under this Note, the Mortgage, the Personal Guarantee, or applicable law. This clause is intended to provide the Lenders with additional security and enforcement mechanisms, ensuring that all remedies are cumulative and non-exclusive.

The Borrower and Guarantors further agree to execute any additional documents or amendments necessary to clarify or confirm the incorporation of these provisions, as requested by the Lenders.

4

(b)     **Defaults and Remedies**. The Borrower expressly acknowledges and agrees that time is of the essence with respect to this agreement. In the event of any default in the payment of principal, interest, or other sums due under this Note that is not cured within five (5) days of receiving notice (with email constituting sufficient notice), or after the expiration of any applicable cure or grace period provided herein, the entire remaining balance of principal, interest, fees, and any other amounts owed under this Note, at the sole option of the Lender and without further notice, shall become immediately due and payable. Any other non-payment default by the Borrower must be cured within ten (10) days after receipt of notice (with email constituting sufficient notice).

Failure by the Lender to exercise any such option shall not constitute a waiver of the right to exercise the same in the event of any future or continued default. If a default is not cured within the prescribed timeframe and legal action is initiated, the Borrower shall be liable for a minimum fee equal to Ten Percent (10%) of the principal loan amount as compensation for legal fees and penalties. Should this amount exceed Seven Thousand Eight Hundred Dollars and 00/100 ($7,800.00), the Borrower shall instead be responsible for the actual legal costs incurred by the Lender.

The Lender reserves the unequivocal right to initiate foreclosure proceedings immediately upon any uncured default, in compliance with applicable Kentucky state laws and the terms of this Mortgage and Promissory Note. To mitigate the need for formal court foreclosure proceedings, the Borrower and Lender mutually agree to act in good faith to facilitate the direct transfer of the property deed to the Lender in the event of a default, subject to all terms and conditions stipulated herein.

(c)     **Partial Principal Repayment:** In the event that the Borrower is unable to fully repay the principal loan amount by the Maturity Date, any partial repayment of the principal shall be allocated as follows:
   * **SIMAYA:** 83.33% of the amount repaid.
   * **GEMS:** 16.67% of the amount repaid.

This allocation shall apply to all partial principal repayments and shall remain binding until the total principal loan amount is fully satisfied. The Borrower's obligation to repay the full principal, together with any accrued interest, fees, and other amounts owed as specified under this Note, remains unaffected by this provision. This clause, including the specified allocation terms, is enforceable under the terms of this Promissory Note and the associated Mortgage Agreement

(d)     **Cumulative Remedies**. Each and every right, remedy, option, power, and benefit provided herein to the Lender shall be cumulative and shall not be exclusive of any other rights, remedies, options, powers, or benefits provided by law. Neither the failure nor delay by the Lender in exercising any right, remedy, option, power, or benefit under this agreement shall operate as a waiver of the Lender's ability to exercise the same at any future time. Furthermore, no single or partial exercise of any such right, remedy, option, power, or benefit by the Lender shall preclude or limit the Lender's ability to exercise any additional rights or remedies available under this Note or applicable law.

**Notice Requirements:** All notices required under this Note, including but not limited to foreclosure notices, shall comply with applicable provisions of the Kentucky Revised Statutes (KRS), including KRS Chapter 426, governing foreclosure proceedings. Notices shall be provided in writing and delivered via certified mail, return receipt requested, or by any other method permitted under Kentucky law.

Any required publication of foreclosure notices shall conform to KRS 426.560 and related statutes, including requirements for timely and accurate publication in a newspaper of general circulation within the county where the mortgaged property is located.

The borrower acknowledges and agrees that failure to respond to any notice within the specified timeframe shall result in the acceleration of all obligations under this Note, as described herein, and the initiation of legal remedies, including foreclosure.

**To Lighthouse Estates LLC:** Notices shall be sent via Certified Mail, Return Receipt Requested, to an address to be provided to the Lender, and by Email. The date the email is sent shall constitute the Notice Delivery Date.

**To Simaya Innovations LLC:** Notices shall be sent via Certified Mail, Return Receipt Requested, to an address to be provided to the Borrower, and by Email. The date the email is sent shall constitute the Notice Delivery Date.

**To Hidden Gems Ventures LLC** Notices shall be sent via Certified Mail, Return Receipt Requested, to an address to be provided to the Borrower, and by Email. The date the email is sent shall constitute the Notice Delivery Date.

All communications must be conducted exclusively through Email or U.S. Mail. Text messages, instant messages, or any other informal means of communication shall not be deemed proper notice under this agreement and shall not elicit a response

2. **Foreclosure.**

The lender may initiate foreclosure proceedings in accordance with applicable Kentucky law (KRS Chapter 426) upon the occurrence of an uncured default under this Note or the mortgage securing it. Foreclosure shall proceed judicially, as non-judicial foreclosure is not permitted in Kentucky. The borrower shall be provided with all required notices in compliance with Kentucky foreclosure statutes. Such notices shall be deemed effective upon mailing to the borrower's last known address, as provided in the mortgage, and proof of delivery shall be retained by the lender for evidentiary purposes.

**Judicial Foreclosure and Redemption Rights**

Foreclosure proceedings shall be conducted through the judicial system in compliance with **KRS Chapter 426**. Following the foreclosure sale, the borrower retains statutory rights of redemption as outlined in **KRS 426.530**. During the redemption period, the borrower may redeem the mortgaged property by paying the total amount due, including the outstanding principal balance, accrued interest, late fees, attorneys' fees, foreclosure-related expenses, and any other costs allowed under this Note, the mortgage, or Kentucky law. Failure to redeem the mortgaged property within the statutory redemption period shall extinguish all of the borrower's rights, title, and interest in the mortgaged property.

If the proceeds of the foreclosure sale are insufficient to fully satisfy the outstanding debt, including all accrued interest, costs, and fees, the borrower shall remain personally liable for the resulting deficiency unless expressly waived by the lender in writing.

6

**Deed in Lieu of Foreclosure**

As an alternative to foreclosure proceedings, the borrower and lender may agree to execute a deed in lieu of foreclosure, provided such agreement is documented in a separate instrument signed by both parties. The deed in lieu of foreclosure shall comply with all applicable **Kentucky laws**, including **KRS Chapter 382**, and the terms of this Note and the mortgage. The borrower acknowledges and agrees that execution of a deed in lieu of foreclosure does not automatically discharge or satisfy the borrower's remaining debt obligations unless explicitly stated in writing by the lender. Any remaining deficiency shall continue to be owed unless waived in writing by the lender.

**Costs and Remedies**

All reasonable costs incurred by the lender in connection with foreclosure proceedings—or in executing a deed in lieu of foreclosure—shall be added to the borrower's total indebtedness secured by the mortgage. Such costs shall bear interest at the rate specified in this Note until fully reimbursed. These costs may include, but are not limited to, attorneys' fees, court costs, publication fees, and any other expenses related to enforcing the lender's rights under this Note or the mortgage, in compliance with **KRS 411.195 and KRS Chapter 426**.

**Waiver of Claims and Defenses**

The borrower expressly waives any and all claims, defenses, and counterclaims related to the foreclosure proceedings or the lender's exercise of its remedies under this Note or the mortgage, except for claims directly arising from the lender's failure to comply with statutory notice or procedural requirements under **Kentucky law**. Such waiver is intended to ensure the timely and efficient resolution of foreclosure actions and minimize unnecessary delays

3. **General Agreements**.

The borrower agrees to pay all costs and expenses, including attorneys' fees and expenses, incurred by the lender in connection with any collection, enforcement, or litigation arising out of this Note or the mortgage. The borrower and all endorsers, guarantors, and all persons liable or to become liable under this Note hereby waive, to the fullest extent permitted by law, presentment, demand, notice of non-payment, diligence of collection, protest, notice of protest, protest of dishonor, notice of dishonor, and any other notices in connection with this Note. The borrower further waives any notice of foreclosure sale and releases any right of redemption, except as provided under **KRS 426.530**.

This Note shall be construed and interpreted under, and governed by, the internal laws of the State of Kentucky, without regard to its choice of law principles. No modification, waiver, amendment, discharge, or change of this Note shall be valid unless in writing and signed by the party against whom the enforcement of such modification, waiver, amendment, discharge, or change is sought.

The borrower and lender affirm that each provision in this Note complies with all applicable local, state, and federal laws and judicial decisions. If any provision, or portion thereof, is found by a court of competent jurisdiction to be illegal, invalid, void, or unenforceable, it is the intent of the parties that the remaining provisions of this Note shall continue in full force and effect. Any unenforceable provision shall be reformed to the maximum extent permitted by law to reflect the original intent of the parties.

7

Borrower agrees that this Loan: (i) constitutes a business loan that complies with Kentucky law governing commercial lending, and (ii) is an exempt transaction under the Truth in Lending Act, 15 U.S.C. Sec. 1601 et seq.

No agreement, term, or provision herein shall obligate the borrower to pay, nor shall the lender be entitled to receive, interest or other charges exceeding the maximum amount permitted by Kentucky usury laws, including **KRS 360.010**. In the event any interest or charges exceed such lawful limits, the excess shall automatically be applied toward the unpaid principal balance of the loan, and any remaining amount shall be refunded to the borrower.

BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS NOTE. THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS NOTE.

Borrower irrevocably submits to the non-exclusive jurisdiction of any Kentucky state or federal court for any action or proceeding arising out of this Note. Borrower waives, to the fullest extent permitted by law, any objection to venue or the removal of such action or proceeding to another jurisdiction on the basis of forum non conveniens or other grounds.

## SIGNATURE PAGE TO FOLLOW

IN WITNESS WHEREOF, Borrower has caused this Note to be executed as of the date first above written.

**BORROWER:**

LIGHTHOUSE ESTATES LLC

By: _____
Van Barker, Duly Authorized Member

By: _____
Joshua Kennedy, Duly Authorized Member

By: _____
Ariel Mermelshtayn, Duly Authorized Member

State of _____Kentucky_____

County of _____Hardin_____

The foregoing instrument was acknowledged before me this ___12___ day of March 2024, by
_____Van Barker_____, as a Duly Authorized Member of Lighthouse Estates LLC, who are personally known to me or who have produced valid identification as indicated below and who affirmed that they are authorized to act on behalf of the company.

**Type of Identification Presented:** _____Drivers License_____

Notary Public State of: _____Kentcky_____

SARITA S. PEREZ
MY COMM EXPIRES 06/08/2025
NOTARY PUBLIC
ID # KYNP30876
STATE AT LARGE
KENTUCKY

9



Signature _____

Printed Name: ____Santa S. Perez____

My Commission Expires: ____6·8·2025____

Notary ID Number: ____KYNP 30876____

10

IN WITNESS WHEREOF, Borrower has caused this Note to be executed as of the date first above written.

**BORROWER:**

LIGHTHOUSE ESTATES LLC

By: _____
Van Barker, Duly Authorized Member

By: _____
Joshua Kennedy, Duly Authorized Member

By: _____
Ariel Mermelshtayn, Duly Authorized Member

State of __Missouri__

County of __St. Louis City__

The foregoing instrument was acknowledged before me this ___12th___ day of March 2025, by ___Joshua Kennedy_____, as a Duly Authorized Member of Lighthouse Estates LLC, who are personally known to me or who have produced valid identification as indicated below and who affirmed that they are authorized to act on behalf of the company.

**Type of Identification Presented:** __drivers license__

Notary Public State of: __Missouri__

9

Signature _____

Printed Name: Zansheree Knight

My Commission Expires: 05/18/2025

Notary ID Number: 22563741

ZANSHEREE KNIGHT
Notary Public - Notary Seal
State of Missouri
St. Louis City
My Commission Expires: May 18, 2025
Commission #22563741

10

IN WITNESS WHEREOF, Borrower has caused this Note to be executed as of the date first above written.

**BORROWER:**

LIGHTHOUSE ESTATES LLC

By: _____
     Van Barker, Duly Authorized Member

By: _____
     Joshua Kennedy, Duly Authorized Member

By: _~~Ariel~~ _Barker AB_____
     Ariel ~~Mermelshteyn~~, Duly Authorized Member

State of ___Indiana___

County of ___Hamilton___

The foregoing instrument was acknowledged before me this __12th__ day of March ~~2024~~ 2025 mu, by ___Ariel Barker___, as a Duly Authorized Member of Lighthouse Estates LLC, who are personally known to me or who have produced valid identification as indicated below and who affirmed that they are authorized to act on behalf of the company.

Type of Identification Presented: ___Driver's License___

Notary Public State of: ___Indiana___

> MARK ULBRICH
> Notary Public- Seal
> Marion County - State of Indiana
> Commission Number - NPO 635554
> My Commission Expires Jan 18, 2033

9

_Mark Ulbrich_
Signature

Printed Name: _Mark Ulbrich_

My Commission Expires: _1/18/2033_

Notary ID Number: _695554_

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

---

# EXHIBIT

# G

210 N 26th St Louisville Personal Guarantee

---

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

# UNLIMITED PERSONAL GUARANTEE

THIS GUARANTEE dated this 12th day of March 2025

*Barker AB*

From: VAN BARKER, JOSHUA KENNEDY, ARIEL ~~MERMELSHTAYN~~ and LIGHTHOUSE ESTATES LLC (jointly and severally known as the "Guarantor" and the "Borrower")

To: SIMAYA INNOVATIONS LLC and HIDDEN GEMS VENTURES LLC (collectively the "Lender")

In consideration of the Lender extending a loan of **SEVENTY-EIGHT THOUSAND DOLLARS and 00/100 ($78,000.00)** to the Borrower, the receipt and sufficiency of which is hereby acknowledged, the Guarantor personally guarantees the prompt, full, and complete performance of any and all present and future duties, obligations, and indebtedness (the "Debt") owed to the Lender by the Borrower, including any interest, fees advanced, legal fees, and other costs incurred by the Lender, under the terms of the March 12, 2025 Promissory Note signed by the Borrower (the "Note"), and under the following terms and conditions:

1. **Guarantee of Payment:** The Guarantor unconditionally guarantees the full and prompt payment of the principal, interest, and any other sums owed under the Debt as and when they become due, in accordance with the terms and conditions provided in the Note.
2. **Waiver of Defenses:** To the fullest extent permitted by Kentucky law, the Guarantor waives all defenses, counterclaims, or offsets that may be legally available to the Guarantor with respect to the payment of the Debt by the Borrower.
3. **Unlimited Guarantee:** This Personal Guarantee is an unlimited guarantee and is not limited to the amount of the loan or any specific sum.
4. **Non-Dischargeability:** The Guarantor expressly acknowledges and agrees that this Personal Guarantee constitutes a non-dischargeable obligation under any chapter of the United States Bankruptcy Code, to the fullest extent permitted by federal and Kentucky law.
5. **Governing Law and Jurisdiction:** This Personal Guarantee shall be construed and governed exclusively by the laws of the State of Kentucky. Any disputes arising under this Personal Guarantee shall be brought exclusively in the state or federal courts of Kentucky, and the Guarantor hereby submits to the jurisdiction of such courts and waives any objection based on forum non conveniens or venue.
6. **Entire Agreement:** This Personal Guarantee embodies the entire agreement and understanding between the parties with respect to the subject matter herein. It supersedes all prior agreements and understandings, whether written or oral.

This Personal Guarantee shall be construed exclusively in accordance with, and governed by, the laws of the State of Kentucky Any dispute arising hereunder may only be brought within the State Courts of the State of Kentucky. This Personal Guarantee embodies the entire promise of Guarantor to personally guarantee Borrower's Debt and supersedes all prior agreements and understandings relating to the subject matter here, whether oral or in writing.

## SIGNATURE PAGE TO FOLLOW

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
    Van Barker, an individual

By: _____
    Joshua Kennedy, an individual

By: _____
    Ariel Mermelshtayn, an individual

State of _Kentucky_

County of _Hardin_

THE FOREGOING INSTRUMENT was acknowledged before me this _12_ day of March 2025 by
_____Van Barker_____, an individual personally known to me or have produced
his/her ___Drivers License_ as identification and represents that he/she is authorized to act on behalf
of the company.

_____
Notary Public, State of: KY

My Commission Expires: ___June 8. 2025_

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
    Van Barker, an individual

By: _____
    Joshua Kennedy, an individual

By: _____
    Ariel Mermelshtayn, an individual


State of _Missouri_

County of _St. Louis City_

THE FOREGOING INSTRUMENT was acknowledged before me this 12th day of March 2025 by _Joshua Kennedy_____, an individual personally known to me or have produced his/her _driver's license_ as identification and represents that he/she is authorized to act on behalf of the company.

_____
Notary Public, State of: _Missouri_

My Commission Expires: _05/18/2025_

ZANSHEREE KNIGHT
Notary Public - Notary Seal
State of Missouri
St. Louis City
My Commission Expires: May 18, 2025
Commission #22583741

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
    Van Barker, an individual

By: _____
    Joshua Kennedy, an individual

By: _Arile Barker_____
    Ariel ~~Mermelshtayn~~, an individual
         Barker AB

State of _Indiana_

County of _Hamilton_

THE FOREGOING INSTRUMENT was acknowledged before me this _12th_ day of March 2025 by
_Ariel Barker_____, an individual personally known to me or have produced
his/her _Driver's License_ as identification and represents that he/she is authorized to act on behalf
of the company.

> MARK ULBRICH
> Notary Public- Seal
> Marion County - State of Indiana
> Commission Number - NPO 695554
> My Commission Expires Jan 18, 2033

_Mark Ulbrich_____
Notary Public, State of: _Indiana_

My Commission Expires: _1/18/2033_

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# H

3110 Prairie Ave St Louis JV Agreement

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

**JOINT VENTURE AGREEMENT**
**(Real Estate)**

**THIS JOINT VENTURE AGREEMENT** ("Agreement") is effective as of the latest date this Agreement is executed by the Parties as set forth below (the "Effective Date").

**1. BASIC TERMS**. This <u>Section 1</u> defines the Basic Terms of this Agreement.

1.1 Property: <u>3110 Prairie Ave, Saint Louis, MO 63107</u>

1.2 Parties: PARTY A:

Name: <u>Lighthouse Estates LLC</u>

Address: <u>5720B Brown Ave. Unit B, Fort Knox, KY 40121</u>

Email: <u>management@gostarpoint.com</u>

Phone: <u>321-378-5722</u>

PARTY B:

Name: <u>Simaya Innovations LLC</u>

Address: <u>2469 S Broadway,  Denver, CO 80210</u>

Email: <u>crystaltkac@gmail.com</u>

Phone: <u>303-621-5738</u>

1.3 Title to the Property shall be held in the name of: <u>Lighthouse Estates LLC</u>

1.4 Closing Date of Transaction: <u>5-7-2025</u>

Title Company: <u>Community Title Services</u>
Phone: <u>314-695-5223</u>
Escrow Agent: <u>Sara Cary (Sara@CTitleServices.com)</u>

1.5 Allocation of Expenses: The payment of Expenses will be allocated as follows:

☒ Party A funding: <u>all amounts exceeding the $100,000.00 capital investment of Party B</u>

Parties' Initials:

1

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

☒ Party B funding:  <u>will not exceed $100,000.00 for all expenses related to the</u> <u>property acquisition, closing costs, TC fees and property renovation costs.</u>

1.6 Compensation Prior to Allocation of Profit:

    ☐ None of the Parties will be compensated on their investment prior to the allocation of Profit; or

    ☒ One or more of the Parties shall be compensated on their investment prior to the allocation of Profit as follows:

        ☒ Party B is entitled to receive <u>the return of their funding</u> <u>contribution in the amount of $100,000.00, a lending fee of</u> <u>$15,000.00, in addition to extension fees.</u>

1.7 Profit shall be allocated as follows:

    ☒ Party A shall receive <u>the remaining distributable profits after satisfying Party</u> <u>B's, returns as outlined in Section 1.6, along with closing costs, liens, taxes, and</u> <u>judgments.</u>

1.8 Additional Terms and Conditions:

- This Joint Venture Agreement, executed between Party A and Party B establishes a partnership with Party A as the Owner Partner, Party B as the Party B.

**Financial Contribution from Party B:**
- **Initial Contribution:**
  - Party B shall contribute their funding contribution outlined in Section 1.5 no later than the day of closing for the property as outlined in Section 1.1 upon receipt of clear Title Commitment, proof of Builder's Risk insurance with Party B listed as lien holder/additional payee/loss payee.
  - The funds will be wired to the Title Company outlined in Section 1.4 upon Party B's independent confirmation of wire instruction
  - In the event of the failure of escrow to close Party B shall be entitled to the return of their initial funding contribution as delineated in Section 1.5.
  - From the total funding contribution outlined in Section 1.5, an immediate sum of $100,000.00 shall be designated and made promptly available. This allocation covers expenses such as property acquisition, closing costs, holding costs, insurance, transaction coordinator (TC) fees, and construction/renovations, as detailed in Section 1.1

- **Payment Timelines:**
  - <mark>Maturity date is Nov 6, 2025.</mark>
  - Grace period of 10 calendar days

Parties' Initials: _[Initial] aB  [Initial] Jk  [Initial] VB  [Initial] CC_

2

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

- All sums outlined in Section 1.6 for Party B shall be disbursed in full on or before the maturity date, subsequent to the initial closing of the property purchase.
- All payments of funding contribution, compensation, extension fees and wire fees hereunder shall be made when due without set-off, counterclaim or any other deduction whatsoever in immediately available funds to Party B by **electronic means (wire transfer or ACH) only.**

- **Compensation:**
  - Upon the sale or refinancing of the property, Party B shall first receive their initial contribution and compensation as outlined in Section 1.6, along with any extension and wire fees, before any compensation or profits are allocated to Party A.

- **Late/Extension Fees**:
  - Party B will guarantee only one extension of up to one (1) month for a fee of $**2.500.00**
  - Any extension granted will be for a period of up to one (1) month. If the loan is repaid before the end of the extension period, the extension fee will be **pro-rated** based on the actual number of days the extension was used.
  - A **ten (10) day grace period** will be provided after the Maturity Date, during which no extension/late fee will be charged. If the loan is not repaid in full within the grace period, the extension fee will begin accruing on day 2 and be calculated from that day forward.
  - Late/Extension fees are **not required to be paid in advance**. Any late/extension fee (whether full or pro-rated) will be **added to the total payoff amount** due at the time the loan is repaid.
  - If Party A does not (a) request an extension (b) does not pay off loan by maturity date (grace period) or (c) fails to be responsive to any communication from Party B;  Party B may automatically continue to extend the loan for one (1) month at a time and extensions fees will continue to accrue and will be added to the payoff amount or Party B may choose any and all legal remedies available to Party B including foreclosure.

### Responsibility of Party A:

1. **Transaction Coordinator**
   - Party A is accountable for settling the outstanding balance for the fees associated with the TC.
2. **Insurance:**
   - Party A shall at its sole cost and expense, keep the Premises insured against all hazards as is customary and reasonable for properties of similar type and nature located in the county where the Premises is located.
   - Party A shall procure and maintain the requisite insurance coverage necessary for a property under construction, ensuring compliance with all

Parties' Initials:     Initial: *aB*   Initial: *Jk*   Initial: *VB*   Initial: *U*

3

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

applicable legal requirements. The Builders Risk insurance will cover renovation risks, fire, vandalism, theft, and vacancy exposure
- Party A is obligated to include the Party B as an additional insured on the insurance policy. Party A must provide the Party B with a copy of the insurance policy's declaration page upon the policy activation or renewal.

3. **Budget and Timeline Management:**
   - Party A is responsible for all cost overruns beyond the original agreed funding amount. Party B is not obligated to provide additional funds unless agreed in writing.
   - Party A hereby undertakes to effectuate the refinancing or sale of the property within the 6-month timeframe delineated by this agreement.
   - Party B may inspect the property upon reasonable notice during renovation process to verify process. Party B may not question the crew or assign work to the crew.

4. **Project Management:** Party A is hereby tasked with the onsite management and supervision of the property's renovations, assuming full responsibility for all project related activities from the close of escrow for the property purchase to the close of escrow for its sale. This includes but is not limited to, the following obligations:
   - Providing weekly updates and progress photos through text message.
   - Ensuring the timely completion of all necessary renovations and refinance of the property within the 6-month timeframe stipulated by this agreement.
   - Timely remittance of payment to all contractors and subcontractors, contingent upon the receipt of lien waivers in exchange. Party A to collect lien waivers from contractors and subs prior to disbursing final rehab payments or listing/refinance.
   - Party A to obtain all required permits, inspections, and code approvals from the city/fire department as needed, and to cover any associated costs or penalties.
   - Party A is responsible for obtaining fire clearance or certificate of occupancy after construction.

**Collateral and Security:**
1. **Title Commitment:** A Title Commitment will be executed and provided to Party B prior to the wiring of funds..
2. **Promissory Note and Personal Guarantees:** A Promissory Note and Personal Guarantee(s) will be executed by Party A for Party B.
3. **Lenders Title Policy:** A Lender's Title policy will be provided by the title company.
4. **Recorded Lien / Security Instrument:** A First Position Lien Deed of Trust / Mortgage will be filed and recorded by the Title company against the property as delineated in line 1.1 of this agreement for Party B.
5. **Builder's Insurance Policy:** Party A shall add Party B to their builder's insurance policy as a lien holder/additional insured/loss payee for the total amount funded.

Parties' Initials:   Initial [aB]   Initial [Jk]   Initial [VB]   Initial [CC]

4

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

6. **No Loan Modification or Additional Liens:** Party A agrees that no loan modifications or additional liens maybe taken out against the property until Party B has been paid.
   - Party A may not assign, sell, or transfer any interest in the Property without the prior written consent of Party B.
7. **Closing Documents:** An electronic set of the signed closing loan document will be sent to Party B by the TC. A set of the executed wet signature closing loan documents shall be overnighted by the title company to Party B at the address delineated in Section 1.2. Party B assumes responsibility for the safekeeping of said documents in the event that legal action becomes necessary.

### Acknowledgment of Lien and Release Conditions:

1. **Acknowledgment of Lien:**
   - Party A acknowledges that the Party B has imposed a First position lien on the property as delineated in Section 1.1.
2. **Conditions for Lien Release:**
   - After the full payment has been received by Party B as specified in this Joint Venture agreement and the accompanying Mortgage and Promissory Note action will be taken to effectuate the release of the lien.
3. **Recording Satisfaction of Mortgage:**
   - After the full payment has been received by Party B a Satisfaction of Mortgage will be sent to Party A or title to be recorded.
4. **Expense of Recording:**
   - The cost associated with recording the Satisfaction of Mortgage will be borne by Party A.

### Default and Remedies Clause:

It is expressly agreed by Party A that time is of the essence hereof. In the event the repayment extends thirty (30) days beyond the maturity date, Party B shall undertake the following actions:

- **Notice of Default:** It is expressly agreed by Party A that time is of the essence hereof. In the event of: any default in the payment of any principal, interest or other sums when due hereunder that is not cured within five (5) days of receiving notice (email is considered notice), cure or grace period provided therein, if any, the entire amount of principal, fees and interest then remaining unpaid hereunder or thereunder, at the option of Lender and without notice, shall become immediately due and payable. Any other default by Borrower must be cured within ten (10) days after receipt of notice (email is considered notice). Failure to exercise any such option shall not constitute a waiver of the right to exercise the same at a later time or in the event of any subsequent default.
- **Remedies on Continued Default:** If any Default is not cured within the allotted time, and legal procedures are instituted, Party A will be charged a minimum of Five Percent (5%) of the Principal amount of the loan for legal fees and penalties. If the amount exceeds $5,000.00 Party A will be charged actual fees.

Parties' Initials: ___ Initial [ aB ] Initial [ Jk ] Initial [ VB ] Initial [ CC ] ___

5

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

- **Foreclosure Process:** Party B hereby reserve the unequivocal right to initiate the foreclosure process immediately upon the occurrence of a default, in accordance with applicable state laws and the terms of the Mortgage and Promissory Note.
  - o To circumvent court proceedings, Party A and the Party B mutually agree to work collaboratively in transferring the deed of the property directly to Party B.

This agreement stands in effect until all parties have been compensated as indicate herein.

**2. PURPOSE OF JOINT VENTURE.** The purpose of this Agreement and the joint venture described herein shall be for the Parties to acquire, sell and/or hold the Property for Profit (the "Purpose of the Joint Venture").

**3. EXPENSES**. The term "Expenses" shall mean all amounts paid or incurred by the Parties  for the Purpose of the Joint Venture, which Expenses include, but are not limited to, all amounts  paid for the acquisition of the Property, interest on any loans obtained or consented to by the Parties related to the Property (excluding interest on any loans obtained by a Party for the purpose of paying their share of the Expenses), all costs related to the remodeling and/or rehabilitation of the Property, insurance, property taxes, utilities for the Property, advertising costs, staging costs, commissions, and closing costs for the acquisition and sale of the Property.

The Expenses shall be allocated to and paid by the Parties as set forth in Section 1.5. In the event a Party fails or  refuses to pay their portion of the Expenses as required herein, the other Party(ies') may, after five (5) days written notice to the non-paying Party, pay the non-paying Party's share of the expenses  in which event the Party(ies') paying the non-paying Party's expenses shall receive compensation of 20% of the amount paid on the non-paying Party's behalf prior to allocation of any Profit.

**4. PROFIT.** The term "Profit" shall mean: (A) the amount remaining from the Parties' sale  of the Property after the repayment of any liens secured by the Property, payment of all Expenses  related to the sale of the Property, repayment to the Parties for all Expenses previously paid, and the payment of compensation to any of the Parties as set forth in Sections 1.6 and 3; and/or (B) the cash flow from the Property after the repayment to the Parties for all Expenses, and the payment of compensation to any of the Parties as set forth in Sections 1.6 and 3. The Profit shall be allocated to the Parties as set forth in Section 1.6.

**5. ESCROW INSTRUCTIONS UPON THE SALE OF THE PROPERTY**. Except to the extent the Parties agree otherwise in writing, the Parties, upon the sale of the Property, shall prepare irrevocable escrow instructions setting forth the distribution of Expenses, compensation, and Profit to be paid to each Party from closing of the sale of the Property and deliver said escrow instructions to the appropriate closing agent.

**6. TERMINATION OF THIS AGREEMENT**. This Agreement shall terminate upon the sale of the Property and full payment to each Party of the amounts each Party is entitled to receive under this Agreement or upon the written agreement of the Parties.

6

Parties' Initials:

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

## 7. RESOLUTION OF DISPUTES.

7.1 *Commitment to Resolution:* The Parties' commit to each other to resolve any issues in a commercially reasonable manner as promptly as possible. This commitment underlines the intention to handle disputes amicably and efficiently.

**8. COSTS AND ATTORNEYS' FEES**. In the event any action, suit, arbitration, or other proceeding is instituted arising out of or related to this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party actual costs and expenses incurred, including, without limitation, court costs, expert witness fees, pre-litigation enforcement costs, and reasonable attorneys' fees. This right to recovery shall extend to fees and costs incurred in enforcing any judgment or award, including collection efforts

**9. NO ORAL CHANGES OR REPRESENTATIONS.** This Agreement supersedes any and all prior understandings and agreements. This Agreement may be amended or modified only in writing signed by the Parties.

**10. NOTICES**. Any and all notices, demands or requests required or permitted hereunder shall be in writing and shall be effective upon personal delivery or when sent by electronic mail addressed as follows:

To Party A: See Section 1.2.          To Party B: See Section 1.2.

Any Party may change its email address for notice by giving notice of change of email address in the manner provided above. The inability to deliver a notice because of a changed email address of which no notice was given shall not affect the effective date or effectiveness of the notice.

## 11. MISCELLANEOUS.

11.1 *Assignment*. No Party may assign this Agreement without the written consent of all other Parties hereto.

11.2 *Additional Terms and Conditions*. The Parties agree to be bound by and to perform the additional terms and conditions specified in Section 1.8.

11.3 *Successors and Assigns*. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

11.4 *Waiver*. The waiver by any party hereto of any right granted to it hereunder shall not be deemed to be a waiver of any other right granted hereunder, nor shall the same be deemed to be a waiver of a subsequent right obtained by reason of the continuation of any matter previously waived.

11.5 *Severability*. If any provision of this Agreement or any portion of any provision of this Agreement shall be deemed to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability shall not alter the remaining portion of such provision, or any other provision hereof, as each provision of this Agreement shall be deemed severable from all other provisions hereof.

Parties' Initials:

7

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

11.6 *Time is of the Essence.* Time is of the essence with respect to the performance of all terms, conditions, and provisions of this Agreement.

11.7 *Choice of Law.* This Agreement shall be governed and enforced under the laws of the state where the Property is located without regard to any conflict of law provisions.

11.8 *Counterparts*. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one instrument. The parties may execute this Agreement by electronic means and may deliver their signatures by facsimile transmission or .pdf e-mail delivery, and such transmission shall have the same effect as delivery of original signatures.

## 12. **HOLD HARMLESS**

12.1 *No Agency*. No services provided by Hidden Gems TC Services LLC ("Hidden Gems") shall constitute acting as a legal representative or agent of any other party, nor shall Hidden Gems have the right or authority to assume, create, or incur any liability or obligation of any kind, express or implied, in the name of or on behalf of any other party. Additionally, Hidden Gems shall not be liable for any failure or delay in performance by the parties to the agreement.

12.2 *No Legal Advice.* Any information provided by Hidden Gems does not and is not intended to constitute legal advice. All information, content, and materials provided are for general informational purposes only. Such information may include links to other third-party websites, which are solely for the convenience of the reader, user, or browser. Hidden Gems does not recommend or endorse the content of third-party sites.

12.3 *Usuary Laws.* The Parties acknowledges that each state imposes specific legal limits on maximum interest rates and allowable late fees. It is the responsibility of the Party B to be aware of the usury laws of the state in which they are lending. Should the imposed fees or interest rates exceed these legal limits, the Party B assumes full responsibility for any resulting legal consequences. In the event of legal action to enforce a lien, the court may refuse to allow the recovery of excessive late fees, interest, and potentially even the principal balance. Hidden Gems TC shall not be held responsible or liable for any fees or interest rates imposed that exceed the legal limits or for any legal consequences arising from such actions.

12.4 *Limitation of Liability.* Hidden Gems shall not be liable for any indirect, incidental, consequential, special, or exemplary damages arising out of or in connection with the services provided, including but not limited to, loss of profits, loss of data, or loss of business opportunities, even if such damages are foreseeable and whether or not Hidden Gems has been advised of the possibility thereof.

12.5 *Indemnification.* The parties to this agreement agree to indemnify, defend, and hold harmless Hidden Gems, its officers, directors, employees, agents, and affiliates from and against any and all claims, liabilities, damages, losses, costs, and expenses (including reasonable attorneys' fees) arising out of or in any way connected with the parties' use of the services provided by Hidden Gems, any breach by the client of this agreement, or any violation by the client of any applicable law or regulation.

Parties' Initials:

8

Docusign Envelope ID: 51CA1941-224C-418D-A682-15E03463687A

12.6 *Disclaimer of Warranties.* The services provided by Hidden Gems are offered on an "as is" and "as available" basis. Hidden Gems expressly disclaims all warranties of any kind, whether express or implied. Hidden Gems makes no warranty that the services will meet the client's requirements, or that they will be uninterrupted, timely, secure, or error-free.

# SIGNATURE PAGE TO FOLLOW

Parties' Initials:

9

**By affixing your signature hereto, all parties confirm they have thoroughly reviewed the document and possess a comprehensive understanding of its terms and implications. Furthermore, all parties hereby acknowledge that they have been duly advised to seek legal counsel before entering into this agreement.**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the dates written below.

PARTY A:

Lighthouse Estates LLC, a Kentucky limited liability company

Signature: *Ariel Barker*
C47BAECDC8FA4D1...

Date: 5/4/2025

Name of Signer: Ariel Barker

Its: Partner

Signature: *Josh Kennedy*
FB8CF64C68C24A6...

Date: 5/4/2025

Name of Signer: Josh Kennedy

Its: Partner

Signature: *Van Barker*
DB1C8A4B4F5343A...

Date: 5/4/2025

Name of Signer: Van Barker

Its: Managing Partner

PARTY B:

Simaya Innovations LLC, a Colorado limited liability company

Signature: 
7C88F1BA47454AB...

Date: 5/4/2025

Name of Signer: Crystal Cervantez-Tkac

Its: Manager

Parties' Initials: AB  JK  VB  CC

10

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# I

3110 Prairie Ave St Louis Promissory Note

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

# PROMISSORY NOTE

**$100,000.00**                                                    Date: May 7, 2025

**FOR VALUE RECEIVED**, the receipt and sufficiency of which is hereby acknowledged, **LIGHTHOUSE ESTATES LLC,** a Kentucky limited liability company (the "Grantor"), promises to pay to the order of **SIMAYA INNOVATIONS LLC** ("**SIMAYA**"), a Colorado limited liability company (the "Grantee"), the principal sum of **ONE HUNDRED THOUSAND DOLLARS AND 00/100 ($100,000.00)** (the "Loan"), allocated as follows together with interest on the outstanding principal balance from the date of this Note until the Note is paid in full.

**IMPORTANT DISCLOSURE: THIS LOAN INCLUDES A BALLOON PAYMENT THAT WILL BE DUE AND PAYABLE ON NOVEMBER 6, 2025. FAILURE TO PAY THE BALLOON AMOUNT BY THE MATURITY DATE MAY RESULT IN FORECLOSURE PROCEEDINGS.**

This Promissory Note is executed for the purpose of financing the purchase and renovation of the property located at **3110 Prairie Ave, Saint Louis, MO 63107.**

1.    **Payment of Interest and Principal**.

The Grantor promises to pay the principal and interest due under this Note according to the following terms and conditions:

(a)    **Maturity Date**. The Grantor acknowledges and agrees that the full payment of the principal amount of this Note, along with all lending fees, accrued interest, and any other sums due under the terms of this Note, the Mortgage (the "Mortgage"), and any other security agreements securing this Note, shall be due and payable on **November 6, 2025** (the "Maturity Date"), unless otherwise paid earlier through:
(i) the refinancing of the loan secured by this Note, or
(ii) the sale of the Mortgaged Property to a third party, whichever occurs first.

NOTICE TO GRANTOR: THIS LOAN REQUIRES A BALLOON PAYMENT. ON THE MATURITY DATE, YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE, ACCRUED INTEREST, AND ANY OTHER AMOUNTS OWED UNDER THIS NOTE IN A SINGLE LUMP-SUM PAYMENT. FAILURE TO PAY THIS AMOUNT IN FULL MAY RESULT IN DEFAULT AND FORECLOSURE OF THE MORTGAGED PROPERTY.

This Note expressly requires a balloon payment on the Maturity Date, meaning the Grantor must pay all outstanding obligations in full as a lump-sum payment. The Grantor acknowledges and agrees that failure to make the required balloon payment by the Maturity Date shall constitute an immediate event of default, entitling the Grantee to exercise all rights and remedies under this Note, the Mortgage, and applicable Missouri law, including but not limited to:

1.    Acceleration of the debt, making all outstanding amounts immediately due and payable.
2.    Non-judicial foreclosure under Missouri's power of sale provisions, if applicable.
3.    Judicial foreclosure, deficiency judgments, and other legal remedies.
4.    Recovery of all attorney's fees, collection costs, and court expenses incurred by the Grantee.
5.    A default interest rate of the lesser of the maximum rate permitted under Missouri law or an additional 5% per annum on the outstanding balance.

1

To the fullest extent permitted by Missouri law, the Grantor expressly waives any rights to demand additional notice of the balloon payment obligation or the Maturity Date beyond what is provided in this Note. The Grantee's acceptance of any partial payments after the Maturity Date shall not constitute a waiver of its right to enforce the full balloon payment.

**(b)    Rate and Payment.** The Loan includes a lending fee of **FIFTEEN THOUSAND DOLLARS AND 00/100 ($15,000.00)**. The commencement date of this Promissory Note shall be the date set forth above. The lending fee, combined with the principal loan amount, is due and payable no later than the Maturity Date.

The Grantee shall not be required to accept partial payments, whether for principal, interest, or any or any other amounts due, unless agreed in writing by all the Grantee. Any partial payments that are accepted shall not be deemed a waiver of the Grantee' right to demand full payment in accordance with this Note.

Any failure by the Grantor to make the full payment of all amounts owed by the Maturity Date shall constitute an immediate even of default, granting the Grantee the right to enforce all remedies available under this note, the Mortgage, and applicable Missouri law, including but not limited to the right to accelerate the balance due, impose default interest, an initiate foreclosure proceedings.

**(c)    Prepayments.**

1. **Partial Prepayments**: No partial prepayments shall be accepted under this Note unless explicitly agreed to in writing by the Grantee. Acceptance of any partial prepayment shall not constitute a waiver of the Grantee's right to refuse future partial prepayments.
2. **Application of Partial Payments**: In the event the Grantee agrees to accept a partial prepayment, such payment shall be applied in the following order of priority:
   a. First, to any amounts due under the Mortgage and other security documents securing this Note, including any fees or advances made by the Grantee on behalf of the Grantor;
   b. Second, to any unpaid late charges;
   c. Third, to accrued and unpaid interest due as of the date of the prepayment; and
   d. Finally, to the outstanding principal balance.
3. **Full Prepayment**: The Grantor may pay off the Loan in full prior to the Maturity Date, provided that:
   a. The Grantor delivers written notice to the Grantee at least ten (10) days before the intended payoff date;
   b. The payoff amount includes the full principal amount, all accrued and unpaid interest, any additional charges due as of the payoff date, and any applicable prepayment penalties or fees, as outlined below.
4. **Payoff Certification**: The Grantee shall provide the Grantor with a written payoff statement within five (5) business days of receiving the Grantor's notice of intent to prepay. The Grantor shall rely on this payoff statement to determine the total amount required for full payment
5. **Missouri Law Compliance**: This provision complies with Indiana state law and shall be interpreted in accordance with the Uniform Commercial Code (UCC) as adopted in Missouri.
6. **No Waiver of Future Rights**: Acceptance of any prepayment, whether partial

2

or full, shall not waive the Grantee's rights under this Note or any related agreements, including the right to enforce the remaining terms and obligations in the event of a subsequent default.

(d)    **Method and Place of Payment**. All payments of principal, lending fees, interest, and any other amounts due under this Note shall be made in immediately available funds via wire transfer only, to the account(s) designated in writing by the Grantee. Payments must be accompanied by any reference details or instructions specified by the Grantee to ensure proper crediting.

1. **Exclusive Method of Payment**: No other methods of payment, including but not limited to cash, check, or ACH transfer, shall be accepted unless expressly agreed to in writing by the Grantee.
2. **Responsibility for Payment Processing**: The Grantor shall bear any and all costs, fees, or charges associated with the processing or transmission of payments, including wire transfer fees. The Grantee shall not be responsible for any delays or additional costs incurred by the Grantor in making payments.
3. **Timeliness**: Payments must be received by the Grantee in the designated account no later than 3:00 PM Eastern Time on the due date. Payments received after this time shall be deemed received on the next business day and may incur additional interest or late fees as provided in this Note.
4. **Default for Improper Payment**: Any failure by the Grantor to comply with the payment method described herein, including any delays caused by the use of unauthorized payment methods, shall constitute an event of default under this Note. The Grantee shall have the right to reject non-compliant payments, and any rejected payments shall not be deemed as timely received.
5. **Missouri UCC Compliance**: This method of payment is established in compliance with the Uniform Commercial Code (UCC) as adopted in Missouri and shall be interpreted in accordance with its provisions.

(e)    **Acceleration Clause and Balloon Payment**. This loan includes a balloon payment provision. The entire outstanding principal balance, along with all accrued interest, fees, and other sums, shall be due and payable on the Maturity Date, as defined herein. The Grantor acknowledges and agrees to the following:

1. **Enforceability of Balloon Payment**: The balloon payment is fully enforceable, and the Grantor is solely responsible for ensuring full repayment on the Maturity Date. The Grantor further acknowledges that the Loan does not automatically renew and that Grantee is under no obligation to refinance or extend the Loan.
2. **Acceleration Rights**: The Grantee reserves the right to accelerate the loan and demand immediate payment in full of the outstanding principal, accrued interest, fees, and other sums upon the occurrence of any Event of Default, as defined in this Note.
3. **Compliance with Missouri Law**: This provision complies with Missouri Revised Statutes and the Uniform Commercial Code (UCC) as adopted in Missouri, and all necessary disclosures regarding the balloon payment and acceleration clause have been provided to the Grantor.
4. **Acknowledgment of Disclosure**: The Grantor expressly confirms receipt of disclosures in compliance with applicable Missouri law regarding the balloon payment and acceleration clause. The Grantor further acknowledges that Grantee has recommended the Grantor seek independent legal counsel to review the terms of this Note.
5. **Notice Requirement**: The Grantee shall provide written notice of default and an

3

opportunity to cure as required by Missouri law, except where such notice is waived or not applicable due to the nature of the default.

6.  **Surviving Obligations**: The obligations of the Grantor under this clause, including the payment of the balloon amount and any amounts due upon acceleration, shall survive any bankruptcy, insolvency, or other proceedings involving the Grantor and shall remain enforceable to the fullest extent permitted by Missouri law.

(f)  **Late Fees/Extensions**. If the Grantor anticipates being unable to repay the Loan, including all principal, interest, fees, and equity, by the Maturity Date, the Grantor must provide written notice to the Grantee no less than thirty (30) days prior to the Maturity Date. Upon receipt of such notice, the Grantee may, at their sole discretion, consider granting an extension of the Maturity Date. The granting of an extension is not guaranteed and is subject to the following terms and conditions:

1.  **Extension Period**:
    Each approved extension shall be for a period of one (1) month. Any request for an additional extension beyond the initial period must be submitted separately and is subject to the Grantee' approval under the same terms and conditions.

2.  **Extension Fees & Grace Period**:
    A **ten (10) day grace period** will apply following the Maturity Date, during which no extension or late fee will be charged. If the Loan is not repaid in full by the end of the grace period, an **extension fee of Two Thousand Five Hundred Dollars and 00/100 ($2,500.00)** shall begin accruing on Day 2. This fee will be **pro-rated daily** and **added to the total payoff amount** at the time of repayment. Late/Extension fees are **not required to be paid in advance**.

3.  **Automatic Extensions / Failure to Communicate**:
    If the Grantor fails to adhere to these extension requirements, including timely notice and payment of the extension fee, the Loan shall remain due and payable on the original Maturity Date, with all applicable penalties and remedies available to the Grantee in the event of default.

4.  **Non-Refundable Fees**:
    All extension fees are non-refundable and shall not reduce the principal balance, interest, or any other amounts owed under this Note.

5.  **Grantee's Sole Discretion**:
    The Grantee retain the exclusive right to approve or deny any extension request, and any denial shall not be construed as a waiver of the Grantor's obligations under this Note, the Mortgage, or any related documents.

6.  **Missouri Law Compliance**:
    The extension provision shall be governed by and interpreted in accordance with the laws of the State of Missouri, including but not limited to the applicable provisions of the Missouri Revised Statutes and the Uniform Commercial Code (UCC) as adopted in Missouri.

2.  **Defaults and Remedies.**

(a)  **Incorporation of Documents**. The terms, conditions, and provisions of the Mortgage and the Personal Guarantee executed in connection with this Note are hereby expressly incorporated by reference and made an integral part of this Promissory Note as though fully set forth herein. This incorporation ensures that all obligations, covenants, warranties, representations, and remedies outlined in the Mortgage and Personal Guarantee are binding on the Grantor and any Guarantors, and are enforceable by the Grantee under the terms of this Note. The Grantor acknowledges that any breach of the terms of the Mortgage or the Personal

4

Guarantee shall constitute a breach of this Promissory Note, entitling the Grantee to exercise all rights and remedies available under this Note, the Mortgage, the Personal Guarantee, or applicable law. This clause is intended to provide the Grantee with additional security and enforcement mechanisms, ensuring that all remedies are cumulative and non-exclusive.

The Grantor and Guarantors further agree to execute any additional documents or amendments necessary to clarify or confirm the incorporation of these provisions, as requested by the Grantee.

(b)      **Defaults and Remedies**. The Grantor expressly acknowledges and agrees that time is of the essence with respect to this agreement. In the event of any default in the payment of principal, interest, or other sums due under this Note that is not cured within five (5) days of receiving notice (with email constituting sufficient notice), or after the expiration of any applicable cure or grace period provided herein, the entire remaining balance of principal, interest, fees, and any other amounts owed under this Note, at the sole option of the Grantee and without further notice, shall become immediately due and payable. Any other non-payment default by the Grantor must be cured within ten (10) days after receipt of notice (with email constituting sufficient notice).

Failure by the Grantee to exercise any such option shall not constitute a waiver of the right to exercise the same in the event of any future or continued default. If a default is not cured within the prescribed timeframe and legal action is initiated, the Grantor shall be liable for a minimum fee equal to Five Percent (5%) of the principal loan amount as compensation for legal fees and penalties. Should this amount exceed Five Thousand Dollars and 00/100 ($5,000.00), the Grantor shall instead be responsible for the actual legal costs incurred by the Grantee.

The Grantee reserves the unequivocal right to initiate foreclosure proceedings immediately upon any uncured default, in compliance with applicable Missouri state laws and the terms of this Mortgage and Promissory Note. To mitigate the need for formal court foreclosure proceedings, the Grantor and Grantee mutually agree to act in good faith to facilitate the direct transfer of the property deed to the Grantee in the event of a default, subject to all terms and conditions stipulated herein.

(c)      **Partial Principal Repayment:** In the event that the Grantor is unable to fully repay the principal loan amount by the Maturity Date, any partial repayment of the principal shall be allocated as follows:

- **SIMAYA:** 100.00% of the amount repaid.

This allocation shall apply to all partial principal repayments and shall remain binding until the total principal loan amount is fully satisfied. The Grantor's obligation to repay the full principal, together with any accrued interest, fees, and other amounts owed as specified under this Note, remains unaffected by this provision. No partial principal repayment shall be construed as a waiver of the Grantee's right to demand full repayment of all outstanding amounts under this Note. This clause, including the specified allocation terms, shall be enforceable under the terms of this Promissory Note, the associated Mortgage Agreement, and applicable Missouri law.

(d)      **Cumulative Remedies**. Each and every right, remedy, option, power, and benefit provided herein to the Grantee shall be cumulative and shall not be exclusive of any other rights, remedies, options, powers, or benefits provided by law. Neither the failure nor delay by the Grantee in exercising any right, remedy, option, power, or benefit under this agreement shall operate as a waiver of the Grantee's ability to exercise the same at any future time. Furthermore, no single or partial exercise of any such right, remedy, option, power, or benefit by the Grantee shall preclude or limit the Grantee's ability to exercise any additional rights or remedies available under this Note or applicable law.

5

**Notice Requirements:** All notices required under this Note, including but not limited to foreclosure notices, shall comply with applicable provisions of the **Missouri Revised Statutes**, including sections governing foreclosure proceedings. Notices shall be provided in writing and delivered via certified mail, return receipt requested, or by any other method permitted under Missouri law. Any required publication of foreclosure notices shall conform to Missouri statutes governing foreclosure, including requirements for timely and accurate publication in a newspaper of general circulation within the county where the Mortgaged Property is located.

The Grantor acknowledges and agrees that failure to respond to any notice within the specified timeframe shall result in the acceleration of all obligations under this Note, as described herein, and the initiation of legal remedies, including foreclosure.

**To Lighthouse Estates LLC:** Notices shall be sent via Certified Mail, Return Receipt Requested, to an address to be provided to the Grantee, and by Email. The date the email is sent shall constitute the Notice Delivery Date.

**To Simaya Innovations LLC:** Notices shall be sent via Certified Mail, Return Receipt Requested, to an address to be provided to the Grantor, and by Email. The date the email is sent shall constitute the Notice Delivery Date.

All communications must be conducted exclusively through Email or U.S. Mail. Text messages, instant messages, or any other informal means of communication shall not be deemed proper notice under this agreement and shall not elicit a response

2. **Foreclosure.**

The Grantee may initiate foreclosure proceedings in accordance with applicable **Missouri law** upon the occurrence of an **uncured default** under this Note or the Mortgage securing it. Foreclosure may proceed **judicially** or **non-judicially (under power of sale)**, depending on the terms of the Mortgage and the election of the Grantee. The Grantor shall be provided with all required notices in compliance with **Missouri foreclosure statutes**. Such notices shall be deemed effective upon mailing to the Grantor's last known address, as provided in the Mortgage, and proof of delivery shall be retained by the Grantee for evidentiary purposes.

**Power of Sale and Judicial Foreclosure**
If the Mortgage grants a **power of sale**, the Grantee may proceed with a **non-judicial foreclosure** in accordance with the requirements of **Chapter 443 of the Missouri Revised Statutes**, including publication and notice requirements.

Alternatively, the Grantee may, at its sole discretion, elect to proceed with a **judicial foreclosure action** through the appropriate Missouri court, seeking a decree of foreclosure and order of sale.

**Deficiency Judgement and Redemption Rights**
Missouri Law does not provide for an automatic statutory right of redemption following a **non-judicial foreclosure sale**. If the Grantee proceeds judicially, any statutory redemption rights that apply shall be governed by **Missouri law** at the time of the foreclosure.

If the proceeds of the foreclosure sale are insufficient to fully satisfy the outstanding debt, including all accrued interest, costs, and fees, the Grantor shall remain **personally liable** for the resulting deficiency, unless expressly waived by the Grantee in writing. The Grantor shall also

6

remain liable for all **legal fees, court costs, and foreclosure-related expenses** incurred by the Grantee in enforcing this Note and the Mortgage.

### Deed in Lieu of Foreclosure

As an alternative to foreclosure proceedings, the Grantor and Grantee may agree to execute a deed in lieu of foreclosure, provided such agreement is documented in a separate written instrument signed by both parties. The deed in lieu of foreclosure shall comply with all applicable **Missouri laws** and the terms of this Note and the Mortgage.

The Grantor acknowledges and agrees that the execution of a deed in lieu of foreclosure does not automatically discharge or satisfy the Grantor's remaining debt obligations unless explicitly stated in writing by the Grantee. Any deficiency, including the unpaid principal balance, accrued interest, legal fees, and any other costs or amounts owed under this Note or the Mortgage, shall remain the personal obligation of the Grantor unless the Grantee expressly waives such deficiency in a written and signed release.

### Costs and Remedies

All reasonable costs incurred by the Grantee in connection with foreclosure proceedings—whether judicial, non-judicial, or through the execution of a deed in lieu of foreclosure—shall be added to the Grantor's total indebtedness secured by the Mortgage. Such costs shall bear interest at the rate specified in this Note until fully reimbursed.

These costs may include, but are not limited to, attorneys' fees, court costs, trustee fees, publication fees, title fees, recording costs, and any other expenses reasonably incurred in enforcing the Grantee's rights under this Note, the Mortgage, or applicable **Missouri law**.

The Grantor's obligation to reimburse these costs and expenses shall survive any foreclosure sale, deed in lieu of foreclosure, or other transfer of title and shall remain enforceable to the fullest extent permitted under Missouri law.

### Waiver of Claims and Defenses

The Grantor expressly waives any and all claims, defenses, and counterclaims related to foreclosure proceedings or the Grantee's exercise of its remedies under this Note or the Mortgage, except for claims directly arising from the Grantee's failure to comply with statutory notice or procedural requirements under **Missouri law**.

This waiver is intended to ensure the timely and efficient resolution of foreclosure actions and to minimize unnecessary delays. The Grantor further agrees that this waiver extends to any equitable defenses, objections, or procedural challenges that may otherwise be used to contest foreclosure, acceleration, or enforcement actions initiated by the Grantee.

3.  **General Agreements**.

Grantor agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, incurred by Grantee in connection with any collection, enforcement, or litigation arising out of this Note, the Mortgage, or any related agreements. Grantor and all endorsers, guarantors, and all persons liable or to become liable under this Note hereby waive, to the fullest extent permitted by law, presentment, demand, notice of non-payment, diligence of collection, protest, notice of protest, protest of dishonor, notice of dishonor, and any other notices in connection with this Note. Grantor further waives any statutory notice of foreclosure sale to the extent permitted by Missouri

law and releases any right of redemption, except as may be specifically provided under Missouri law for judicial foreclosures.

This Note shall be construed and interpreted under, and governed by, the internal laws of the **State of Missouri**, without regard to its choice of law principles. No modification, waiver, amendment, discharge, or change of this Note shall be valid unless in writing and signed by the party against whom the enforcement of such modification, waiver, amendment, discharge, or change is sought.

Grantor and Grantee affirm that each provision in this Note complies with all applicable local, state, and federal laws and judicial decisions. If any provision, or portion thereof, is found by a court of competent jurisdiction to be illegal, invalid, void, or unenforceable, it is the intent of the parties that the remaining provisions of this Note shall continue in full force and effect. Any unenforceable provision shall be reformed to the maximum extent permitted by law to reflect the original intent of the parties.

Grantor agrees that this Loan: (i) constitutes a business-purpose loan that complies with Missouri law governing commercial lending, and (ii) is an exempt transaction under the Truth in Lending Act, 15 U.S.C. Sec. 1601 et seq.

No agreement, term, or provision herein shall obligate Grantor to pay, nor shall Grantee be entitled to receive, interest or other charges exceeding the maximum amount permitted by **Missouri usury laws**. In the event any interest or charges exceed such lawful limits, the excess shall automatically be applied toward the unpaid principal balance of the Loan, and any remaining amount shall be refunded to Grantor.

GRANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS NOTE. THIS WAIVER IS A MATERIAL INDUCEMENT FOR GRANTEE TO ENTER INTO THIS NOTE.

Grantor irrevocably submits to the non-exclusive jurisdiction of any **Missouri state or federal court** for any action or proceeding arising out of this Note. Grantor waives, to the fullest extent permitted by law, any objection to venue or the removal of such action or proceeding to another jurisdiction on the basis of forum non conveniens or other grounds.

# SIGNATURE PAGE TO FOLLOW

8

IN WITNESS WHEREOF, Grantor has caused this Note to be executed as of the date first above written.

**GRANTOR:**

LIGHTHOUSE ESTATES LLC

By: _____
      Van Barker, Duly Authorized Member

By: _____
      Joshua Kennedy, Duly Authorized Member

By: _____
      Ariel Barker, Duly Authorized Member

State of _Kentucky_

County of _Meade_

The foregoing instrument was acknowledged before me this ___06___ day of May 2025, by _Van Barker_ _____, as a Duly Authorized Member of Lighthouse Estates LLC, who are personally known to me or who have produced valid identification as indicated below and who affirmed that they are authorized to act on behalf of the company.

**Type of Identification Presented:** _Ha Driver's License_

Notary Public State of: _Kentucky_

LISA R DUNHAM
Notary Public - State at Large
State of Kentucky
Notary ID # KYNP 17894
My Commission Expires Nov. 2, 2028

_Lisa R Dunham_
Signature

Printed Name: _Lisa R Dunham_

My Commission Expires: _11/02/2028_

Notary ID Number: _KYNP 17894_

9

IN WITNESS WHEREOF, Grantor has caused this Note to be executed as of the date first above written.

**GRANTOR:**

LIGHTHOUSE ESTATES LLC

By: _____
    Van Barker, Duly Authorized Member

By: _____
    Joshua Kennedy, Duly Authorized Member

By: _____
    Ariel Barker, Duly Authorized Member

State of _____IN_____

County of _____Vanderburgh_____

The foregoing instrument was acknowledged before me this _____6_____ day of May 2025, by _____Joshua Kennedy_____, as a Duly Authorized Member of Lighthouse Estates LLC, who are personally known to me or who have produced valid identification as indicated below and who affirmed that they are authorized to act on behalf of the company.

**Type of Identification Presented:** _IN DR LiC_

Notary Public State of: _____IN_____

Signature _____

Printed Name: _Tammy L Wargel_

My Commission Expires: _NOV 1, 2026_

Notary ID Number: _NP0716688_

TAMMY L WARGEL
Notary Public, State of Indiana
Resident of Vanderburgh County, IN
My Commission Expires: November 1, 2026
Commission Number NP0716688

9

IN WITNESS WHEREOF, Grantor has caused this Note to be executed as of the date first above written.

**GRANTOR:**

LIGHTHOUSE ESTATES LLC

By: _____
     Van Barker, Duly Authorized Member

By: _____
     Joshua Kennedy, Duly Authorized Member

By: _____
     Ariel Barker, Duly Authorized Member

State of _Indiana_

County of _Hamilton_

The foregoing instrument was acknowledged before me this _6_ day of May 2025, by _Ariel Barker_ , as a Duly Authorized Member of Lighthouse Estates LLC, who are personally known to me or who have produced valid identification as indicated below and who affirmed that they are authorized to act on behalf of the company.

**Type of Identification Presented:** _Drivers License - CA_

Notary Public State of: _Indiana_

Signature _____

Printed Name: _Larry S Dodson_

My Commission Expires: _9-2-2031_

Notary ID Number: _NP0672482_

> LARRY S DODSON
> Notary Public - Seal
> Marion County - State of Indiana
> Commission Number NP0672482
> My Commission Expires Sep 2, 2031

9

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# J

3110 Prairie Ave St Louis Personal Guarantee

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

# UNLIMITED PERSONAL GUARANTEE
THIS GUARANTEE dated this 7ᵗʰ day of May 2025

From: VAN BARKER, JOSHUA KENNEDY, ARIEL BARKER and LIGHTHOUSE ESTATES LLC
(jointly and severally known as the "Guarantor" and the "Grantor")
To: **SIMAYA INNOVATIONS LLC** (the "Grantee")

In consideration of the Grantee extending a loan of **ONE HUNDRED THOUSAND DOLLARS and 00/100 ($100,000.00)** to the Grantor, the receipt and sufficiency of which is hereby acknowledged, the Guarantor personally guarantees the prompt, full, and complete performance of any and all present and future duties, obligations, and indebtedness (the "Debt") owed to the Grantee by the Grantor, including any interest, fees advanced, legal fees, and other costs incurred by the Grantee, under the terms of the May 7, 2025 Promissory Note signed by the Grantor (the "Note"), and under the following terms and conditions:

1. **Guarantee of Payment:** The Guarantor unconditionally guarantees the full and prompt payment of the principal, interest, and any other sums owed under the Debt as and when they become due, in accordance with the terms and conditions provided in the Note.
2. **Waiver of Defenses:** To the fullest extent permitted by Missouri law, the Guarantor waives all defenses, counterclaims, or offsets that may be legally available to the Guarantor with respect to the payment of the Debt by the Grantor.
3. **Unlimited Guarantee:** This Personal Guarantee is an unlimited guarantee and is not limited to the amount of the loan or any specific sum.
4. **Non-Dischargeability:** The Guarantor expressly acknowledges and agrees that this Personal Guarantee constitutes a non-dischargeable obligation under any chapter of the United States Bankruptcy Code, to the fullest extent permitted by federal and Missouri law.
5. **Governing Law and Jurisdiction:** This Personal Guarantee shall be construed and governed exclusively by the laws of the State of Missouri. Any disputes arising under this Personal Guarantee shall be brought exclusively in the state courts of Missouri, and the Guarantor hereby submits to the jurisdiction of such courts and waives any objection based on forum non conveniens or venue.
6. **Entire Agreement:** This Personal Guarantee embodies the entire agreement and understanding between the parties with respect to the subject matter herein. It supersedes all prior agreements and understandings, whether written or oral.

This Personal Guarantee shall be construed exclusively in accordance with, and governed by, the laws of the State of Missouri Any dispute arising hereunder may only be brought within the State Courts of the State of Missouri. This Personal Guarantee embodies the entire promise of Guarantor to personally guarantee Grantor's Debt and supersedes all prior agreements and understandings relating to the subject matter here, whether oral or in writing.

## SIGNATURE PAGE TO FOLLOW

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
Van Barker, an individual


State of _Kentucky_

County of _Meade_


THE FOREGOING INSTRUMENT was acknowledged before me this _06_ day of May 2025 by

_Van Barker_ _____, an individual, personally known to me or have produced

his/her _6a Driver's License_ as identification and represents that he/she is authorized to act on behalf

of the company.

(seal)

_Lisa R Dunham_ _____
Notary Public, State of: _Kentucky_

My Commission Expires: _11/02/2028_

LISA R DUNHAM
Notary Public - State at Large
State of Kentucky
Notary ID # KYNP 17894
My Commission Expires Nov. 2, 2028

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
    Joshua Kennedy, an individual

State of _____IN_____

County of __Vanderburgh__

THE FOREGOING INSTRUMENT was acknowledged before me this _6_ day of May 2025 by __Joshua Kennedy__, an individual, personally known to me or have produced his/her __IN DR LiC__ as identification and represents that he/she is authorized to act on behalf of the company.

    (seal)

_____
Notary Public, State of:

My Commission Expires: __Nov 1, 2026__

TAMMY L WARGEL
Notary Public, State of Indiana
Resident of Vanderburgh County, IN
My Commission Expires: November 1, 2026
Commission Number NP0716688

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
    Ariel Barker, an individual

State of _____Indiana_____

County of _____Hamilton_____

THE FOREGOING INSTRUMENT was acknowledged before me this ___6___ day of May 2025 by
_____Ariel Barker_____, an individual, personally known to me or have produced
his/her ___Drivers License___ as identification and represents that he/she is authorized to act on behalf
of the company.

(seal)

LARRY S DODSON
Notary Public - Seal
Marion County - State of Indiana
Commission Number NP0672482
My Commission Expires Sep 2, 2031

Notary Public, State of: _____

My Commission Expires: ___9-2-2031___

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# K

Order of Detention Pending Trial (Barker, Dec. 19, 2025)

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

# UNITED STATES DISTRICT COURT
### for the

Western **District of** Kentucky

<table>
<tr><td>United States of America</td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Case No.    3:25-mj-766</td></tr>
<tr><td>Van Laurence Barker</td><td>)</td><td></td></tr>
<tr><td>*Defendant*</td><td>)</td><td></td></tr>
</table>

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

☑ **A.** Motion of the Government for a detention hearing pursuant to 18 U.S.C. § 3142(f)(1) because the defendant is charged with:

  ☐ **(1)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in l8 U.S.C. **(2)** 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

  ☐ **(2)** an offense for which the maximum sentence is life imprisonment or death; **or**

  ☐ **(3)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801–904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951–971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501–70508); **or**

  ☐ **(4)** any felony if such person has been convicted of two or more offenses described in Subparagraphs (1) through (3) of this paragraph or two or more of such offenses if a circumstance giving rise to federal jurisdiction had existed, or a combination thereof; **or**

  ☑ **(5)** any felony that is not otherwise a crime of violence but involves **(a)** a minor victim; **(b)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(c)** any other dangerous weapon; or **(d)** a failure to register under 18 U.S.C. § 2250;

    **OR**

☐ **B.** Motion of the Government or the Court's own motion for a detention hearing pursuant to 18 U.S.C. § 3142(f)(2) because the case involves:

  ☐ **(1)** a serious risk that the defendant will flee if released; **or**

  ☐ **(2)** a serious risk that the defendant will obstruct or attempt to obstruct justice or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate a prospective witness or juror if released.

The Court found that the Government established one or more of the factors above, held a detention hearing, and found that detention is warranted. This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

AO 472 (Rev. 1/25) Order of Detention Pending Trial

## Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

☐ **A. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** *(previous violator)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

  ☐ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

   ☐ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

   ☐ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

   ☐ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801–904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951–971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501–70508); **or**

   ☐ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs
   (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses; **or**

   ☐ **(e)** any felony that is not otherwise a crime of violence that involves:
   **(i)** a minor victim; **(ii)** the possession or use of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; **and**

  ☐ **(2)** the defendant has been convicted of a federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to federal jurisdiction had existed; **and**

  ☐ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a federal, State, or local offense; **and**

  ☐ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

☑ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

  ☐ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801–904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951–971), or Chapter 705 of Title 46 (46 U.S.C. §§ 70501–70508);

  ☐ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

  ☐ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

  ☐ **(4)** an offense under Chapter 77 of Title 18 (18 U.S.C. §§ 1581–1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

  ☑ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

☑ **C. Application of Any Presumption Established Above**

  ☑ The defendant has not rebutted the presumption.
  **OR**
  ☐ The defendant has rebutted the presumption.

### Part III - Analysis and Statement of the Reasons for Detention

After considering any applicable presumption, the nature and circumstances of the defendant's alleged conduct, the defendant's history and characteristics, the other factors set forth in 18 U.S.C. § 3142(g), the information presented at the detention hearing, and the available conditions of release under 18 U.S.C. § 3142(c), the Court concludes that the defendant must be detained pending trial because the Government has proven:

☑ By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

☑ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

The reasons for detention include the following checked items (*After this list, add any additional items or explanations as needed to comply with the requirement for a written statement of reasons under 18 U.S.C. § 3142(i).*):

☑ The offense charged is a crime of violence, a violation of § 1591, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device.

☑ Weight of evidence against the defendant is strong.

☐ Subject to lengthy period of incarceration if convicted.

☐ Lack of significant family or other ties to the community.

☑ Significant family or other ties outside the United States.

☐ Lack of legal status in the United States.

☐ Subject to removal or deportation after serving any period of incarceration.

☐ Lack of stable residence.

☐ Lack of stable employment.

☐ Lack of financially responsible sureties.

☐ Prior attempt(s) to evade law enforcement.

☐ Use of alias(es) or false documents.

☐ History of alcohol or substance abuse.

☐ Prior criminal history.

☐ History of violence or use of weapons.

☐ Prior violations of probation, parole, or supervised release.

☑ Prior failure to appear in court as ordered.

☐ On probation, parole, and/or release pending trial, sentence appeal, or completion of the sentence at the time of the alleged offense.

☐ Participation in criminal activity while on probation, parole, or supervision.

☑ The defendant's release poses serious danger to any person or the community.

OTHER REASONS OR FURTHER EXPLANATION:

AO 472 (Rev. 1/25) Order of Detention Pending Trial

## Part IV - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The defendant must be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date: _____          _____

                                                        U.S. Magistrate Judge

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# L

CeeKou LLC Operating Agreement

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

Operating Agreement

## CeeKou LLC,
## a Wyoming Limited Liability Company

THIS OPERATING AGREEMENT of CeeKou LLC (the "Company") is entered into as of the date set forth on the signature page of this Agreement by each of the Members listed on Exhibit A of this Agreement.

A.      The Members have formed the Company as a Wyoming limited liability company under the Wyoming Limited Liability Company Act. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized under the laws of the state of Wyoming. The Members hereby adopt and approve the Articles of Organization of the Company filed with the Wyoming Secretary of State.

B.      The Members enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

## ARTICLE 1: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article 1 or elsewhere in this Agreement and if not so specified, have the meanings set forth in the Wyoming Limited Liability Company Act.

"Agreement" means this Operating Agreement of the Company, as may be amended from time to time.

"Capital Account" means, with respect to any Member, an account consisting of such Member's Capital Contribution, (1) increased by such Member's allocated share of income and gain, (2) decreased by such Member's share of losses and deductions, (3) decreased by any distributions made by the Company to such Member, and (4) otherwise adjusted as required in accordance with applicable tax laws.

"Capital Contribution" means, with respect to any Member, the total value of (1) cash and the fair market value of property other than cash and (2) services that are contributed and/or agreed to be contributed to the Company by such Member, as listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement.

"Exhibit" means a document attached to this Agreement labeled as "Exhibit A," "Exhibit B," and so forth, as such document may be amended, updated, or replaced from time to time according to the terms of this Agreement.

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

"Member" means each Person who acquires Membership Interest pursuant to this Agreement. The Members are listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement. Each Member has the rights and obligations specified in this Agreement.

"Membership Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Wyoming Limited Liability Company Act, together with the obligations of the Member to comply with all of the terms and provisions of this Agreement.

"Ownership Interest" means the Percentage Interest or Units, as applicable, based on the manner in which relative ownership of the Company is divided.

"Percentage Interest" means the percentage of ownership in the Company that, with respect to each Member, entitles the Member to a Membership Interest and is expressed as either:

A.      If ownership in the Company is expressed in terms of percentage, the percentage set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement; or

B.      If ownership in the Company is expressed in Units, the ratio, expressed as a percentage, of:

(1)   the number of Units owned by the Member (expressed as "MU" in the equation below) divided by

(2)   the total number of Units owned by all of the Members of the Company (expressed as "TU" in the equation below).

$$\text{Percentage Interest} = \frac{MU}{TU}$$

"Person" means an individual (natural person), partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Units" mean, if ownership in the Company is expressed in Units, units of ownership in the Company, that, with respect to each Member, entitles the Member to a Membership Interest which, if applicable, is expressed as the number of Units set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement.

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

## ARTICLE 2: CAPITAL CONTRIBUTIONS, ADDITIONAL MEMBERS, CAPITAL ACCOUNTS AND LIMITED LIABILITY

2.1     **Initial Capital Contributions**. The names of all Members and each of their respective addresses, initial Capital Contributions, and Ownership Interests must be set forth on Exhibit A. Each Member has made or agrees to make the initial Capital Contribution set forth next to such Member's name on Exhibit A to become a Member of the Company.

2.2     **Subsequent Capital Contributions**. Members are not obligated to make additional Capital Contributions unless unanimously agreed by all the Members. If subsequent Capital Contributions are unanimously agreed by all the Members in a consent in writing, the Members may make such additional Capital Contributions on a pro rata basis in accordance with each Member's respective Percentage Interest or as otherwise unanimously agreed by the Members.

2.3     **Additional Members**.

A.     With the exception of a transfer of interest (1) governed by Article 7 of this Agreement or (2) otherwise expressly authorized by this Agreement, additional Persons may become Members of the Company and be issued additional Ownership Interests only if approved by and on terms determined by a unanimous written agreement signed by all of the existing Members.

B.     Before a Person may be admitted as a Member of the Company, that Person must sign and deliver to the Company the documents and instruments, in the form and containing the information required by the Company, that the Members deem necessary or desirable. Membership Interests of new Members will be allocated according to the terms of this Agreement.

2.4     **Capital Accounts**. Individual Capital Accounts must be maintained for each Member, unless (a) there is only one Member of the Company and (b) the Company is exempt according to applicable tax laws. Capital Accounts must be maintained in accordance with all applicable tax laws.

2.5     **Interest**. No interest will be paid by the Company or otherwise on Capital Contributions or on the balance of a Member's Capital Account.

2.6     **Limited Liability; No Authority.** A Member will not be bound by, or be personally liable for, the expenses, liabilities, debts, contracts, or obligations of the Company, except as otherwise provided in this Agreement or as required by the Wyoming Limited Liability Company Act. Unless expressly provided in this Agreement, no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, or otherwise act on behalf of, the Company or any other Member.

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1     **Allocations**. Unless otherwise agreed to by the unanimous consent of the Members any income, gain, loss, deduction, or credit of the Company will be allocated for accounting and tax purposes on a pro rata basis in proportion to the respective Percentage Interest held by each Member and in compliance with applicable tax laws.

3.2     **Distributions**. The Company will have the right to make distributions of cash and property to the Members on a pro rata basis in proportion to the respective Percentage Interest held by each Member. The timing and amount of distributions will be determined by the Members in accordance with the Wyoming Limited Liability Company Act.

3.3     **Limitations on Distributions**. The Company must not make a distribution to a Member if, after giving effect to the distribution:

A.     The Company would be unable to pay its debts as they become due in the usual course of business; or

B.     The fair value of the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of Members, if any, whose preferential rights are superior to those of the Members receiving the distribution.

## ARTICLE 4: MANAGEMENT

4.1     **Management**.

A.     **Generally**. Subject to the terms of this Agreement and the Wyoming Limited Liability Company Act, the business and affairs of the Company will be managed by the Members.

B.     **Approval and Action**. Unless greater or other authorization is required pursuant to this Agreement or under the Wyoming Limited Liability Company Act for the Company to engage in an activity or transaction, all activities or transactions must be approved by the Members, to constitute the act of the Company or serve to bind the Company. With such approval, the signature of any Members authorized to sign on behalf of the Company is sufficient to bind the Company with respect to the matter or matters so approved. Without such approval, no Members acting alone may bind the Company to any agreement with or obligation to any third party or represent or claim to have the ability to so bind the Company.

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

C.      **Certain Decisions Requiring Greater Authorization**. Notwithstanding clause B above, the following matters require unanimous approval of the Members in a consent in writing to constitute an act of the Company:

(i)      A material change in the purposes or the nature of the Company's business;

(ii)      With the exception of a transfer of interest governed by Article 7 of this Agreement, the admission of a new Member or a change in any Member's Membership Interest, Ownership Interest, Percentage Interest, or Voting Interest in any manner other than in accordance with this Agreement;

(iii)      The merger of the Company with any other entity or the sale of all or substantially all of the Company's assets; and

(iv)      The amendment of this Agreement.

4.2      **Officers**. The Members are authorized to appoint one or more officers from time to time. The officers will have the titles, the authority, exercise the powers, and perform the duties that the Members determine from time to time. Each officer will continue to perform and hold office until such time as (a) the officer's successor is chosen and appointed by the Members; or (b) the officer is dismissed or terminated by the Members, which termination will be subject to applicable law and, if an effective employment agreement exists between the officer and the Company, the employment agreement. Subject to applicable law and the employment agreement (if any), each officer will serve at the direction of Members, and may be terminated, at any time and for any reason, by the Members.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1      **Accounts**. The Company must maintain complete accounting records of the Company's business, including a full and accurate record of each Company transaction. The records must be kept at the Company's principal executive office and must be open to inspection and copying by Members during normal business hours upon reasonable notice by the Members wishing to inspect or copy the records or their authorized representatives, for purposes reasonably related to the Membership Interest of such Members. The costs of inspection and copying will be borne by the respective Member.

5.2 **Records**. The Members will keep or cause the Company to keep the following business records.

(i) An up to date list of the Members, each of their respective full legal names, last known business or residence address, Capital Contributions, the amount and terms of any agreed upon future Capital Contributions, and Ownership Interests, and Voting Interests;

(ii) A copy of the Company's federal, state, and local tax information and income tax returns and reports, if any, for the six most recent taxable years;

(iii) A copy of the Articles of Organization of the Company, as may be amended from time to time ("Articles of Organization"); and

(iv) An original signed copy, which may include counterpart signatures, of this Agreement, and any amendments to this Agreement, signed by all then-current Members.

5.3 **Income Tax Returns.** Within 45 days after the end of each taxable year, the Company will use its best efforts to send each of the Members all information necessary for the Members to complete their federal and state tax information, returns, and reports and a copy of the Company's federal, state, and local tax information or income tax returns and reports for such year.

5.4 **Subchapter S Election**. The Company may, upon unanimous consent of the Members, elect to be treated for income tax purposes as an S Corporation. This designation may be changed as permitted under the Internal Revenue Code Section 1362(d) and applicable Regulations.

5.5 **Tax Matters Member**. Anytime the Company is required to designate or select a tax matters partner or partnership representative, pursuant to Section 6223 of the Internal Revenue Code and any regulations issued by the Internal Revenue Service, the Members must designate one of the Members as the tax matters partner or partnership representative of the Company and keep such designation in effect at all times.

5.6 **Banking**. All funds of the Company must be deposited in one or more bank accounts in the name of the Company with one or more recognized financial institutions. The Members are authorized to establish such accounts and complete, sign, and deliver any banking resolutions reasonably required by the respective financial institutions in order to establish an account.

## ARTICLE 6: MEMBERSHIP VOTING AND MEETINGS

6.1    **Members and Voting Rights**. The Members have the right and power to vote on all matters with respect to which the Articles of Organization, this Agreement, or the Wyoming Limited Liability Company Act requires or permits. Unless otherwise stated in this Agreement (for example, in Section 4.1(c)) or required under the Wyoming Limited Liability Company Act, the vote of the Members holding at least a majority of the Voting Interest of the Company is required to approve or carry out an action.

6.2    **Meetings of Members**. Annual, regular, or special meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company. A written notice setting forth the date, time, and location of a meeting must be sent before the date of the meeting to each Member entitled to vote at the meeting. A Member may waive notice of a meeting by sending a signed waiver to the Company's principal executive office or as otherwise provided in the Wyoming Limited Liability Company Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Wyoming Limited Liability Company Act, including by conference call or similar communications equipment. Any action that could be taken at a meeting may be approved by a consent in writing that describes the action to be taken and is signed by Members holding the minimum Voting Interest required to approve the action. If any action is taken without a meeting and without unanimous written consent of the Members, notice of such action must be sent to each Member that did not consent to the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS, AND RETURN OF CAPITAL CONTRIBUTIONS

7.1    **Withdrawal**. Members may withdraw from the Company prior to the dissolution and winding up of the Company (a) by transferring or assigning all of their respective Membership Interests pursuant to Section 7.2 below, or (b) if all of the Members unanimously agree in a written consent. Subject to the provisions of Article 3, a Member that withdraws pursuant to this Section 7.1 will be entitled to a distribution from the Company in an amount equal to such Member's Capital Account.

7.2    **Restrictions on Transfer; Admission of Transferee.**  A Member may not transfer any Membership Interests, whether now owned or later acquired, unless Members holding a majority of the Percentage Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A Person that acquires Membership Interests in accordance with this Section 7.2 will be admitted as a Member of the Company only after the requirements of Section 2.3(b) are complied with in full.

7.3    **Return of Capital Contribution**.

-7-

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

A.    A Member may not receive out of the Company's property any part of his, her, or its Capital Contribution unless:

  (i)  All liabilities of the Company, except liabilities to Members on account of their contributions to capital, have been paid or there remains property of the Company sufficient to pay them;

  (ii)  The unanimous agreement of all of the Members in a consent in writing is had, unless the return of the Capital Contribution may be rightfully demanded as provided in this Section; or

  (iii)  The Articles of Organization are cancelled or so amended as to set out the withdrawal or reduction.

B.    Subject to the provisions of subsection (a) above, a Member may rightfully demand the return of his, her or its contribution:

  (i)  On the dissolution of the Company; or

  (ii)  After the Member has given all other Members of the Company six months prior notice in writing.

C.    In the absence of a statement in the Articles of Organization to the contrary or unanimous agreement of all of the Members in a consent in writing, a Member, irrespective of the nature of his, her or its contribution, has only the right to demand and receive cash in return for his, her or its Capital Contribution.

D.    A Member may have the Company dissolved and its affairs wound up when:

  (i)  The Member rightfully but unsuccessfully has demanded the return of his, her or its Capital Contribution; or

  (ii)  The other liabilities of the Company have not been paid, or the Company's property is insufficient for their payment and the Member would otherwise be entitled to the return of his, her or its Capital Contribution.

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

## ARTICLE 8: DISSOLUTION

8.1    **Dissolution.** The Company will be dissolved upon the first to occur of the following events:

> (i)    The unanimous agreement of all Members in a consent in writing to dissolve the Company;

> (ii)    At any time that there are no Members, unless and provided that the Company is not otherwise required to be dissolved and wound up, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and (i) to become a Member; or (ii) to the extent that the last remaining Member assigned its interest in the Company, to cause the Member's assignee to become a Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member;

> (iii)    The sale or transfer of all or substantially all of the Company's assets;

> (iv)    A merger or consolidation of the Company with one or more entities in which the Company is not the surviving entity.

8.2    **No Automatic Dissolution Upon Certain Events**. Unless otherwise set forth in this Agreement or required by applicable law, the death, incapacity, disassociation, bankruptcy, or withdrawal of a Member will not automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

9.1    **Indemnification**. The Company has the power to defend, indemnify, and hold harmless any Person who was or is a party, or who is threatened to be made a party, to any Proceeding (as that term is defined below) by reason of the fact that such Person was or is a Member, officer, employee, representative, or other agent of the Company, or was or is serving at the request of the Company as a director, Governor, officer, employee, representative or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (each such Person is referred to as a "Company Agent"), against Expenses (as that term is defined below), judgments, fines, settlements, and other amounts (collectively, "Damages") to the maximum extent now or hereafter permitted under Wyoming law. "Proceeding," as used in this Article 9, means any threatened, pending, or completed action, proceeding, individual claim or matter within a proceeding, whether civil, criminal, administrative, or investigative. "Expenses," as used in this Article 9, includes, without limitation, court costs, reasonable attorney and expert fees,

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

and any expenses incurred relating to establishing a right to indemnification, if any, under this Article 9.

9.2    **Mandatory.** The Company must defend, indemnify and hold harmless a Company Agent in connection with a Proceeding in which such Company Agent is involved if, and to the extent, Wyoming law requires that a limited liability company indemnify a Company Agent in connection with a Proceeding.

9.3    **Expenses Paid by the Company Prior to Final Disposition**. Expenses of each Company Agent indemnified or held harmless under this Agreement that are actually and reasonably incurred in connection with the defense or settlement of a Proceeding may be paid by the Company in advance of the final disposition of a Proceeding if authorized by a vote of the Members that are not seeking indemnification holding a majority of the Voting Interests (excluding the Voting Interest of the Company Agent seeking indemnification). Before the Company makes any such payment of Expenses, the Company Agent seeking indemnification must deliver a written undertaking to the Company stating that such Company Agent will repay the applicable Expenses to the Company unless it is ultimately determined that the Company Agent is entitled or required to be indemnified and held harmless by the Company (as set forth in Sections 9.1 or 9.2 above or as otherwise required by applicable law).

## ARTICLE 10: GENERAL PROVISIONS

10.1    **Notice**. (a) Any notices (including requests, demands, or other communications) to be sent by one party to another party in connection with this Agreement must be in writing and delivered personally, by reputable overnight courier, or by certified mail (or equivalent service offered by the postal service from time to time) to the following addresses or as otherwise notified in accordance with this Section: (i) if to the Company, notices must be sent to the Company's principal executive office; and (ii) if to a Member, notices must be sent to the Member's last known address for notice on record. (b) Any party to this Agreement may change its notice address by sending written notice of such change to the Company in the manner specified above. Notice will be deemed to have been duly given as follows: (i) upon delivery, if delivered personally or by reputable overnight carrier or (ii) five days after the date of posting if sent by certified mail.

10.2    **Entire Agreement; Amendment**. This Agreement along with the Articles of Organization (together, the "Organizational Documents"), constitute the entire agreement among the Members and replace and supersede all prior written and oral understandings and agreements with respect to the subject matter of this Agreement, except as otherwise required by the Wyoming Limited Liability Company Act. There are no representations, agreements, arrangements, or undertakings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents. This Agreement may not be modified or amended in any respect, except in a writing signed by all of the Members, except as otherwise required or permitted by the Wyoming Limited Liability Company Act.

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

10.3     **Governing Law; Severability**. This Agreement will be construed and enforced in accordance with the laws of the state of Wyoming. If any provision of this Agreement is held to be unenforceable by a court of competent jurisdiction for any reason whatsoever, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any provisions containing any such unenforceable provision that are not themselves unenforceable) will not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the unenforceable provision will be deemed modified and replaced by a provision that approximates the intent and economic effect of the unenforceable provision and the Agreement will be deemed amended accordingly.

10.4     **Further Action**. Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.5     **No Third Party Beneficiary**. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person or entity will have or acquire any right by virtue of this Agreement. This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.6     **Incorporation by Reference**. The recitals and each appendix, exhibit, schedule, and other document attached to or referred to in this Agreement are hereby incorporated into this Agreement by reference.

10.7     **Counterparts**. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members signed the same copy. All counterparts will be construed together and will constitute one agreement.

*[Remainder Intentionally Left Blank.]*

-11-

**IN WITNESS WHEREOF**, the parties have executed or caused to be executed this Operating Agreement and do each hereby represent and warrant that their respective signatory, whose signature appears below, has been and is, on the date of this Agreement, duly authorized to execute this Agreement.

Dated: ____5/6/2025____ __5/6/2025___

*Siyuan Zheng*

2A7C48833A7F466...

Signature of Siyuan Zheng

*Van Barker*

DB1C8A4B4F5343A...

Signature of Representative of Lighthouse Estates LLC

Van Barker

Name of Representative

Managing Member

Title of Representative

Docusign Envelope ID: A74863C8-5922-426C-BE79-BA781FF07C7D

EXHIBIT A
**MEMBERS**

       The Members of the Company and their respective addresses, Capital Contributions, and Ownership Interests are set forth below. The Members agree to keep this Exhibit A current and updated in accordance with the terms of this Agreement, including, but not limited to, Sections 2.1, 2.3, 2.4, 7.1, 7.2, and 10.1.

| Members | Capital Contribution | Percentage Interest |
|---|---|---|
| Siyuan Zheng<br>1603 Capitol Ave Ste 415 #310764<br>Cheyenne, Wyoming 82001 | _____ | 81% |
| Lighthouse Estates LLC<br>1603 Capitol Ave Ste 415 #310764<br>Cheyenne, Wyoming 82001 | _____ | 19% |

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# M

Starpoint Holdings LLC Articles of Organization

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

# State of Indiana
## Office of the Secretary of State

### Certificate of Organization
### of
# STARPOINT HOLDINGS L.L.C.

I, DIEGO MORALES, Secretary of State, hereby certify that Articles of Organization of the above Domestic Limited Liability Company have been presented to me at my office, accompanied by the fees prescribed by law and that the documentation presented conforms to law as prescribed by the provisions of the Indiana Code.



NOW, THEREFORE, with this document I certify that said transaction will become effective Wednesday, September 27, 2023.



In Witness Whereof, I have caused to be affixed my signature and the seal of the State of Indiana, at the City of Indianapolis, September 28, 2023.

*Diego Morales*

DIEGO MORALES
SECRETARY OF STATE

202309271728562 / 10038522

To ensure the certificate's validity, go to https://bsd.sos.in.gov/PublicBusinessSearch

**APPROVED AND FILED**
DIEGO MORALES
INDIANA SECRETARY OF STATE
09/28/2023 08:58 AM

## ARTICLES OF ORGANIZATION

Formed pursuant to the provisions of the Indiana Code.

## ARTICLE I - NAME AND PRINCIPAL OFFICE ADDRESS

| | |
|---|---|
| **BUSINESS ID** | 202309271728562 |
| **BUSINESS TYPE** | Domestic Limited Liability Company |
| **BUSINESS NAME** | STARPOINT HOLDINGS L.L.C. |
| **PRINCIPAL OFFICE ADDRESS** | 8520 Allison Pointe Blvd Ste 223 #934717, Indianapolis, IN, 46250, USA |

## ARTICLE II - REGISTERED OFFICE AND ADDRESS

| | |
|---|---|
| **REGISTERED AGENT TYPE** | Business Commercial Registered Agent |
| **NAME** | UNITED STATES CORPORATION AGENTS, INC. |
| **ADDRESS** | 8520 Allison Pointe Blvd., Ste. 220, Indianapolis, IN, 46250, USA |

## ARTICLE III - PERIOD OF DURATION AND EFFECTIVE DATE

| | |
|---|---|
| **PERIOD OF DURATION** | Perpetual |
| **EFFECTIVE DATE** | 09/27/2023 |
| **EFFECTIVE TIME** | 04:43PM |

## ARTICLE IV - GOVERNING PERSON INFORMATION

| | |
|---|---|
| **TITLE** | Member |
| **NAME** | Van Laurence Barker |
| **ADDRESS** | 8520 Allison Pointe Blvd Ste 223 #934717, Indianapolis, IN, 46250, USA |

| | |
|---|---|
| **TITLE** | Member |
| **NAME** | Joshua James Kennedy |
| **ADDRESS** | 8520 Allison Pointe Blvd Ste 223 #934717, Indianapolis, IN, 46250, USA |

**APPROVED AND FILED**
DIEGO MORALES
INDIANA SECRETARY OF STATE
09/28/2023 08:58 AM

## MANAGEMENT INFORMATION

**THE LLC WILL BE MANAGED BY MANAGER(S)**    No

**IS THE LLC A SINGLE MEMBER LLC?**    No

## SIGNATURE

THE SIGNATOR(S) REPRESENTS THAT THE REGISTERED AGENT NAMED IN THE APPLICATION HAS CONSENTED TO THE APPOINTMENT OF REGISTERED AGENT.

THE UNDERSIGNED, DESIRING TO FORM A LIMITED LIABILITY COMPANY PURSUANT TO THE PROVISIONS OF THE INDIANA BUSINESS FLEXIBILITY ACT EXECUTES THESE ARTICLES OF ORGANIZATION.

IN WITNESS WHEREOF, THE UNDERSIGNED HEREBY VERIFIES, SUBJECT TO THE PENALTIES OF PERJURY, THAT THE STATEMENTS CONTAINED HEREIN ARE TRUE, THIS DAY **September 27**, **2023**.

THE UNDERSIGNED ACKNOWLEDGES THAT A PERSON COMMITS A CLASS A MISDEMEANOR BY SIGNING A DOCUMENT THAT THE PERSON KNOWS IS FALSE IN A MATERIAL RESPECT WITH THE INTENT THAT THE DOCUMENT BE DELIVERED TO THE SECRETARY OF STATE FOR FILING.

**SIGNATURE**    Van Laurence Barker

**TITLE**    Member

Business ID : 202309271728562

Filing No :    10038522

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# N

KPL Investment Opportunity Overview (Q1 2025 Pitch Deck)

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

**CONFIDENTIAL**
*Q1 2025*



# Investment Opportunity Overview

## A Higher Yield, Lower Risk Investment Alternative

**Aaron Metten | ametten@kentuckypl.com | 502.905.0656**

Membership interest is being offered only to "accredited investors" as defined in Regulation D under the Securities Act of 1993.

# WHO WE ARE

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

Kentucky Private Lending was formed in 2022 to **capitalize on inefficiencies in the real estate lending market**.

We offer an alternative investment vehicle for **accredited investors** seeking to improve the overall risk-return characteristics of their portfolio.

## Founded by traditional market and real estate investors looking for higher yield income returns.

➤ Taking a more sophisticated approach to private money real estate investing.
➤ Providing **passive income returns to investors**.

- Above-market, high single-digit yield.
- Diversification away from certain macro economic factors.
- Stability of principal supported indirectly by underlying real estate assets.

➤ Leveraging our dedicated expertise in originating, servicing, and managing private real estate loans.



1

**CONFIDENTIAL**

*Q1 2025*

# INVESTMENT OPPORTUNITY SUMMARY

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**Kentucky Private Lending offers investors a fund opportunity for private real estate lending.**

➤ Investors execute promissory note(s) with **Kentucky Private Lending.**

- Kentucky Private Lending is a conduit through which investor funds are loaned to the borrowers.
- We provide quarterly distributions.
- Investors receive annual 1099 tax statements.

➤ Investors receive a **preferred annual return of 9.0%.**

- **No investor or management fees.**
- **1-year minimum hold period (preferred).**
- Funds can be called within 6 months of commitment.
- Investors may request redemptions on a quarterly basis (subject to an initial hold period and a redemption gate).

➤ Kentucky Private Lending has the right to return surplus capital if market conditions deteriorate.



2

**CONFIDENTIAL**
*Q1 2025*

# PRIVATE MONEY LENDING IS NOW MAINSTREAM

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**Crowdsourcing and peer-to-peer (P2P) models for online loan origination provide industry-wide validation of opportunities to fill a need and profit where banks fail to perform.**

- ➤ Online P2P marketplaces that match private lenders and borrowers are booming.
  - Disintermediating banks with more efficient consumer lending.
  - Lending Club originated +$60B of loans since inception; Prosper Marketplace has originated +$18B.
- ➤ P2P markets are less prolific in real estate.
  - Only a handful of online marketplace start-ups are focused on lending to residential real estate investors (e.g. Patch of Land, Ground Floor, and Realty Mogul).
  - Real estate is not algorithmic and marketplace models put responsibility for diversification on individual investors.

**Kentucky Private Lending facilitates private money lending to real estate investors where both banks and P2P marketplaces fail to perform.**



3

CONFIDENTIAL
*Q1 2025*

# OUR MODEL FOR REAL ESTATE INVESTMENT LENDING

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**Our fund is ideal for investors seeking to lend capital for investment properties.**

➤ **Passive diversification** and **preferred returns** are only subject to seniority of bank borrowing by the operating entity.

- Investors are not tied to any specific property.
- Default risk is spread across the portfolio, allowing management of delinquent borrowers without impacting returns to any single investor.
- There are no top-line management fees.
- **Kentucky Private Lending** note holders are solely compensated from earnings after all Senior Bank commitments (if any) have been paid.
- Our model is different from online marketplace models where "steerage" fees are paid first and investor risk is tied directly to specific loans.

➤ **Risk mitigation** comes from a tiered capital structure.

- Investors are senior to and paid before a similar but closely held investment fund.

Local market knowledge to **properly evaluate and value property**

Local market presence to **monitor projects**

Local market **familiarity with borrowers and their track record**



4

**CONFIDENTIAL**
*Q1 2025*

# TIERED CAPITAL STRUCTURE

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**3 segments of capital allow Kentucky Private Lending investors to be fully invested and risk mitigated at all times.**

➤ A bank revolver at Kentucky Private Lending allows flexibility of capital as loans are repaid and funds are deployed so that **investor principal is never idle.**

➤ Investor Notes maintain a senior position to the closely held fund.

➤ A closely held fund of founder and family money sits in a higher risk position, **subordinated position to investor funds.**

## ILLUSTRATIVE CAPITAL STRUCTURE

**Bank Revolver Capacity**
► Borrowing fluctuates up and down weekly

**9.0% Notes – Investor Capital**
► Senior note position
► 9.0% preferred return

**10% Notes – Founder Capital**
► Subordinate Risk
► 10% return



| $18.2M | $28M |
| $2.3M | $10M |
| $5.1M | $6.0M |

$25.6M
*Current
Q1 2025*

$44.0M
*Target
Q4 2025*



5

**CONFIDENTIAL**
*Q1 2025*

# NO TOP-LINE MANAGEMENT FEES

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**The preferred 9.0% return is structured so that all investors in Kentucky Private Lending are paid quarterly in full before Kentucky Private Lending principals.**

➤ **The waterfall structure pays bank interest and 9.0% Note investor returns first, then the closely held fund and the principals after that.**

  - The interest spread between loans to borrowers and the Kentucky Private Lending preferred return primarily fund the operations of Kentucky Private Lending.
  - The Kentucky Private Lending earnings (and thus principal compensation) are driven primarily by loan origination activity and the related fees charged to Kentucky Private Lending borrowers.

➤ **Principal compensation is at risk if the interest spread does not cover operating expenses and/or investor capital is not deployed efficiently to originate new loans.**

  - **The Kentucky Private Lending principals are incentivized to generate origination fees by keeping loan hold periods short, which aligns with investor goals to mitigate risk with shorter term loans.**
  - Conversely, Kentucky Private Lending principals are not incentivized to foreclose on and hold properties; inactive capital for any reason impairs the profit potential for those managing it.



6

# WHAT WE DO

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**High frequency, short-term lending (6 months or less) by Kentucky Private Lending.**

**First lien mortgages for acquisition, development, and renovation of residential real estate.**

## RISK MITIGATION

- Funding targets based on proprietary evaluation

  ~ 65% of estimated after-repaired value (ARV)

  ~ 95% loan-to-cost (LTC) for work completed

- Fees paid at closing; monthly payments
- Staggered draw requests, paid on completed work
- Short grace period for late fees
- Builder network to acquire foreclosed property (if needed)

## TARGET LOAN RETURNS

- 12-14% interest
- 2-4% origination payment fees
- Average loan size of $100-200K
- Average hold period of 6-7 months



**Our model is <u>not to acquire property</u>.**

**We focus on collecting payments and returning capital to our investors.**



KENTUCKY
PRIVATE LENDING

7

**CONFIDENTIAL**
*Q1 2025*

# THE LOUISVILLE MARKET

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**The Louisville market is ideal for private, non-bank related real estate lending, including house flipping, construction loans, land loans, investors with multiple projects, and competitive situations where investors require speed.**

➤ As the largest city in the state, **Louisville** is slowly becoming one of the best markets for real estate investors in the country as a result of the area's affordability, broad selection of neighborhoods, promising appreciation statistics, demand for both primary residence and rental options, and the state being known as landlord friendly.

➤ **Greater Louisville** and the surrounding areas provide KYPL a lending market that is not as susceptible to real estate fluctuations that can be experienced in larger cities such as New York, Los Angeles, Chicago, and Houston for example. Having a steady real estate market provides additional security to Kentucky Private Lending, our investors, and our clients.

### December 2024 DATA

| | |
|---|---|
| **Homes for Sale** | 2,397 |
| **Price Range** | $15K – $4.99M |
| **Average Listing Price** | $260K |
| **Average Price per Square Foot** | $158 |
| **Market Trend Year Over Year** | 2.00% ⬆ |



8

**CONFIDENTIAL**
*Q1 2025*

# POTENTIAL EXPANSION MARKETS

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**As Kentucky Private Lending grows, we plan to deploy capital in other similar markets to provide geographic diversification for our investors.**

- ➤ **Lender-friendly** states

- ➤ No "**boom and bust**" markets (i.e. Los Angeles or New York)

- ➤ **Economy** anchored by large, stable industries and prominent universities

- ➤ Population density and real estate transaction volume to **validate demand**

- ➤ **A local market expert – never without one**

**Cincinnati, Ohio**
- Population of 306,592 in 2023
- Number of Homes for Sale (October): 3,198
- Median Sale Price: $245K
- Trending up 6.6% from October 2022
- Average days on market: 39

**Indianapolis, Indiana**
- Population of 871,449 in 2023
- Number of Homes for Sale (October): 3,953
- Median Sale Price: $235K
- Trending up 1% from 2022
- Average days on market: 25



9

**CONFIDENTIAL**
*Q1 2025*

# OUR LOAN PROCESS

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

➤ **Local real estate expert**

- Feet on the street to execute foundational lending criteria and monitor loan performance.

➤ **Well-established underwriting processes**

- Practiced in borrower screening. Target borrowers are experienced real estate investors with multiple successful projects in the last 24 months (investing in, managing, or renovating real estate).
- Multipronged property valuation. Local market knowledge, referral network of submarket experts, and third-party services.
- Standard documentation and reporting. Credit scores, no outstanding liens or judgments, referral network of lenders and contractors who share information on borrowers, and pre-approval for long-term hold when applicable.

➤ **Closing and post-closing loan service**

- Third-party attorney prepares Kentucky Private Lending loan and personal guarantor documents.
- Third-party title company facilitates loan closings.
- Documentation of physical progress is provided in advance of scheduled funding.
- Third-party site inspections verify rehab progress before renovation funds are released.



**CONFIDENTIAL**
*Q1 2025*

# OUR TEAM

## A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

**Eric Payne** is a Louisville native and serves as Managing Partner of our team. He has been with Kentucky Private Lending since its inception. Eric has an extensive background in residential and commercial lending having worked for locally-owned Republic Bank. Having spent previous time assisting a local startup company, DPL Financial Partners, Eric brings a unique skill set to KYPL: an in-depth understanding of the real estate investment process combined with an appreciation of the entrepreneurial spirit it takes to be successful.

**Bryan Etscorn** is a Partner of Kentucky Private Lending and a Louisville native with deep-rooted heritage in the city and its surrounding communities. Bryan was previously a co-owner of a third-generation family business known as Etscorn Collision Center. He was instrumental in the daily operations as well as the company's acquisition by a national company in 2021. Bryan remains an active owner of Etscorn Tire Pros and Service Center. He has extensive experience in residential and commercial real estate, property management, construction and renovation, permanent lending, marketing, and contract negotiation.

**Dean Lontos** is a Partner of Kentucky Private Lending and is the founder and managing partner of Bay Mountain Capital, which is a direct private lender serving the housing industry. The company provides acquisition, development, and renovation financing for single family and multi-family projects in Texas. Over the last 30 years, Dean has been involved in thousands of transactions involving billions of dollars of real estate. In the process, he has worked with hundreds of industry professionals and has developed a reputation of high competency, integrity, and success in the areas of finance, investment, and asset management. Dean has developed or acquired numerous residential and commercial properties either personally or through investment partnerships in which he sponsored.

**Ben S. Harralson** is a Partner of Kentucky Private Lending and a Louisville native. After graduating from the University of Kentucky, Ben went on to receive his law degree from the University of Louisville and is now a Partner at Smedal, Harralson & Croce, Attorneys at Law. His expertise proves integral to KYPL's focus on making sure the business operates at a high level of safety, soundness, and regulatory compliance in every area of our services.

**Mark Rittiner** is the majority owner of Meridian Capital Private Lending located in Nashville, Tennessee, and a Partner in Kentucky Private Lending. Mark spent a great deal of time consulting with Bay Mountain Capital on strategies to apply their private real estate lending model in the Nashville Market which opened in 2014. Mark has 25 years of sales and marketing experience with Waste Management, which includes identifying new markets, maintaining executive relationships, and developing sales personnel.

**Aaron Metten** serves as President of Kentucky Private Lending and is a Partner in the company. Having worked for Republic Bank & Trust Company for over 14 years, he brings an extensive background of private and corporate lending in the residential and commercial arena. After his career at Republic Bank, he served as President of Anytime Waste Systems which is a locally owned and operated recycling and waste disposal company that served Kentucky and Southern Indiana. Aaron is also a Partner in a company, Wasteology, which is a leading provider of waste and recycling services based in Louisville, KY with a nationwide service area footprint. Aaron brings a unique skill set to KYPL; an in depth understanding of commercial and residential real-estate lending, underwriting, construction and renovation, property management and contract negotiation along with experience of strategically growing companies in multiple sectors.



**CONFIDENTIAL**
*Q1 2025*

# DISCLAIMERS

A HIGHER YIELD, LOWER RISK INVESTMENT ALTERNATIVE

This presentation has been prepared solely for use in connection with a possible offering of membership interests in Kentucky Private Lending, LLC. The information contained in this presentation has not been independently verified. No representation, warranty or undertaking, expressed or implied, is made as to the accuracy or completeness of the information or the opinions contained herein. In addition, this presentation is entirely subject to the contents of the Kentucky Private Lending Confidential Disclosure Memorandum, including the risk factors contained therein. Furthermore, the information contained in this presentation is provided as of the date of this presentation and is subject to change without notice.

This presentation contains forward-looking statements that are not based on historical facts, that reference future periods or that use forward-looking terminology. These statements are necessary estimates that involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by the forward-looking statements. Furthermore, because projected financial information is based on assumptions about circumstances and events that have not yet occurred and are subject to significant uncertainties beyond our control, and because of the subjective judgments and inherent uncertainties of forecasts, there can be no assurance that any projected results will be achieved, and actual results may be materially different than those shown in this presentation.

This presentation and its contents are confidential and must not be distributed, published or reproduced.



12

CONFIDENTIAL
*Q1 2025*

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# O

1941 W 10th Place Gary JV Agreement

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

**JOINT VENTURE AGREEMENT**
**(Real Estate)**

    **THIS JOINT VENTURE AGREEMENT** ("Agreement") is effective as of the latest date this Agreement is executed by the Parties as set forth below (the "Effective Date").

    **1. BASIC TERMS**. This <u>Section 1</u> defines the Basic Terms of this Agreement.

1.1 Property:      <u>1941 W 10th Pl, Gary, IN 46404</u>

1.2 Parties:      PARTY A:

         Name: <u>Lighthouse Estates LLC</u>

         Address: <u>5720B Brown Ave. Unit B, Fort Knox, KY 40121</u>

         Email: <u>management@gostarpoint.com</u>

         Phone: <u>321-378-5722</u>

         PARTY B:

         Name: <u>Simaya Innovations LLC</u>

         Address: <u>1942 Broadway Street   Suite 314C,Boulder, CO 80302</u>

         Email: <u>crystaltkac@gmail.com</u>

         Phone: <u>303-621-5738</u>

1.3 Title to the Property shall be held in the name of: <u>Lighthouse Estates LLC</u>

1.4 Closing Date of Transaction: <u>02-25-2025</u>

         Title Company: <u>Perpetual Title</u>

         Phone: <u>502-749-7409</u>

         Escrow Agent: <u>Morris Cummings (Morris@PerpetualTitle.com)</u>

Parties' Initials:   Initial: VB   Initial: Jk   Initial: am   Initial: CC

1

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

1.5 Allocation of Expenses: The payment of Expenses will be allocated as follows:

Party A funding: <u>all amounts exceeding the $105,000.00 capital investment of Party B.</u>

Party B funding:  <u>will not exceed $105,000.00 for all expenses related to the property acquisition, closing costs, TC fees and property renovation costs.</u>

1.6 Compensation Prior to Allocation of Profit:

☐ None of the Parties will be compensated on their investment prior to the allocation of Profit; or

☒ One or more of the Parties shall be compensated on their investment prior to the allocation of Profit as follows:

☒ Party B is entitled to receive <u>the return of their funding contribution in the amount of $105,000.00 as well as a compensation of $15,750.00, in addition to extension fees and wire transfer fees.</u>

1.7 Profit shall be allocated as follows:

☒ Party A shall receive <u>the remaining distributable profits after satisfying Party B's, returns as outlined in Section 1.6, along with closing costs, liens, taxes, and judgments.</u>

1.8 Additional Terms and Conditions:

- This Joint Venture Agreement, executed between Party A, Party B, establishes a partnership with Party A as the Owner Partner, Party B as the Funding Partner.

**Financial Contribution from the Funding Partner:**
- **Initial Contribution:**
  - Funding Partner shall contribute their funding contribution outlined in Section 1.5 prior to close of escrow only for the property as outlined in Section 1.1.
  - The funds will be wired to the Title Company outlined in Section 1.4.
  - In the event of the failure of escrow to close Funding Partner shall be entitled to the return of their initial funding contribution as delineated in Section 1.5.
  - From the total funding contribution outlined in Section 1.5, an immediate sum of $105,000.00 shall be designated and made promptly available. This allocation covers expenses such as property acquisition, closing costs, holding costs, insurance, transaction coordinator (TC) fees, and construction/renovations, as detailed in Section 1.1

- **Payment Timelines:**

Parties' Initials: Initial VB  Initial Jk  Initial am  Initial ll

2

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

- <mark>Maturity date is August 24, 2025.</mark>
- Grace period of 10 calendar days
- All sums outlined in Section 1.6 for Funding Partner shall be disbursed in full on or before the maturity date, subsequent to the initial closing of the property purchase.
- All payments of funding contribution, compensation, extension fees and wire fees hereunder shall be made when due without set-off, counterclaim or any other deduction whatsoever in immediately available funds to Funding Partner by **electronic means (wire transfer or ACH) only.**

- **Compensation:**
  - Upon the refinancing (or sale) of the property, Funding Partner shall receive their initial contribution and compensation as outlined in Section 1.6, along with any extension and wire fees, before any compensation or profits are allocated to Party A.

- **Extension Fees**:
  - If Party A is unable to repay the loan with all principals, interest and fees by the Maturity Date, Party A must request an extension from the Funding Partner minimum of thirty (30) days prior to the Maturity Date. Funding Partner will guarantee only one extension of 30 days for a **fee $2,625.00**.
  - Any extension granted will be for a period of thirty (30) days. All extension fees must be paid prior to the granting of any extension period. If Party A does not (a) request an extension (b) does not pay off loan by maturity date or (c) fails to be responsive to any communication from Funding Partner; Funding Partner(s) may automatically continue to extend the loan for thirty (30) days at a time and extensions fees will continue to accrue and will be added to the payoff amount or Funding Partner(s) may choose any and all legal remedies available to Funding Partner(s) including foreclosure.

**Responsibility of Party A:**

1. **Transaction Coordinator**
   - Party A is accountable for settling the outstanding balance for the fees associated with the TC.
2. **Insurance:**
   - Party A shall at its sole cost and expense, keep the Premises insured against all hazards as is customary and reasonable for properties of similar type and nature located in the county where the Premises is located.
   - Party A shall procure and maintain the requisite insurance coverage necessary for a property under construction, ensuring compliance with all applicable legal requirements.
   - Party A is obligated to include the Funding Partner(s) as an additional insured on the insurance policy. Party A must provide the Funding Partner(s) with a copy of the insurance policy's declaration page upon the policy activation or renewal.
3. **Budget and Timeline Management:**

Parties' Initials: _____ Initial _____ Initial _____ Initial _____ Initial

VB    Jk    am    CC

3

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

- Party A hereby undertakes to bear all additional expenses if they failure to adhere to the agreed-upon timelines or if the budgeted funds as explicitly outlined in Section 1.5 provided by Funding Partner(s) is exceeded.
- In the event Party A is unable to furnish any additional funds to ensure project completion, all parties hereby agree to engage in renegotiate the terms outlined in this Joint Venture Agreement taking into consideration the updated funding requirements.
- Party A hereby undertakes to effectuate the refinancing or sale of the property within the 6-month timeframe delineated by this agreement.

4. **Project Management:** Party A is hereby tasked with the onsite management and supervision of the property's renovations, assuming full responsibility for all project related activities from the close of escrow for the property purchase to the close of escrow for its sale. This includes but is not limited to, the following obligations:
   - Providing weekly updates and progress photos through text message.
   - Ensuring the timely completion of all necessary repairs and sale of the property within the 6-month timeframe stipulated by this agreement.
   - Timely remittance of payment to all contractors and subcontractors, contingent upon the receipt of lien waivers in exchange.

**Collateral and Security:**
1. **Title Commitment:** A Title Commitment will be executed and provided to the Funding Partner(s) with the closing packet.
2. **Promissory Note and Personal Guarantees:** A Promissory Note and Personal Guarantee(s) will be executed by Party A for the Funding Partner(s).
3. **Lenders Title Policy:** A Lender's Title policy will be provided by the title company.
4. **Recorded Lien / Security Instrument:** A First Position Lien Deed of Trust / Mortgage will be filed and recorded by the Title company against the property as delineated in line 1.1 of this agreement for the Funding Partner.
5. **Builder's Insurance Policy:** Party A shall add the Funding Partner(s) to their builder's insurance policy as a loss payee for the total amount funded.
6. **No Loan Modification or Additional Liens:** Party A agrees that no loan modifications or additional liens maybe taken out against the property until the Funding Partner has been paid.
7. **Closing Documents:** An electronic set of the signed closing loan document will be sent to Funding Partner by the TC. A set of the executed wet signature closing loan documents shall be overnighted by the title company to Funding Partner at the address delineated in Section 1.2. Party B assumes responsibility for the safekeeping of said documents if legal action becomes necessary.

**Acknowledgment of Lien and Release Conditions:**
1. **Acknowledgment of Lien:**
   - Party A acknowledges that the Funding Partner(s) collectively have imposed a First position lien on the property as delineated in Section 1.1.

Parties' Initials: _____ VB _____ Jk _____ am _____ CC _____

4

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

2. **Conditions for Lien Release:**
   - After the full payment has been received by the Funding Partner as specified in this Joint Venture agreement and the accompanying Mortgage and Promissory Note action will be taken to effectuate the release of the lien.

3. **Recording Satisfaction of Mortgage:**
   - After the full payment has been received by the Funding Partner(s) a Satisfaction of Mortgage will be sent to Party A or title to be recorded.

4. **Expense of Recording:**
   - The cost associated with recording the Satisfaction of Mortgage will be borne by Party A.

**Default and Remedies Clause:**

It is expressly agreed by Party A that time is of the essence hereof. In the event the repayment extends thirty (30) days beyond the maturity date, Funding Partner shall undertake the following actions:

- **Notice of Default:** It is expressly agreed by Party A that time is of the essence hereof. In the event of: any default in the payment of any principal, interest or other sums when due hereunder that is not cured within five (5) days of receiving notice (email is considered notice), cure or grace period provided therein, if any, the entire amount of principal, fees and interest then remaining unpaid hereunder or thereunder, at the option of Lender and without notice, shall become immediately due and payable. Any other default by Borrower must be cured within ten (10) days after receipt of notice (email is considered notice). Failure to exercise any such option shall not constitute a waiver of the right to exercise the same at a later time or in the event of any subsequent default.

- **Remedies on Continued Default:** If any Default is not cured within the allotted time, and legal procedures are instituted, Party A will be charged a minimum of Five Percent (5%) of the Principal amount of the loan for legal fees and penalties. If the amount exceeds Five Thousand Two Hundred Fifty and 00/100 ($5,250.00), Party A will be charged actual fees.

- **Foreclosure Process:** The Funding Partner(s) hereby reserve the unequivocal right to initiate the foreclosure process immediately upon the occurrence of a default, in accordance with applicable state laws and the terms of the Mortgage and Promissory Note.
  - To circumvent court proceedings, Party A and the Funding Partner mutually agree to work collaboratively in transferring the deed of the property directly to Funding Partner.

This agreement stands in effect until all parties have been compensated as indicate herein.

**2. PURPOSE OF JOINT VENTURE.** The purpose of this Agreement and the joint venture

Parties' Initials: ___Initial___ VB ___Initial___ Jk ___Initial___ am ___Initial___ Cl _____

5

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

described herein shall be for the Parties to acquire, sell and/or hold the Property for Profit (the "Purpose of the Joint Venture").

**3. EXPENSES**. The term "Expenses" shall mean all amounts paid or incurred by the Parties for the Purpose of the Joint Venture, which Expenses include, but are not limited to, all amounts paid for the acquisition of the Property, interest on any loans obtained or consented to by the Parties related to the Property (excluding interest on any loans obtained by a Party for the purpose of paying their share of the Expenses), all costs related to the remodeling and/or rehabilitation of the Property, insurance, property taxes, utilities for the Property, advertising costs, staging costs, commissions, and closing costs for the acquisition and sale of the Property.

The Expenses shall be allocated to and paid by the Parties as set forth in Section 1.5. In the event a Party fails or refuses to pay their portion of the Expenses as required herein, the other Party(ies') may, after five (5) days written notice to the non-paying Party, pay the non-paying Party's share of the expenses in which event the Party(ies') paying the non-paying Party's expenses shall receive compensation of 15% of the amount paid on the non-paying Party's behalf prior to allocation of any Profit.

**4. PROFIT.** The term "Profit" shall mean: (A) the amount remaining from the Parties' sale of the Property after the repayment of any liens secured by the Property, payment of all Expenses related to the sale of the Property, repayment to the Parties for all Expenses previously paid, and the payment of compensation to any of the Parties as set forth in Sections 1.6 and 3; and/or (B) the cash flow from the Property after the repayment to the Parties for all Expenses, and the payment of compensation to any of the Parties as set forth in Sections 1.6 and 3. The Profit shall be allocated to the Parties as set forth in Section 1.6.

**5. ESCROW INSTRUCTIONS UPON THE SALE OF THE PROPERTY**. Except to the extent the Parties agree otherwise in writing, the Parties, upon the sale of the Property, shall prepare irrevocable escrow instructions setting forth the distribution of Expenses, compensation, and Profit to be paid to each Party from closing of the sale of the Property and deliver said escrow instructions to the appropriate closing agent.

**6. TERMINATION OF THIS AGREEMENT**. This Agreement shall terminate upon the sale of the Property and full payment to each Party of the amounts each Party is entitled to receive under this Agreement or upon the written agreement of the Parties.

**7. RESOLUTION OF DISPUTES**.

7.1 *Commitment to Resolution:* The Parties' commit to each other to resolve any issues in a commercially reasonable manner as promptly as possible. This commitment underlines the intention to handle disputes amicably and efficiently.

7.2 *Mediation or Arbitration as First Steps:* In the event of a dispute amongst any parties to this Joint Venture agreement, all parties agree to first attempt resolution through Mediation or Arbitration. This approach is aimed at finding a mutually acceptable solution before considering more formal legal proceedings.

7.3 *Procedure in Case of Deadlock:* In the event of a deadlock and upon written demand by one of the Parties', a disputed issue will be presented to a mediator with commercial dispute resolution experience. The written demand must include the names of three (3) acceptable

Parties' Initials: _____ [Initial] VB [Initial] Jk [Initial] am [Initial] CC _____

6

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

mediators available to mediate the issue within ten (10) business days.

7.4 *Responsibility for Expenses:* In case of Mediation or Arbitration due to a dispute, the Parties will share equally all related expenses. This includes the mediator's fees and the attorneys' fees and cost associated with the mediation or arbitration for all parties, irrespective of the allocation of profits under Section 1.6.

7.5 *Location of Mediation or Arbitration:* The mediation will be held in the state and county where the Property is located unless otherwise agreed upon by the Parties.

**8. COSTS AND ATTORNEYS' FEES**. In the event of litigation arising out of this Agreement instituted by any one of the Parties to it, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party in that litigation and the costs and attorneys' fees related to collection of any amounts awarded.

**9. NO ORAL CHANGES OR REPRESENTATIONS.** This Agreement supersedes any and all prior understandings and agreements. This Agreement may be amended or modified only in writing signed by the Parties.

**10. NOTICES**. Any and all notices, demands or requests required or permitted hereunder shall be in writing and shall be effective upon personal delivery or when sent by electronic mail addressed as follows:

To Party A: See Section 1.2.

To Party B: See Section 1.2.

Any Party may change its email address for notice by giving notice of change of email address in the manner provided above. The inability to deliver a notice because of a changed email address of which no notice was given shall not affect the effective date or effectiveness of the notice.

**11. MISCELLANEOUS.**

11.1 *Assignment*. No Party may assign this Agreement without the written consent of all other Parties hereto.

11.2 *Additional Terms and Conditions*. The Parties agree to be bound by and to perform the additional terms and conditions specified in Section 1.8.

11.3 *Successors and Assigns*. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

11.4 *Waiver*. The waiver by any party hereto of any right granted to it hereunder shall not be deemed to be a waiver of any other right granted hereunder, nor shall the same be deemed to be a waiver of a subsequent right obtained by reason of the continuation of any matter previously waived.

Parties' Initials: Initial VB  Initial Jk  Initial am  Initial CC

7

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

11.5 *Severability*. If any provision of this Agreement or any portion of any provision of this Agreement shall be deemed to be invalid, illegal, or unenforceable, such invalidity, illegality or unenforceability shall not alter the remaining portion of such provision, or any other provision hereof, as each provision of this Agreement shall be deemed severable from all other provisions hereof.

11.6 *Time is of the Essence.* Time is of the essence with respect to the performance of all terms, conditions, and provisions of this Agreement.

11.7 *Choice of Law.* This Agreement shall be governed and enforced under the laws of the state where the Property is located without regard to any conflict of law provisions.

11.8 *Counterparts*. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one instrument. The parties may execute this Agreement by electronic means and may deliver their signatures by facsimile transmission or .pdf e-mail delivery, and such transmission shall have the same effect as delivery of original signatures.

## 12. **HOLD HARMLESS**

12.1 *No Agency*. No services provided by Hidden Gems TC Services LLC ("Hidden Gems") shall constitute acting as a legal representative or agent of any other party, nor shall Hidden Gems have the right or authority to assume, create, or incur any liability or obligation of any kind, express or implied, in the name of or on behalf of any other party. Additionally, Hidden Gems shall not be liable for any failure or delay in performance by the parties to the agreement.

12.2 *No Legal Advice.* Any information provided by Hidden Gems does not and is not intended to constitute legal advice. All information, content, and materials provided are for general informational purposes only. Such information may include links to other third-party websites, which are solely for the convenience of the reader, user, or browser. Hidden Gems does not recommend or endorse the content of third-party sites.

12.3 *Usury Laws.* The Parties acknowledges that each state imposes specific legal limits on maximum interest rates and allowable late fees. It is the responsibility of the Funding Partner to be aware of the usury laws of the state in which they are lending. Should the imposed fees or interest rates exceed these legal limits, the Funding Partner assumes full responsibility for any resulting legal consequences. In the event of legal action to enforce a lien, the court may refuse to allow the recovery of excessive late fees, interest, and potentially even the principal balance. Hidden Gems TC shall not be held responsible or liable for any fees or interest rates imposed that exceed the legal limits or for any legal consequences arising from such actions.

12.4 *Limitation of Liability.* Hidden Gems shall not be liable for any indirect, incidental, consequential, special, or exemplary damages arising out of or in connection with the services provided, including but not limited to, loss of profits, loss of data, or loss of business opportunities, even if such damages are foreseeable and whether or not Hidden Gems has been advised of the possibility thereof.

Initial    Initial    Initial    Initial

Parties' Initials: _VB_ _Jk_ _am_ _CC_

8

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

12.5 *Indemnification.* The parties to this agreement agree to indemnify, defend, and hold harmless Hidden Gems, its officers, directors, employees, agents, and affiliates from and against any and all claims, liabilities, damages, losses, costs, and expenses (including reasonable attorneys' fees) arising out of or in any way connected with the parties' use of the services provided by Hidden Gems, any breach by the client of this agreement, or any violation by the client of any applicable law or regulation.

12.6 *Disclaimer of Warranties.* The services provided by Hidden Gems are offered on an "as is" and "as available" basis. Hidden Gems expressly disclaims all warranties of any kind, whether express or implied. Hidden Gems makes no warranty that the services will meet the client's requirements, or that they will be uninterrupted, timely, secure, or error-free.

## *[SIGNATURE PAGES TO FOLLOW]*

**By affixing your signature hereto, all parties confirm they have thoroughly reviewed the document and possess a comprehensive understanding of its terms and implications. Furthermore, all parties hereby acknowledge that they have been duly advised to seek legal counsel before entering into this agreement.**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the dates written below.

9

Parties' Initials:

Docusign Envelope ID: A5EA1153-42ED-4E0B-9ADF-0E0807D09030

PARTY A:

Lighthouse Estates LLC, a Kentucky limited liability company

Signature: *Van Barker*    Date: 2/21/2025

Name of Signer: Van Barker

Its: Managing Partner

Signature: *Josh Kennedy*    Date: 2/21/2025

Name of Signer: Josh Kennedy

Its: Partner

Signature: *Ariel Mermelshtayn*    Date: 2/21/2025

Name of Signer: Ariel Mermelshtayn

Its: Partner

PARTY B:

Simaya Innovations LLC, a Colorado limited liability company

Signature: _____    Date: 2/21/2025

Name of Signer: Crystal Cervantez-Tkac

Its: Manager

Parties' Initials: VB  JK  aM  CC

10

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# P

AVS Estates LLC Operating Agreement

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

Operating Agreement

## AVS Estates LLC,
## a Kentucky Limited Liability Company

THIS OPERATING AGREEMENT of AVS Estates LLC (the "Company") is entered into as of the date set forth on the signature page of this Agreement by each of the Members listed on Exhibit A of this Agreement.

A.      The Members have formed the Company as a Kentucky limited liability company under the Kentucky Limited Liability Company Act. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized under the laws of the commonwealth of Kentucky. The Members hereby adopt and approve the Articles of Organization of the Company filed with the Kentucky Secretary of State.

B.      The Members enter into this Agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

## ARTICLE 1: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article 1 or elsewhere in this Agreement and if not so specified, have the meanings set forth in the Kentucky Limited Liability Company Act.

"Agreement" means this Operating Agreement of the Company, as may be amended from time to time.

"Capital Account" means, with respect to any Member, an account consisting of such Member's Capital Contribution, (1) increased by such Member's allocated share of income and gain, (2) decreased by such Member's share of losses and deductions, (3) decreased by any distributions made by the Company to such Member, and (4) otherwise adjusted as required in accordance with applicable tax laws.

"Capital Contribution" means, with respect to any Member, the total value of (1) cash and the fair market value of property other than cash and (2) services that are contributed and/or agreed to be contributed to the Company by such Member, as listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement.

"Exhibit" means a document attached to this Agreement labeled as "Exhibit A," "Exhibit B," and so forth, as such document may be amended, updated, or replaced from time to time according to the terms of this Agreement.

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

"Member" means each Person who acquires Membership Interest pursuant to this Agreement. The Members are listed on Exhibit A, as may be updated from time to time according to the terms of this Agreement. Each Member has the rights and obligations specified in this Agreement.

"Membership Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Kentucky Limited Liability Company Act, together with the obligations of the Member to comply with all of the terms and provisions of this Agreement.

"Ownership Interest" means the Percentage Interest or Units, as applicable, based on the manner in which relative ownership of the Company is divided.

"Percentage Interest" means the percentage of ownership in the Company that, with respect to each Member, entitles the Member to a Membership Interest and is expressed as either:

A.      If ownership in the Company is expressed in terms of percentage, the percentage set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement; or

B.      If ownership in the Company is expressed in Units, the ratio, expressed as a percentage, of:

(1)   the number of Units owned by the Member (expressed as "MU" in the equation below) divided by

(2)   the total number of Units owned by all of the Members of the Company (expressed as "TU" in the equation below).

$$\text{Percentage Interest} \; = \; \frac{MU}{TU}$$

"Person" means an individual (natural person), partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Units" mean, if ownership in the Company is expressed in Units, units of ownership in the Company, that, with respect to each Member, entitles the Member to a Membership Interest which, if applicable, is expressed as the number of Units set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement.

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

## ARTICLE 2: CAPITAL CONTRIBUTIONS, ADDITIONAL MEMBERS, CAPITAL ACCOUNTS AND LIMITED LIABILITY

2.1     **Initial Capital Contributions**. The names of all Members and each of their respective addresses, initial Capital Contributions, and Ownership Interests must be set forth on Exhibit A. Each Member has made or agrees to make the initial Capital Contribution set forth next to such Member's name on Exhibit A to become a Member of the Company.

2.2     **Subsequent Capital Contributions**. Members are not obligated to make additional Capital Contributions unless unanimously agreed by all the Members. If subsequent Capital Contributions are unanimously agreed by all the Members in a consent in writing, the Members may make such additional Capital Contributions on a pro rata basis in accordance with each Member's respective Percentage Interest or as otherwise unanimously agreed by the Members.

2.3     **Additional Members**.

A.     With the exception of a transfer of interest (1) governed by Article 7 of this Agreement or (2) otherwise expressly authorized by this Agreement, additional Persons may become Members of the Company and be issued additional Ownership Interests only if approved by and on terms determined by a unanimous written agreement signed by all of the existing Members.

B.     Before a Person may be admitted as a Member of the Company, that Person must sign and deliver to the Company the documents and instruments, in the form and containing the information required by the Company, that the Members deem necessary or desirable. Membership Interests of new Members will be allocated according to the terms of this Agreement.

2.4     **Capital Accounts**. Individual Capital Accounts must be maintained for each Member, unless (a) there is only one Member of the Company and (b) the Company is exempt according to applicable tax laws. Capital Accounts must be maintained in accordance with all applicable tax laws.

2.5     **Interest**. No interest will be paid by the Company or otherwise on Capital Contributions or on the balance of a Member's Capital Account.

2.6     **Limited Liability; No Authority.** A Member will not be bound by, or be personally liable for, the expenses, liabilities, debts, contracts, or obligations of the Company, except as otherwise provided in this Agreement or as required by the Kentucky Limited Liability Company Act. Unless expressly provided in this Agreement, no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, or otherwise act on behalf of, the Company or any other Member.

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1 **Allocations**. Unless otherwise agreed to by the unanimous consent of the Members any income, gain, loss, deduction, or credit of the Company will be allocated for accounting and tax purposes on a pro rata basis in proportion to the respective Percentage Interest held by each Member and in compliance with applicable tax laws.

3.2 **Distributions**. The Company will have the right to make distributions of cash and property to the Members on a pro rata basis in proportion to the respective Percentage Interest held by each Member. The timing and amount of distributions will be determined by the Members in accordance with the Kentucky Limited Liability Company Act.

3.3 **Limitations on Distributions**. The Company must not make a distribution to a Member if, after giving effect to the distribution:

A. The Company would be unable to pay its debts as they become due in the usual course of business; or

B. The fair value of the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of Members, if any, whose preferential rights are superior to those of the Members receiving the distribution.

## ARTICLE 4: MANAGEMENT

4.1 **Management**.

A. **Generally**. Subject to the terms of this Agreement and the Kentucky Limited Liability Company Act, the business and affairs of the Company will be managed by the Members.

B. **Approval and Action**. Unless greater or other authorization is required pursuant to this Agreement or under the Kentucky Limited Liability Company Act for the Company to engage in an activity or transaction, all activities or transactions must be approved by the Members, to constitute the act of the Company or serve to bind the Company. With such approval, the signature of any Members authorized to sign on behalf of the Company is sufficient to bind the Company with respect to the matter or matters so approved. Without such approval, no Members acting alone may bind the Company to any agreement with or obligation to any third party or represent or claim to have the ability to so bind the Company.

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

C.      **Certain Decisions Requiring Greater Authorization**. Notwithstanding clause B above, the following matters require unanimous approval of the Members in a consent in writing to constitute an act of the Company:

(i)      A material change in the purposes or the nature of the Company's business;

(ii)     With the exception of a transfer of interest governed by Article 7 of this Agreement, the admission of a new Member or a change in any Member's Membership Interest, Ownership Interest, Percentage Interest, or Voting Interest in any manner other than in accordance with this Agreement;

(iii)    The merger of the Company with any other entity or the sale of all or substantially all of the Company's assets; and

(iv)     The amendment of this Agreement.

4.2     **Officers**. The Members are authorized to appoint one or more officers from time to time. The officers will have the titles, the authority, exercise the powers, and perform the duties that the Members determine from time to time. Each officer will continue to perform and hold office until such time as (a) the officer's successor is chosen and appointed by the Members; or (b) the officer is dismissed or terminated by the Members, which termination will be subject to applicable law and, if an effective employment agreement exists between the officer and the Company, the employment agreement. Subject to applicable law and the employment agreement (if any), each officer will serve at the direction of Members, and may be terminated, at any time and for any reason, by the Members.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1     **Accounts**. The Company must maintain complete accounting records of the Company's business, including a full and accurate record of each Company transaction. The records must be kept at the Company's principal executive office and must be open to inspection and copying by Members during normal business hours upon reasonable notice by the Members wishing to inspect or copy the records or their authorized representatives, for purposes reasonably related to the Membership Interest of such Members. The costs of inspection and copying will be borne by the respective Member.

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

5.2     **Records**. The Members will keep or cause the Company to keep the following business records.

> (i)     An up to date list and all past lists of the Members, each of their respective full legal names, last known business or residence address, Capital Contributions, the amount and terms of any agreed upon future Capital Contributions, and Ownership Interests, and Voting Interests;

> (ii)    A copy of the Company's federal, state, and local tax information and income tax returns and reports, if any, for the six most recent taxable years;

> (iii)   A copy of the Articles of Organization of the Company, as may be amended from time to time ("Articles of Organization"); and

> (iv)    An original signed copy, which may include counterpart signatures, of this Agreement, and any amendments to this Agreement, signed by all then-current Members.

5.3     **Income Tax Returns.** Within 45 days after the end of each taxable year, the Company will use its best efforts to send each of the Members all information necessary for the Members to complete their federal and state tax information, returns, and reports and a copy of the Company's federal, state, and local tax information or income tax returns and reports for such year.

5.4     **Subchapter S Election**. The Company may, upon unanimous consent of the Members, elect to be treated for income tax purposes as an S Corporation. This designation may be changed as permitted under the Internal Revenue Code Section 1362(d) and applicable Regulations.

5.5     **Tax Matters Member**. Anytime the Company is required to designate or select a tax matters partner or partnership representative, pursuant to Section 6223 of the Internal Revenue Code and any regulations issued by the Internal Revenue Service, the Members must designate one of the Members as the tax matters partner or partnership representative of the Company and keep such designation in effect at all times.

5.6     **Banking**. All funds of the Company must be deposited in one or more bank accounts in the name of the Company with one or more recognized financial institutions. The Members are authorized to establish such accounts and complete, sign, and deliver any banking resolutions reasonably required by the respective financial institutions in order to establish an account.

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

ARTICLE 6: MEMBERSHIP VOTING AND MEETINGS

6.1     **Members and Voting Rights**. The Members have the right and power to vote on all matters with respect to which the Articles of Organization, this Agreement, or the Kentucky Limited Liability Company Act requires or permits. Unless otherwise stated in this Agreement (for example, in Section 4.1(c)) or required under the Kentucky Limited Liability Company Act, the vote of the Members holding at least a majority of the Voting Interest of the Company is required to approve or carry out an action.

6.2     **Meetings of Members**. Annual, regular, or special meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company. A written notice setting forth the date, time, and location of a meeting must be sent within a reasonable period of time before the date of the meeting to each Member entitled to vote at the meeting. A Member may waive notice of a meeting by sending a signed waiver to the Company's principal executive office or as otherwise provided in the Kentucky Limited Liability Company Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Kentucky Limited Liability Company Act, including by conference call or similar communications equipment. Any action that could be taken at a meeting may be approved by a consent in writing that describes the action to be taken and is signed by Members holding the minimum Voting Interest required to approve the action. If any action is taken without a meeting and without unanimous written consent of the Members, notice of such action must be sent to each Member that did not consent to the action.

ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1     **Withdrawal**. Members may withdraw from the Company prior to the dissolution and winding up of the Company (a) by transferring or assigning all of their respective Membership Interests pursuant to Section 7.2 below, or (b) if all of the Members unanimously agree in a written consent. Subject to the provisions of Article 3, a Member that withdraws pursuant to this Section 7.1 will be entitled to a distribution from the Company in an amount equal to such Member's Capital Account.

7.2     **Restrictions on Transfer; Admission of Transferee.**  A Member may not transfer any Membership Interests, whether now owned or later acquired, unless Members holding all of the Percentage Interests not subject to transfer consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A Person that acquires Membership Interests in accordance with this Section 7.2 will be admitted as a Member of the Company only after the requirements of Section 2.3(b) are complied with in full.

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

## ARTICLE 8: DISSOLUTION

8.1    **Dissolution.** The Company will be dissolved upon the first to occur of the following events:

(i)     The vote of the Members holding at least a majority of the Voting Interest of the Company to dissolve the Company;

(ii)    Entry of a decree of judicial dissolution under Section 275.290 of the Kentucky Limited Liability Company Act;

(iii)   Filing of a Certificate of Dissolution by the Secretary of State under section 275.315 of the Kentucky Limited Liability Company Act;

(iv)    At any time that there are no Members, unless and provided that the Company is not otherwise required to be dissolved and wound up, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and (i) to become a Member; or (ii) to the extent that the last remaining Member assigned its interest in the Company, to cause the Member's assignee to become a Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member;

(v)     The sale or transfer of all or substantially all of the Company's assets;

(vi)    A merger or consolidation of the Company with one or more entities in which the Company is not the surviving entity.

8.2    **No Automatic Dissolution Upon Certain Events**. Unless otherwise set forth in this Agreement or required by applicable law, the death, incapacity, disassociation, bankruptcy, or withdrawal of a Member will not automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

9.1    **Indemnification**. The Company has the power to defend, indemnify, and hold harmless any Person who was or is a party, or who is threatened to be made a party, to any Proceeding (as that term is defined below) by reason of the fact that such Person was or is a Member, officer, employee, representative, or other agent of the Company, or was or is serving at the request of the Company as a director, Governor, officer, employee, representative or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (each such Person is referred to as a

-8-

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

"Company Agent"), against Expenses (as that term is defined below), judgments, fines, settlements, and other amounts (collectively, "Damages") to the maximum extent now or hereafter permitted under Kentucky law. "Proceeding," as used in this Article 9, means any threatened, pending, or completed action, proceeding, individual claim or matter within a proceeding, whether civil, criminal, administrative, or investigative. "Expenses," as used in this Article 9, includes, without limitation, court costs, reasonable attorney and expert fees, and any expenses incurred relating to establishing a right to indemnification, if any, under this Article 9.

9.2 **Mandatory.** The Company must defend, indemnify and hold harmless a Company Agent in connection with a Proceeding in which such Company Agent is involved if, and to the extent, Kentucky law requires that a limited liability company indemnify a Company Agent in connection with a Proceeding.

9.3 **Expenses Paid by the Company Prior to Final Disposition**. Expenses of each Company Agent indemnified or held harmless under this Agreement that are actually and reasonably incurred in connection with the defense or settlement of a Proceeding may be paid by the Company in advance of the final disposition of a Proceeding if authorized by a vote of the Members that are not seeking indemnification holding a majority of the Voting Interests (excluding the Voting Interest of the Company Agent seeking indemnification). Before the Company makes any such payment of Expenses, the Company Agent seeking indemnification must deliver a written undertaking to the Company stating that such Company Agent will repay the applicable Expenses to the Company unless it is ultimately determined that the Company Agent is entitled or required to be indemnified and held harmless by the Company (as set forth in Sections 9.1 or 9.2 above or as otherwise required by applicable law).

## ARTICLE 10: GENERAL PROVISIONS

10.1 **Notice**. (a) Any notices (including requests, demands, or other communications) to be sent by one party to another party in connection with this Agreement must be in writing and delivered personally, by reputable overnight courier, or by certified mail (or equivalent service offered by the postal service from time to time) to the following addresses or as otherwise notified in accordance with this Section: (i) if to the Company, notices must be sent to the Company's principal executive office; and (ii) if to a Member, notices must be sent to the Member's last known address for notice on record. (b) Any party to this Agreement may change its notice address by sending written notice of such change to the Company in the manner specified above. Notice will be deemed to have been duly given as follows: (i) upon delivery, if delivered personally or by reputable overnight carrier or (ii) five days after the date of posting if sent by certified mail.

10.2 **Entire Agreement; Amendment**. This Agreement along with the Articles of Organization (together, the "Organizational Documents"), constitute the entire agreement among the Members and replace and supersede all prior written and oral understandings and agreements with respect to the subject matter of this Agreement, except as otherwise

-9-

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

required by the Kentucky Limited Liability Company Act. There are no representations, agreements, arrangements, or undertakings, oral or written, between or among the Members relating to the subject matter of this Agreement that are not fully expressed in the Organizational Documents. This Agreement may not be modified or amended in any respect, except in a writing signed by all of the Members, except as otherwise required or permitted by the Kentucky Limited Liability Company Act.

10.3    **Governing Law; Severability**. This Agreement will be construed and enforced in accordance with the laws of the commonwealth ofstate of Kentucky. If any provision of this Agreement is held to be unenforceable by a court of competent jurisdiction for any reason whatsoever, (i) the validity, legality, and enforceability of the remaining provisions of this Agreement (including without limitation, all portions of any provisions containing any such unenforceable provision that are not themselves unenforceable) will not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the unenforceable provision will be deemed modified and replaced by a provision that approximates the intent and economic effect of the unenforceable provision and the Agreement will be deemed amended accordingly.

10.4    **Further Action**. Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

10.5    **No Third Party Beneficiary**. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other Person or entity will have or acquire any right by virtue of this Agreement. This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.6    **Incorporation by Reference**. The recitals and each appendix, exhibit, schedule, and other document attached to or referred to in this Agreement are hereby incorporated into this Agreement by reference.

10.7    **Counterparts**. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members signed the same copy. All counterparts will be construed together and will constitute one agreement.

*[Remainder Intentionally Left Blank.]*

Docusign Envelope ID: 14812404-1EBA-4B7F-B4EF-A8D9E83ED44F

**IN WITNESS WHEREOF**, the parties have executed or caused to be executed this Operating Agreement and do each hereby represent and warrant that their respective signatory, whose signature appears below, has been and is, on the date of this Agreement, duly authorized to execute this Agreement.

Dated: _____3/24/2025_____

Signed by:

*Van Barker*

DB1C8A4B4F5343A...

Signature of Van Barker

Signed by:

*Ariel Barker*

C47BAECDC8FA4D1...

Signature of Ariel Barker

Signed by:

321140A1BCBC4BD...

Signature of Siyuan Zheng

-11-

EXHIBIT A
**MEMBERS**


The Members of the Company and their respective addresses, Capital Contributions, and Ownership Interests are set forth below. The Members agree to keep this Exhibit A current and updated in accordance with the terms of this Agreement, including, but not limited to, Sections 2.1, 2.3, 2.4, 7.1, 7.2, and 10.1.

| Members | Capital Contribution | Percentage Interest |
|---|---|---|
| Van Barker<br>5720B Brown Ave Unit B<br>Fort Knox, Kentucky 40121 | _____ | 34% |
| Ariel Barker<br>5720B Brown Ave Unit B<br>Fort Knox, Kentucky 40121 | _____ | 33% |
| Siyuan Zheng<br>5720B Brown Ave Unit B<br>Fort Knox, Kentucky 40121 | _____ | 33% |

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

---

# EXHIBIT

# Q

Criminal Affidavit (Barker)

---

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Justin Kiehl, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigations (FBI) and have been employed as a Special Agent since October of 2023. I received approximately 20 weeks of training at the FBI Academy in Quantico, Virginia. During that time, I received training on various topics, including evidence collection, interviewing, legal procedure and process, source management, investigative technology, firearms and tactical training, and defensive tactics. I am currently assigned to the Violent Crimes squad as part of the Louisville Child Exploitation and Human Trafficking Task Force in the FBI's Louisville, Kentucky Field Division.  I am responsible for investigating, among other things, violations concerning crimes against children, and other violent crimes. I have conducted or participated in surveillance, the execution of search warrants, the execution and analysis of legal process, and the interviewing of victims and subjects of the aforementioned investigations.

2.      Before my current assignment, I was an Intelligence Analyst with the FBI assigned to the FBI's El Paso, Texas Field Division. I have been employed with the FBI since July of 2019. I was an Intelligence Analyst for approximately four years prior to my assignment as a Special Agent. As an Intelligence Analyst, I received approximately 13 weeks of training at the FBI Academy in Quantico, Virginia during which I received training on analytical tradecraft, intelligence processes, source development and recruitment, social media and geospatial analytical exploitation, report writing, and legal requirements for supporting federal criminal and national security investigations. I was initially assigned as an embedded Intelligence Analyst to the El Paso Organized Crime Drug Enforcement Task

Force for two years and the El Paso Child Exploitation and Human Trafficking Task Force for two years. I received field training and developed actionable intelligence on enterprise investigations involving drug trafficking and child exploitation actors, international money laundering activities, human smuggling, human trafficking, international parental kidnappings, kidnap for ransom schemes, adult and child sextortion, encrypted communication techniques, cross border violence trends between Mexico and the United States, source development and deployment, identification of online and hands-on child exploitation offenders, and disruption of online chat groups involved in child exploitation. Additionally, I received specialized training in internet protocol and social media exploitation for offender identification. I have gained experience in conducting these investigations through training and daily work, including executing digital and physical search warrants, legal process on social media and telephone accounts, and conducting interviews of victims and individuals trading and producing child sexual abuse material. Often, these crimes involve the use of computers and other digital media to produce, receive, transfer, and/or store depictions of children being sexually abused (often referred to as CSAM – child sex abuse materials).

3.      This affidavit is submitted in support of a criminal complaint alleging Van Laurence BARKER, hereinafter BARKER, violated Title 18, United States Code, Section 2422(b) (Attempted Online Enticement of a Minor) and Title 18, United States Code, Section 2252A(a)(2) (Distribution of Child Pornography).

4.      The statements contained in this affidavit are based in part on information provided by other law enforcement officers and on my own investigation of this matter. Since this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging BARKER with Attempted Online Enticement and Distribution of Child Pornography, I have not included every fact known to me

2

concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that BARKER committed the offenses alleged in the complaint.

<b><u>PROBABLE CAUSE</u></b>

5.      On March 19, 2025, Affiant received information from FBI San Francisco regarding conversations between an online covert employee (OCE) and username "clee7654" on the Kik Messenger application. The following information was provided:

6.      Conversations between the OCE and "clee7654" occurred on or around November 23, 2024. Username "clee7654" had a display name of "Cee Lee." The Kik account appeared to be 1227 days old and accessed via an Android device.

7.      The OCE posted in various Kik chat groups known for sharing and/or discussing incestuous activities, to include those involving minors. The OCE included information that they were a 43-year-old father to a minor daughter. After posting that information, the OCE received a private message from "clee7654".

8.      Below are screenshots of the private messages between the OCE and Kik Username "clee7654":[1]

---

[1] The screenshots described in this paragraph will be made available for review by the Magistrate Judge and will be kept in a secure location by the Affiant.

3



a. After saying "Oh ok", username "clee7654" sent 4 images of a nude adult male that included the males lower chin, chest, torso, butt, penis, and upper thighs. The images depict what appears to be a heavy-set white male with a pale complexion, light red and blonde body hair, and a short red-brown beard. The male's face was not visible.

4















b. The OCE advised they would need to trust "clee7654" before sharing his daughter with him at which point "clee7654" sent four images and one video which all appeared to depict potential CSAM. Below are examples of the images and videos shared:

    i. Video: 266d78de-cb1e-4e9e-8cd3-a08db315357d; approximately 55 seconds in length:

        1. Video depicts what appears to be an adult male's erect penis inserted into what appears to be a pre-pubescent girl between the approximate ages of 3-6 years old, anus. Adult male appears to insert his penis repeatedly and moves the young girl's hips in a bouncing motion onto and off his penis. The camera angle pans out and shows the young girl's entire back, nude. The young girl has long brown hair that falls to the middle of her back. There appears to be a white laundry basket and brown floor in the background of the video. The video angle changes again to focus on the adult male's penis and the young girls continued motion onto and off the adult male's penis. The adult male appears to hold his penis in place while directing the young girl's motion on his penis.

    ii. Image: db3baab4-f46c-4136-bcca-cd6cecb075c2:

11

1. Image depicting a pre-pubescent girl between the approximate ages of 6-8 years old. The young girl's vagina, anus, what appear to be pink pants pulled down, and white underwear with green/blue heart designs also pulled down are the primary focus of the picture. There appears to be long dark brown hair in the background of the image as if the young girl is on her hands and knees with her buttocks in the air.

iii. Image: 6838ea93-a1d0-4663-97ce-eff9e7073e7c:

1. Image depicting a pre-pubescent girl between the approximate ages 8–12-year-old laying on what appears to be a bed with pink sheets and pillow covers. The camera angle appears to be from the foot of the bed and the young girl's entire body is visible. The young girl appears to be wearing a white bra and a white thong that is pulled to the side exposing her anus and vagina. The young girl has a stuffed animal/pillow resembling a pig in her hands.









9. On or about November 26, 2024, FBI San Francisco served legal process to Kik Messenger for the username and display name "clee7654" and "Cee Lee." On or about December 2, 2024, Kik Messenger responded to legal process and or about April 16, 2025, Affiant re-submitted legal process with the same results provided. The results are as follows:

    a. Phone Type: One Plus CPH2459 Android

b. Email: clee7654@gmail.com
c. IP address logs:
    i. 8/23/2021; 125.227.90.115 (Asia/Taipei - Location)
    ii. 10/26/2021; 169.56.74.237 (Asia/Seoul - Location)
    iii. 11/3/2021; 113.20.30.139 (Asia/Jakarta - Location)
    iv. 11/4/2021; 126.193.190.113 (Asia/Tokyo - Location)
    v. 1/31/2022; 60.234.42.250 (Pacific/Auckland - Location)
    vi. 11/28/2022; 101.99.64.65 (Unknown IP - Location)
    vii. 11/25/2024; 104.244.210.18 (America/Chicago - Location)
    viii. 11/20/2024; 192.180.151.171 (US/Kentucky – WIFI)

10. On or about December 9, 2024, FBI San Francisco served legal process to Charter Communications for subscriber information related to IP address 192.180.151.171 from November 20, 2024. On or about December 13, 2024, Charter Communications provided the following subscriber information for the aforementioned request:

a. Name: Van BARKER
b. Address: 5720 Brown Ave. #B Fort Knox, KY
c. Phone: 321-378-5722
d. Email: houlovedou@spectrum.net, vlb9@georgetown.edu
e. Status: Active

11. On or about December 13, 2024, FBI San Francisco conducted law enforcement database checks to determine BARKER's identity which yielded the following results.

a. Van Laurence BARKER
b. DOB: XX/XX/1992
    i. Date of birth corroborates the 32-year-old age disclosed by the user of the Kik account "clee7654."
c. SSN: XXX-XX-9565
d. Possibly a service member with the Army stationed at Fort Knox, KY.

12. On or about March 27, 2025, Affiant contacted investigators with Army CID on Fort Knox to identify or verify BARKER's status with the Army. Investigators confirmed BARKER's identifiers listed above and Affiant was provided the following information:

13. As of March 27, 2025, BARKER has resided on Ft. Knox at 5720 Brown Ave. #B, Fort Knox, Kentucky since February 2023. According to military records, BARKER's

17

last known phone number was 321-378-5722. BARKER resides with his wife, Siyuan Zheng, who has no military background. BARKER retired as a Captain as of July 2024.

14.     As of April 29, 2025, BARKER's duty station assignments and timelines were as follows:

   a. April 2017: Tampa, FL
   b. April 2017 – November 2018: Ft. Benning, GA
   c. January 2019: Ft. Huachuca, AZ
   d. July 2019 – June 2022: Camp Zama, Japan
        i. The aforementioned Kik returns for username "clee7654" returned multiple IP addresses in Japan and the Pacific region throughout this timeframe.
   e. August 2022 – February 2023: Ft. Huachuca, AZ
   f. February 2023 – July 2024: Ft. Knox, KY

15.     As of July 11, 2024, BARKER was given a permanent change of assignment and was placed on the retirement list due to disability in Fort Knox, KY.

16.     On or about April 16, 2025, law enforcement database checks yielded multiple recent international flights taken by BARKER. On or about December 25, 2019, BARKER departed the United States via Minneapolis-Saint Paul International Airport with scheduled arrival into Haneda, Tokyo, Japan. On or about July 3, 2022, BARKER departed from Narita, Tokyo, Japan and returned to the United States via John F. Kennedy International Airport.

17.     On or about April 18, 2025, Affiant served legal process for the phone number 321-378-5722 to AT&T. On or about April 18, 2025, AT&T provided the following subscriber information for the phone number.

   a. Subscriber: Van BARKER
   b. Account status: Active
   c. Customer from 7/2022 to present as of subpoena.

18.     On or about May 5, 2025, Affiant requested information from the National Center for Missing and Exploited Children ("NCMEC") regarding potential CyberTipline reports (CTs) associated with the Kik username "clee7654," IP address 192.180.151.171, and other identifiers believed to be associated with BARKER, listed previously. NCMEC

18

provided information on one CT associated with the aforementioned username and IP address 192.180.151.171 and seven additional CTs associated with IP address 192.180.151.171. All CT reports were reported to NCMEC from MediaLab/Kik concerning the two search criteria at different times. All CTs were flagged as potential activity related to CSAM. Affiant conducted a review of attached files which contained potential CSAM files which are listed below.

    a. Related to "clee7654" and IP Address 192.180.151.171

        i. CT 202790130; Submitted on November 26, 2024, by MediaLab/Kik
           1. 44 files uploaded; 24 flagged as potential CSAM
           2. Kik Account information:
               a. Username: clee7654_6k1

    b. Related to IP Address 192.180.151.171

        i. CT 207416344; Submitted on March 9, 2025, by MediaLab/Kik
           1. 12 files uploaded; 11 flagged as potential CSAM
           2. Kik Account Information:
               a. Username: tlee7654_v4q

        ii. CT 206752572; Submitted on February 23, 2025, by MediaLab/Kik
           1. 5 files uploaded; 4 flagged as potential CSAM
           2. Kik Account Information:
               a. Username: dlee4567_ruv

        iii. CT 206196253; Submitted on February 13, 2025, by MediaLab/Kik
           1. 4 files uploaded; 3 flagged as potential CSAM
           2. Kik Account Information:
               a. Username: dlee7654_q48

        iv. CT 205514365; Submitted on January 30, 2025, by MediaLab/Kik
           1. 4 files uploaded; 3 flagged as potential CSAM
           2. Kik Account Information:
               a. Username: blee7654_m9w

        v. CT 204528402; Submitted on January 8, 2025, by MediaLab/Kik
           1. 6 files uploaded; 4 flagged as potential CSAM
           2. Kik Account Information:
               a. Username: blee5432_1j1

        vi. CT 203376917; Submitted on December 10, 2024, by MediaLab/Kik

           1. 16 files uploaded;11 flagged as potential CSAM

           2. Kik Account Information:

               a. Username: clee5432_0cz

       vii. CT 202342846; Submitted on November 14, 2024, by MediaLab/Kik

           1. 48 files uploaded; 26 tagged as potential CSAM

           2. Kik Account Information:

               a. Username: clee4567_t9n

19. On or about June 17, 2025, Affiant served legal process to MediaLab/Kik for the usernames associated with the CTs listed above. On June 30, 2025, MediaLab/Kik provided the following information associated with the request.

a. clee4567:

    i. First Name: Cee
    ii. Last Name: Lee
    iii. Email: clee4567@gmail.com
    iv. Registration DOB: 7/17/1987
    v. Registration Date/Time: 7/16/2021 at 10:58:05
    vi. Last User Location/IP: US/104.244.210.18

b. clee5432:

    i. First Name: clee5432
    ii. Email: tgh5@gmail.com
    iii. Registration DOB: 11/29/1984
    iv. Registration Date/Time: 11/28/2024 at 23:54:51
    v. Last User Location/IP: US/38.92.186.2

c. blee5432:

    i. First Name: blee5432
    ii. Email: tgt22@gmail.com
    iii. Registration DOB: 12/11/1981
    iv. Registration Date/Time: 12/11/2024 at 05:09:02
    v. Last User Location/IP: US/216.227.145.218

d. blee7654:

    i. First Name: blee7654
    ii. Email: blee7654@yahoo.com
    iii. Registration DOB: 1/19/1988
    iv. Registration Date/Time: 1/19/2025 at 01:15:28
    v. Last User Location/IP: US/104.244.210.18

e. dlee7654:

    i. First Name: dlee7654

      ii.  Email: dlee7654@gmail.com
      iii.  Registration DOB: 1/1/1975
      iv.  Registration Date/Time: 1/30/2025 at 10:53:25
      v.  Last User Location/IP: US/104.244.210.18

f. dlee4567:

      i.  First Name: dlee4567
      ii.  Email: teudf@gmail.com
      iii.  Registration DOB: 1/1/1993
      iv.  Registration Date/Time: 1/30/2025 at 11:37:05
      v.  Last User Location/IP: US/104.244.210.18

g. tlee7654:

      i.  First Name: tlee7654
      ii.  Email: timduff222@gmail.com
      iii.  Registration DOB: 12/27/1986
      iv.  Registration Date/Time: 2/24/2025 at 00:04:53
      v.  Last User Location/IP: US/104.244.210.18

20. On or about June 18, 2025, Affiant conducted an IP analysis between all the aforementioned CTs with the following results.

a. IP address 192.180.154.171, associated with the Charter Communications legal process, was associated with every account reported in the aforementioned CTs on multiple dates and times.

b. IP address 104.244.210.18 was associated with every account reported in the aforementioned CTs on multiple dates and times. The IP address appears to be related to a VPN service provider with no attributable subscriber.

c. Multiple different IP address was identified as being associated with a virtual private network.

21. On or about June 18, 2025, Affiant served legal process to Charter Communications for subscriber information related to IP address 192.180.151.171 on February 25, 2025; listed as a log in IP address in CT 207416344. Charter Communications responded to the request on June 24, 2025, with the subscriber listed as Van BARKER, phone number 321-378-5722, address 5720 Brown Ave. #B Fort Knox, KY 40121.

22. On or about August 13, 2025, Affiant conducted physical surveillance at BARKER's residence in coordination with Army CID Special Agent Pasquale Defelice. Affiant observed an adult male matching the physical description of BARKER from both

21

official military records and driver's license records, which also match the physical description of male depicted in the nude images sent by the Kik username "clee7654" to the FBI OCE, exited the front door of the residence. Moreover, a small in stature adult female accompanied BARKER when he exited the residence. The adult female appeared to be of Asian descent with long black hair and matched the description of his spouse Siyuan Zheng. Both BARKER and Zheng were observed walking along the sidewalk in the neighborhood with two small dogs. Approximately 30 to 40 minutes later, the same adult male and female with two small dogs re-entered the residence through the front door.

23.     On or about August 13, 2025, Army CID Investigators provided an updated photograph of BARKER based on current military ID required to enter the base that BARKER had recently updated as of July 2025. The photo matched the description of the adult male observed entering and exiting BARKER's residence.

24.     On or about August 18, 2025, the lease agreement for BARKER's residence was provided to Affiant. The lease agreement listed the primary resident as Van L. BARKER, phone number 321-378-5722. Additional occupants included Siyuan Zheng. No other residents were listed. The lease agreement was with the Knox Hills Community located on Ft. Knox, KY and was for a duration of August 20, 2025, until August 19, 2026.

25.     On December 16, 2025, agents executed a federal search warrant at BARKER's residence. During the search warrant, Affiant interviewed BARKER. BARKER was given his Miranda rights. BARKER indicated that he understood his rights and elected to speak with Affiant.

26.     During the interview, BARKER was shown the private chats that took place on November 23, 2024, between the OCE and the Kik Username "clee7654". BARKER admitted that the Kik Username "clee7654" was his account and that he was the one

communicating. BARKER also admitted to sending an image of his penis and sending the CSAM.

27.     BARKER made the following additional statements during the interview:

a.  BARKER joined several "Kink" or "Taboo" Kik messenger groups and traded (to include saving images/videos to resend to other users) images and videos of young girls between the ages of 11-18. Later BARKER said that in at least one instance he requested content of 8–12-year-old females. On several occasions he had to verify himself to be added to Kik groups by sending CSAM.

b.  BARKER would use various inactive emails that were not set up to create various Kik user accounts with a common naming convention of a first letter and "lee" with an ascending or descending string of 4 numbers after.

c.  BARKER confirmed all user accounts included in the affidavit as his at various points.

d.  BARKER stated he alone has access to these accounts and devices.

e.  BARKER stated he would use VPNs and that provided him a sense of security while online, specifically "Astrill", but was a Spectrum internet customer for approximately 3 years.

f.  BARKER has resided at his current residence for approximately 3 years.

g.  BARKER has not met up with anyone in person, nor does he know of anyone who is actively abusing a minor.

h.  BARKER's preference was "teen violence" "rape" or "cnc" which stands for consensual nonconsensual.

i.  On multiple occasions, BARKER used Paypal to purchase packages or megalinks of CSAM that was advertised as "teen violence" approximately $50 spent per hyperlink or package. Purchases contained at a minimum a couple dozen folders of categorized CSAM of various ages.

j.  All conversations related to hands-on offenses were related to fantasy desires or role play including the OCE conversation listed in the affidavit. BARKER was insistent he would never actively hurt a child.

k.  BARKER started this behavior through his use of voyeurism pornography which led to CNC which introduced him into child porn.

l.  BARKER has lived in both China and Japan as a civilian and as a member of the military.

m.  BARKER just returned from a multiple week trip from China

## CONCLUSION

28.     Based on the aforementioned information, your affiant submits that there is probable cause to believe that in Jefferson County, Kentucky, in the Western District of

23

Kentucky, Van Laurence BARKER, violated Title 18, United States Code, Section 2422(b)

(Attempted Online Enticement of a Minor) and Title 18, United States Code, Section

2252A(a)(2) (Distribution of Child Pornography).

Respectfully submitted,

*/s/ Justin Kiehl*

Justin Kiehl
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me by applicant by telephone per the requirements of Fed. R. Crim. P. 4(d) and 4.1 on this 16th day of December 2025.

HON. REGINA S. EDWARDS
UNITED STATES MAGISTRATE JUDGE

**DMY**

24

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# R

Kennedy Investor Letter

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*



**LIGHTHOUSE
ESTATES**

Everyone,

Since late 2023, our growth has been funded primarily through a combination of hard money and private capital. That capital allowed us to rapidly scale our rental portfolio to approximately $50 million in assets.

The issue we ran into was not deal quality, but timing. Our BRRR strategy became constrained when DSCR takeout financing slowed significantly and underwriting timelines expanded. Properties that were intended to refinance quickly remained unfinished or overleveraged longer than planned.

In mid-2025, we attempted to solve this through institutional DSCR financing via People's Bank, introduced by KPL. While promising, the process was slow and underwriting intensive, and it did not produce liquidity fast enough to meet short-term obligations.

To bridge that gap, a temporary system evolved where KPL and PML loans were effectively recycled internally. Operating costs and debt service were all supported by retained capital being rolled forward into new transactions. That system only works when inflows remain uninterrupted.

Once inflows slowed and leadership disruption occurred, the model became unsustainable. At that point, the problem was no longer growth — it was liquidity and predictability.



The strategy we are implementing now is designed to stop the bleeding and stabilize the business around assets we already own. The core elements are:

- Listing all properties for sale and accepting best offers through January 31 to create immediate liquidity for both KPL and PML
- Selective internal asset sales funded by new private capital
- Loan write-downs from KPL to realistic current values (30—50%)
- Conversion of impaired balances into a documented Global Note
- Centralized servicing of that note through pooled closing costs
- Elimination of capital recycling as an operating necessity

In parallel, KYPL Holdings has been created as a separate entity to park finished and stabilized properties. This allows clean separation between active construction inventory and long-term rental assets.

Beginning in April, a warehouse-style line of credit will be opened at the KYPL Holdings level to temporarily hold finished inventory while DSCR refinancing timelines play out. This removes timing pressure from refinances and prevents unfinished or stabilized assets from becoming liquidity traps.

Taken together, this approach reduces leverage, creates real cash-to-close, restores the ability to service debt consistently, and allows the team to focus on finishing, stabilizing, and refinancing existing properties rather than chasing new acquisitions.

The goal is not to grow. The goal is to survive cleanly, regain predictability, and work our way back to stability over time.


Best regards,

*Joshua Kennedy*

JOSHUA KENNEDY
MEMBER OF LIGHTHOUSE ESTATES

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# S

1941 W 10th Place Gary Personal Guarantee

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

## UNLIMITED PERSONAL GUARANTEE

THIS GUARANTEE dated this **27th** day of February 2025

From: VAN BARKER, JOSHUA KENNEDY, ARIEL MERMELSHTAYN and LIGHTHOUSE ESTATES LLC (jointly and severally known as the "Guarantor" and the "Borrower")
To: SIMAYA INNOVATIONS, LLC (the "Lender")

In consideration of the Lender extending a loan of **ONE HUNDRED FIVE THOUSAND DOLLARS AND 00/100 ($105,000.00)** to the Borrower, the receipt and sufficiency of which is hereby acknowledged, the Guarantor personally guarantees the prompt, full, and complete performance of any and all present and future duties, obligations, and indebtedness (the "Debt") owed to the Lender by the Borrower, including any interest, fees advanced, legal fees, and other costs incurred by the Lender, under the terms of the February 26, 2024 Promissory Note signed by the Borrower (the "Note"), and under the following terms and conditions:

1. **Guarantee of Payment:** The Guarantor unconditionally guarantees the full and prompt payment of the principal, interest, and any other sums owed under the Debt as and when they become due, in accordance with the terms and conditions provided in the Note.
2. **Waiver of Defenses:** To the fullest extent permitted by Indiana law, the Guarantor waives all defenses, counterclaims, or offsets that may be legally available to the Guarantor with respect to the payment of the Debt by the Borrower.
3. **Unlimited Guarantee:** This Personal Guarantee is an unlimited guarantee and is not limited to the amount of the loan or any specific sum.
4. **Non-Dischargeability:** The Guarantor expressly acknowledges and agrees that this Personal Guarantee constitutes a non-dischargeable obligation under any chapter of the United States Bankruptcy Code, to the fullest extent permitted by federal and Indiana law.
5. **Governing Law and Jurisdiction:** This Personal Guarantee shall be construed and governed exclusively by the laws of the State of Indiana. Any disputes arising under this Personal Guarantee shall be brought exclusively in the state or federal courts of Indiana, and the Guarantor hereby submits to the jurisdiction of such courts and waives any objection based on forum non conveniens or venue.
6. **Entire Agreement:** This Personal Guarantee embodies the entire agreement and understanding between the parties with respect to the subject matter herein. It supersedes all prior agreements and understandings, whether written or oral.

This Personal Guarantee shall be construed exclusively in accordance with, and governed by, the laws of the State of Indiana Any dispute arising hereunder may only be brought within the State Courts of the State of Indiana. This Personal Guarantee embodies the entire promise of Guarantor to personally guarantee Borrower's Debt and supersedes all prior agreements and understandings relating to the subject matter here, whether oral or in writing.

## SIGNATURE PAGE TO FOLLOW

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
    Van Barker, Member

By: _____
    Joshua Kennedy, Member

By: _____
    Ariel Mermelshtayn, Member

State of _____IN_____

County of _Vanderburgh_

THE FOREGOING INSTRUMENT was acknowledged before me this _27th_ day of February 2025 by _Joshua Kennedy_, in his/her capacity as member of Lighthouse Estates LLC, personally known to me or have produced his/her _Drivers License_ as identification and represents that he/she is authorized to act on behalf of the company.

_____
Notary Public, State of:

My Commission Expires: _2-4-33_

Donna M Blanchard
Notary Public Seal State of Indiana
Vanderburgh County
Commission Number NP0690154
My Commission Expires 2/4/2033

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
    Van Barker, Member

By: _____
    Joshua Kennedy, Member

By: _____
    Ariel Mermelshtayn, Member

State of ____Kentucky____

County of ____Hardin____

THE FOREGOING INSTRUMENT was acknowledged before me this 27 day of February 2025 by _____Van Barker_____, in his/her capacity as member of Lighthouse Estates LLC, personally known to me or have produced his/her ___Drives License___ as identification and represents that he/she is authorized to act on behalf of the company.

_____
Notary Public, State of: ky

My Commission Expires: ___6-5-2025___

This Unlimited Personal Guarantee is effective as of the date first written above.

By: _____
    Van Barker, Member

By: _____
    Joshua Kennedy, Member

By: _____
    Ariel Mermelshtayn, Member

State of ___Indiana___

County of ___Hamilton___

THE FOREGOING INSTRUMENT was acknowledged before me this 27th day of February 2025 by ___Ariel Mermelshtayn___, in his/her capacity as member of Lighthouse Estates LLC, personally known to me or have produced his/her ___Driver's License___ as identification and represents that he/she is authorized to act on behalf of the company.

MARK ULBRICH
Notary Public- Seal
Marion County - State of Indiana
Commission Number - NPO 685554
My Commission Expires Jan 18, 2033

_____
Notary Public, State of: ___Indiana___

My Commission Expires: ___1/18/2033___

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# T

210 N 26th St Louisville ALTA Settlement Statement

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

| American Land Title Association | ALTA Settlement Statement - Borrower/Buyer<br>Adopted 05-01-2015 |
|---|---|

**DHR Properties LLC dba Perpetual Title**
**ALTA Universal ID:**
**130 St. Matthews Ave.**
**Suite 300**
**Louisville, KY 40207**

**Perpetual Title**

| | |
|---|---|
| File No./Escrow No.: | KY-2025-0266 |
| Print Date & Time: | March 12, 2025 10:37 am |
| Officer/Escrow Officer: | Beau Baustien |
| Settlement Location: | 130 St. Matthews Ave., Suite 300<br>Louisville, KY 40207 |
| Property Address: | 210 N. 26th St<br>Louisville, KY 40212 |
| Borrower: | Lighthouse Estates LLC<br>5720-B Brown Ave<br>Fort Knox, KY 40121-2004 |
| Seller: | Jonathan Bratcher<br>210 N. 26th St<br>Louisville, KY 40212 |
| Lender: | Simaya Innovations LLC & Hidden Gems Ventures LLC |
| Settlement Date : | March 11, 2025 |
| Disbursement Date : | March 11, 2025 |

| Description | Borrower | |
|---|---|---|
| | **Debit** | **Credit** |
| **Financial** | | |
| Sale Price of Property | 10,000.00 | |
| Assignor Concession | | 1,666.66 |
| Assignor Concession | | 1,666.67 |
| Assignor Concession | | 1,666.67 |
| Loan Amount | | 78,000.00 |
| | | |
| **Prorations/Adjustments** | | |
| County Taxes<br>01/01/25-03/11/25 | | 8.81 |
| | | |
| **Title Charges and Escrow/Settlement Charges** | | |
| Lender's Title Insurance to DHR Properties LLC dba Perpetual Title<br>  Coverage:            $78,000.00<br>  Disclosed Premium:       $312.00<br>  Version: 2021 ALTA Loan Policy (07/01/21) | 312.00 | |
| Buyer Closing Fee to DHR Properties LLC dba Perpetual Title | 495.00 | |
| CPL Fee to First American Title Insurance Company | 52.50 | |

Copyright 2015 American Land Title Association
All rights reserved

File # KY-2025-0266/66
Printed on 03/12/25 at 10:37:31 AM by Beau Baustien

| Description | Borrower | |
|---|---|---|
| | Debit | Credit |
| **Title Charges and Escrow/Settlement Charges (continued)** | | |
| Deed Prep to DHR Properties LLC dba Perpetual Title | 225.00 | |
| Insurance Policy Premium Tax to First American Title Insurance Company | 35.30 | |
| Postage/Overnight/Wire Fee to DHR Properties LLC dba Perpetual Title | 45.00 | |
| Seller Closing Fee to DHR Properties LLC dba Perpetual Title | 275.00 | |
| Title Search Fee to DHR Properties LLC dba Perpetual Title<br>    Invoice # DW0266 | 100.00 | |
| Owner's Title Insurance to DHR Properties LLC dba Perpetual Title<br>    Coverage:                        $10,000.00<br>    Disclosed Premium:             $200.00<br>    Version:  2021 ALTA Owner's Policy (07/01/21) | 200.00 | |
| | | |
| **Government Recording and Transfer Charges** | | |
| Recording Fee to Simplifile<br>    Deed | 50.00 | |
| E-Recording Fee Submission Fee to Simplifile<br>    Deed | 5.25 | |
| E-Recording Fee Submission Fee to Simplifile<br>    Mortgage | 5.25 | |
| E-Recording Fee Submission Fee to Simplifile<br>    Affidavit of Descent | 5.25 | |
| Recording Fee to Simplifile<br>    Mortgage | 80.00 | |
| Recording Fee to Simplifile<br>    Affidavit of Descent | 50.00 | |
| | | |
| **Miscellaneous** | | |
| Assignment Fee to Next Level Investors LLC | 7,666.67 | |
| Assignment Fee to Hayli Compton | 9,666.67 | |
| Assignment Fee to Maddox Home LLC | 23,666.66 | |
| Document Prep to Cummins Law Office, PLLC<br>    Affidavit of Descent | 100.00 | |
| PML - TC Services to Hidden Gems TC Services | 1,500.00 | |
| Remote Notary Fee (Buyer) to Notarized | 525.00 | |
| | **Debit** | **Credit** |
| **Subtotals** | 55,060.55 | 83,008.81 |
| **Due to Borrower** | 27,948.26 | |
| **Totals** | 83,008.81 | 83,008.81 |

Copyright 2015 American Land Title Association
All rights reserved

File # KY-2025-0266/66
Printed on 03/12/25 at 10:37:31 AM by Beau Baustien

**Tkac, et al. v. Lighthouse Estates LLC, et al.**

*Class Action Complaint*

# EXHIBIT

# U

3110 Prairie Ave St Louis ALTA Settlement Statement

Loftus & Eisenberg, Ltd.
*181 W. Madison St., Suite 4700, Chicago, IL 60602*

Docusign Envelope ID: 5C13A799-FD66-4D78-B6DB-4CE20EA94CD2

American Land Title Association

ALTA Settlement Statement - Borrower/Buyer
Adopted 05-01-2015

**Community Title Services, LLC**
**ALTA Universal ID**
**2112 Schuetz Road**
**Saint Louis, MO 63146**

| | |
|---|---|
| **File No./Escrow No.:** | CTS16860 |
| **Print Date & Time:** | May 6, 2025 at 04:15·PM |
| **Officer/Escrow Officer:** | Ashlyn Boyer |
| **Settlement Location:** | 2112 Schuetz Rd., St. Louis, MO 63146 |
| | |
| **Property Address:** | 3110 N. Prairie Avenue Saint Louis, MO 63107 |
| | |
| **Borrower:** | Lighthouse Estates LLC |
| **Seller:** | Phillip Green |
| **Lender:** | Simaya Innovations, LLC |
| **Settlement Date:** | May 7, 2025 |
| **Disbursement Date:** | May 7, 2025 |

| Description | Borrower/Buyer Debit | Borrower/Buyer Credit |
|---|---|---|
| **Financial** | | |
| Sale Price of Property | $ 18,100.00 | |
| Loan Amount | | $ 100,000.00 |
| **Prorations/Adjustments** | | |
| Sewer Lateral Line 05/08/25 to 01/01/26 | $ 18.26 | |
| Water Prorations 05/08/25-06/01/25 | $ 43.19 | |
| City/Town Taxes 01/01/25 to 05/08/25 | | $ 97.79 |
| **Loan Charges to Simaya Innovations, LLC** | | |
| **Other Loan Charges** | | |
| **Impounds** | | |
| **Title Charges & Escrow / Settlement Charges** | | |
| Title - Lender's Title Insurance to  Community Title Services, LLC | $ 75.90 | |
| Coverage:    $ 100,000.00 Premium:      $ 75.90 | | |

Copyright 2015 American Land Title Association

(CTS16860.PFD/CTS16860/34)

Docusign Envelope ID: 5C13A799-FD66-4D78-B6DB-4CE20EA94CD2

ALTA Settlement Statement Borrower/Buyer - Continued

| | | Debit | Credit |
|---|---|---|---|
| Title - Owner's Title Insurance (optional)<br>to Community Title Services, LLC<br>Coverage:  $ 18,100.00<br>Premium:   $ 25.34 | | $ 25.34 | |
| Title-Closing Fee | to Community Title Services, LLC | $ 690.00 | |
| Title-CPL Fee | to Westcor Land Title Insurance Company | $ 50.00 | |
| Title-Delivery and Handling Fee | to Community Title Services, LLC | $ 235.00 | |
| Title-Recording Service Fee | to St. Louis City Recorder | $ 15.00 | |
| Title-Search & Exam Fee | to Community Title Services, LLC | $ 800.00 | |
| Title-Mobile Closing Fee | to First Class Signing | $ 525.00 | |
| Title- Overnight Labels | to Community Title Services, LLC | $ 185.00 | |
| Title-Processing Fee | to Community Title Services, LLC | $ 150.00 | |
| Title- Affidavit | to Community Title Services, LLC | $ 80.00 | |

**Government Recording and Transfer Charges**

| | | | |
|---|---|---|---|
| Recording Fees<br>Deed:$71.00 Mortgage:$88.00 | to St. Louis City Recorder | $ 159.00 | |

**Payoffs**

**Miscellaneous**

| | | | |
|---|---|---|---|
| TC Services | to Hidden Gems TC Services | $ 1,500.00 | |
| Assignment Fee | to T& K Corporations, LLC | $ 8,700.00 | |
| Assignment Fee | to Clear Path Keys, LLC | $ 8,700.00 | |
| Assignment Fee | to LABB, LLC | $ 5,600.00 | |
| Sewer Bill | to MSD | $ 3,900.00 | |

| | | Debit | Credit |
|---|---|---|---|
| **Subtotals** | | $ 49,551.69 | $ 100,097.79 |
| **Balance Due TO** | | $ 50,546.10 | |
| **TOTALS** | | $ 100,097.79 | $ 100,097.79 |

Title insurance premium and a closing protection fee have been calculated according to rates filed with the Missouri Department of Commerce and Insurance. However, title service charges, closing charges, and other fees are not limited by state law.

For further general information regarding title insurance, you may visit the Missouri Insurance website at www.insurance.mo.gov, or call the Missouri Department of Commerce and Insurance at (800) 726-7390.

**Acknowledgement**

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Community Title Services, LLC to cause the funds to be disbursed in accordance with this statement.

Lighthouse Estates LLC:

Copyright 2015 American Land Title Association

(CTS16860.PFD/CTS16860/34)

Docusign Envelope ID: 5C13A799-FD66-4D78-B6DB-4CE20EA94CD2

ALTA Settlement Statement Borrower/Buyer - Continued

Debit          Credit

Signed by:

BY: Van Barker
DB1C8A4B4F5343A

Van Barker, Member

Signed by:

By: Josh kennedy
FB8CF64C68C24A8

Joshua Kennedy, Member

Signed by:

By: Ariel Barker
C47BAECDC8FA4D1

Ariel Mermelshtayn nka Ariel Barker, Member

Ashlyn Boyer, Escrow Officer

Copyright 2015 American Land Title Association                    (CTS16860.PFD/CTS16860/34)